138 P.3d 963 (2006)
Heather ANDERSEN and Leslie Christian; Peter Ilgenfritz and David Shull; Johanna Bender and Sherri Kokx; Janet Helson and Betty Lundquist; David Serkin-Poole and Michael Serkin-Poole; Vegavahini Subramaniam and Vaijayanthimala Nagarajan; Elizabeth Reis and Barbara Steele; and Michelle Esguerra; and Boo Torres De Esguera, Respondents,
v.
KING COUNTY; Ron Sims, King County Executive; and Dean Logan, King County Director of Records, Elections and Licensing Services Division, Appellants,
State of Washington, Appellant,
Senator Val Stevens; Representative Gigi Talcott; Coalition for Community Development and Renewal; Nuwanda Adams; Tracey Armstrong; Gerald Baker; Richard Blair; Ed Cook; Rick Danner, Sr.; Bill Demps; Harvey Drake; George Frost; Elvin Gladney; Aaron Haskins; Rick Kingham; Samuel K. Law; Jimmie W. Lee; Dan Magalei; *964 Dana McClendon; Tony Morris; Nate Mullen; Paul Olver; Joseph Phillips; David Pierson; John Penton; Kenneth J. Ransfer, Sr; Willie C. Seals, Jr.; Paul Stoot; Washington Talaga; Daniel Villa; David Wallace; Thomas L. Westbrook; Doug Wheeler; Earnest Williams; Reggie Witherspoon; Nathaniel Wolf; Grant Zweigle; and Washington Evangelicals for Responsible Government, Appellants/Intervenors.
Celia Castle and Brenda Bauer; Pamela Coffey and Valere Tibbett; Gary Murell and Michael Gyde; Christina Gamache and Judith Fleissner Kevin Chestnut and Curtis Crawford; Jeff Kingsbury and Alan Fuller; Lauri Conner and Leja Wright; Allan Henderson and John Berquist; Marge Ballack and Diane Lantz; Tom Duke and Phuoc Lam; and Kathy and Karrie Cunningham, Respondents,
v.
State of Washington, Appellant.
No. 75934-1, 75956-1.
Supreme Court of Washington, En Banc.
Argued March 8, 2005.
Decided July 26, 2006.
*967 Steven T. O'Ban, Kristen Kellie Waggoner, Ellis Li & McKinstry PLLC, Seattle, Darren E. Carnell, Janine Elizabeth Joly, King County Pros Attorney, Seattle, William Berggren Collins, Attorney at Law, Highways Licenses Bldg Olympia, Kristofer John Bundy, King County Admin Bldg, Seattle, for Petitioner/Appellants.
Jennifer Suzanne Divine, Bradley H. Bagshaw, Helsell Fetterman LLP, Seattle, Patricia S. Novotny, Attorney at Law, Seattle, Nancy Lynn Sapiro, Lisa Marie Stone, Northwest Women's Law Center, Seattle, Jamie D. Pedersen, Matthew J. Segal, Paul J. Lawrence, Preston Gates & Ellis LLP, Seattle, Aaron Hugh Caplan, Attorney at Law, ACLU of Washington, Seattle, Roger Ashley Leishman, Davis Wright Tremaine, Seattle, Karolyn Ann Hicks, Stokes Lawrence PS, Seattle, for Appellee/Respondents.
Kathleen Phair Barnard, Seattle, for Amicus Curiae American Federation of Teachers et al.
Salvador Alejo Mungia, II, Gordon Thomas Honeywell, Tacoma, Colin Jeffrey Folawn, Schwabe Williamson & Wyatt, Seattle, for Amicus Curiae American Psychological Ass'n.
Breean Lawrence Beggs, Center for Justice, Spokane, for Amicus Curiae Children's Rights Organizations.
Robert A. Free, Kathleen A. Wareham, Ester Frances Greenfield, Seattle, for Amicus Curiae Compassion in Dying of Washington, et al.
Theresa Ann Schrempp, Sonkin & Schrempp PLLC, Bellevue, David Knox Dewolf, Gonzaga School of Law, Spokane, for Amicus Curiae Concerned Women for America.
Joshua K. Baker, Washington DC, Lincoln J. Miller, Roger D. Sherrard, Sherrard & McGonagle, Poulsbo, for Amicus Curiae Families Northwest.
P. Craig Beetham, Eisenhower & Carlson, Tacoma, for Amicus Curiae Family Law Practitioners.
Todd Michael Nelson, Ferring Nelson, LLP, Seattle, David R. Langdon, Langdon & Shafer, LLC, Cincinnati, Oh, for Amicus Curiae Family Research Council.
Nancy Dykes Isserlis, Winston & Cashatt, PS, Spokane, for Amicus Curiae Greater Seattle Business Ass'n.
Michael Richard Wrenn, Matthew Aaron Carvalho, Molly A. Terwilliger, Andrew Kamins, Heller Ehrman, LLP, Seattle, for Amicus Curiae History Scholars.
Nancy Dikes Isserlis, Winston & Cashatt, PS, Spokane, for Amicus Curiae, Inland Northwest Business Alliance.
Michael Richard Heath, Cairncross & Hempelmann PS, Seattle, for Amicus Curiae Legal Marriage Alliance of Washington et al.
Suzanne J. Thomas, Law Offices of Suzanne J. Thomas, PS, Seattle, for Amicus Curiae Libertarian Party of Washington State.
Suzanne J. Thomas, Law Offices of Suzanne J. Thomas, PS, Seattle, for Amicus Curiae Log Cabin Republicans of Washington.
Karen M. McGaffey, Amanda J. Beane, Melissa Robertson, Kirstin S. Dodge, Perkins Coie LLC, Seattle, for Amicus Curiae Loren Miller Bar Ass'n et al.
Monte N. Stewart, William C. Duncan, Marriage Law Foundation, Provo, Ut, Don Edward Powell, Richland, for Amicus Curiae Marriage Law Foundation.
David L. Donnan, Washington Appellate Project, Vanessa Soriano Power, Stoel Rives LLP, Seattle, for Amicus Curiae Multifaith Works Religious Coalition for Equality et al.
*968 Lindsay Taylor Thompson, Thompson Gipe, PC, Seattle, for Amicus Curiae Pride Foundation et al.
Lisa Ellen Brodoff, Seattle University Peterson Law Clinic, Seattle, for Amicus Curiae Senior Services of Seattle/King County.
Lisa Ellen Brodoff, Seattle University Peterson Law Clinic, Seattle, for Amicus Curiae Services & Advocacy for Gay Lesbian et al.
Hugh Davidson Spitzer, Foster Pepper PLLC, Seattle, for Amicus Curiae State Legislators, Representatives, and Senators.
Kenneth Duane VanDerhoef, Seattle, Richard G. Wilkins, Provo, UT, Paul Benjamin Linton, Northbrook, ILL, for Amicus Curiae, United Families International.
Salvador Alejo Mungia, II, Gordon Thomas Honeywell, Tacoma, Colin Jeffrey Folawn, Schwabe Williamson & Wyatt, Seattle, for Amicus Curiae Washington State Psychological Ass'n.
Beth A. Bloom, Frank Freed Subit & Thomas, Seattle, Ellizabeth L. Rosenblatt, Douglas NeJaime, Irell & Manella, LLP, Los Angeles, Jennifer K. Brown, Deborah A. Widiss, Legal Momentum, New York, NY, for Amicus Curiae Women's Organizations.
MADSEN, J.
ś 1 The trial courts in these consolidated cases held that the provisions of Washington's 1998 Defense of Marriage Act (DOMA) that prohibit same-sex marriages are facially unconstitutional under the privileges and immunities and due process clauses of the Washington State Constitution. King County and the State of Washington have appealed. The plaintiffs-respondents, gay and lesbian couples, renew their constitutional arguments made to the trial courts, including a claim that DOMA violates the Equal Rights Amendment.
ś 2 The two cases before us require us to decide whether the legislature has the power to limit marriage in Washington State to opposite-sex couples. The state constitution and controlling case law compel us to answer "yes," and we therefore reverse the trial courts.
ś 3 In reaching this conclusion, we have engaged in an exhaustive constitutional inquiry and have deferred to the legislative branch as required by our tri-partite form of government. Our decision accords with the substantial weight of authority from courts considering similar constitutional claims. We see no reason, however, why the legislature or the people acting through the initiative process would be foreclosed from extending the right to marry to gay and lesbian couples in Washington.
ś 4 It is important to note that the court's role is limited to determining the constitutionality of DOMA and that our decision is not based on an independent determination of what we believe the law should be. United States Supreme Court Justice John Paul Stevens talked about the court's role when he described several noteworthy opinions he had written or joined while "convinced that the law compelled a result that [he] would have opposed if [he] were a legislator." John Paul Stevens, United States Supreme Court Justice, Judicial Predilections, Address to the Clark County Bar Association, Las Vegas, Nev. 2 (Aug. 18, 2005). As Justice Stevens explained, a judge's understanding of the law is a separate and distinct matter from his or her personal views about sound policy. Id. at 17.
ś 5 A judge's role when deciding a case, including the present one, is to measure the challenged law against the constitution and the cases that have applied the constitution. Personal views must not interfere with the judge's responsibility to decide cases as a judge and not as a legislator. This, after all, is one of the three legs supporting the rule of law. Here, the solid body of constitutional law disfavors the conclusion that there is a right to marry a person of the same sex. It may be a measure of this fact that Justice Fairhurst's dissent is replete with citation to dissenting and concurring opinions, and that, in the end, it cites very little case law that, without being overstated, supports its conclusions.
ś 6 Perhaps because of the nature of the issue in this case and the strong feelings it brings to the front, some members of the court have uncharacteristically been led to *969 depart significantly from the court's limited role when deciding constitutional challenges. For example, Justice Fairhurst's dissent declines to apply settled principles for reviewing the legislature's acts and instead decides for itself what the public policy of this state should be. Justice Bridge's dissent claims that gay marriage will ultimately be on the books and that this court will be criticized for having failed to overturn DOMA. But, while same-sex marriage may be the law at a future time, it will be because the people declare it to be, not because five members of this court have dictated it.[1] Justice J.M. Johnson's concurrence, like Justice Fairhurst's dissent, also ignores the proper standards for reviewing legislation. And readers unfamiliar with appellate court review may not realize the extent to which this concurrence departs from customary procedures because, among other things, it merely repeats the result and much of the reasoning of the court's decision on most issues, thus adding unnecessarily to the length of the opinions.
ś 7 In brief, unless a law is a grant of positive favoritism to a minority class, we apply the same constitutional analysis under the state constitution's privileges and immunities clause that is applied under the federal constitution's equal protection clause. DOMA does not grant a privilege or immunity to a favored minority class, and we accordingly apply the federal analysis. The plaintiffs have not established that they are members of a suspect class or that they have a fundamental right to marriage that includes the right to marry a person of the same sex. Therefore, we apply the highly deferential rational basis standard of review to the legislature's decision that only opposite-sex couples are entitled to civil marriage in this state. Under this standard, DOMA is constitutional because the legislature was entitled to believe that limiting marriage to opposite-sex couples furthers procreation, essential to survival of the human race, and furthers the well-being of children by encouraging families where children are reared in homes headed by the children's biological parents. Allowing same-sex couples to marry does not, in the legislature's view, further these purposes.[2] Accordingly, there is no violation of the privileges and immunities clause.
ś 8 There also is no violation of the state due process clause. DOMA bears a reasonable relationship to legitimate state interestsâ procreation and child-rearing. Nor do we find DOMA invalid as a violation of privacy interests protected by article I, section 7 of the Washington State Constitution. The people of Washington have not had in the past nor, at this time, are they entitled to an expectation that they may choose to marry a person of the same sex.
ś 9 Finally, DOMA does not violate the state constitution's equal rights amendment because that provision prohibits laws that render benefits to or restrict or deny rights of one sex. DOMA treats both sexes the same; neither a man nor a woman may marry a person of the same sex.

FACTS
ś 10 In 1996, while a state constitutional challenge to same-sex marriage was pending in Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44, reconsideration granted in part, 74 Haw. 650, 875 P.2d 225 (1993), Congress enacted the federal Defense of Marriage Act, Pub.L. No. 104-199, 110 Stat. 2419 (1996), which *970 provides that for purposes of all federal laws marriage means only a legal union between a man and a woman as husband and wife. 1 U.S.C. § 7. The act also authorizes states to decline to recognize same-sex marriages that may be valid under the law of another state. 28 U.S.C. § 1738C. In 1998, Washington adopted the state Defense of Marriage Act (DOMA). Laws of 1998, ch. 1. DOMA amended RCW 26.04.010 to describe marriage as a civil contract that is valid only if "between a male and a female" and to provide in RCW 26.04.020(1)(c) that a marriage contract is prohibited for couples "other than a male and a female." In addition, RCW 26.04.020(3) states that "[a] marriage between two persons that is recognized as valid in another jurisdiction is valid in this state only if the marriage is not prohibited or made unlawful under subsection ... (1)(c) . . . of this section."
ś 11 In Andersen v. King County, 2004 WL 1738447, sixteen individuals, eight couples, sought marriage licenses from King County. Their requests were denied because each sought to marry a person of the same sex. They filed suit in King County Superior Court seeking a writ of mandamus requiring issuance of marriage licenses and a declaratory judgment that RCW 26.04.010 and RCW 26.04.020(1)(c) are unconstitutional. They claimed that the prohibition against same-sex marriage violates article I, section 12 (the privileges and immunities clause of the state constitution), article I, section 3 (the due process clause of the state constitution), and article XXXI, section 1 (the 1972 Equal Rights Amendment (ERA) to the state constitution). The county filed a third party complaint against the State of Washington asking it to defend the state law. The court allowed intervention by two state legislators and other individuals and organizations seeking to defend DOMA (Intervenors). The parties moved for summary judgment. The trial court granted summary judgment in favor of plaintiffs. In light of significant authority to the contrary, the trial court declined to find that plaintiffs constitute a suspect class as claimed. The court also found no ERA violation because in Singer v. Hara, 11 Wash.App. 247, 522 P.2d 1187 (1974) the Court of Appeals held that denial of same-sex marriage does not violate the ERA. Relying on federal cases interpreting the federal constitution, the trial court held DOMA unconstitutional under the privileges and immunities and due process clauses of the state constitution on the basis that it denies the plaintiffs the fundamental right to marry. The parties agreed to a stay pending review by this court, and therefore the trial court did not enter an order directing any specific remedy. The court certified the matter under CR 54(b) for immediate appeal. The State, county, and Intervenors petitioned for direct review, which this court granted.
ś 12 In Castle v. State, plaintiffs are 22 individuals, 11 gay and lesbian couples, some who want to marry a person of the same sex and some who were married elsewhere and want to have their marriages recognized in Washington. They filed suit against the State of Washington in Thurston County Superior Court seeking a declaratory judgment that RCW 26.04.010 and RCW 26.04.020(1)(c) are facially unconstitutional under the state constitution's privileges and immunities and due process clauses, and that DOMA violates the ERA. The Thurston County Superior Court concluded it was bound by Singer on the ERA claim but determined under an independent state constitutional analysis that plaintiffs constitute a suspect class and that plaintiffs' fundamental right to marry is at stake. Applying heightened scrutiny, the court concluded that DOMA violates the privileges and immunities clause of the state constitution. In light of this holding, the court did not reach substantive due process and right to privacy claims asserted by the plaintiffs, nor did it address any federal constitutional issues. The court granted the plaintiffs' motion for summary judgment. Its order was stayed pending further review. The State sought direct review by this court, which was granted. Castle was consolidated with Andersen.[3]

*971 ANALYSIS
ś 13 These cases are here following grants of summary judgment. Review of a grant of summary judgment is de novo. Bank of Am. v. David W. Hubert, P.C., 153 Wash.2d 102, 111, 101 P.3d 409 (2004). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Further, de novo review is proper where, as here, the issues presented are questions of law. Labriola v. Pollard Gp., Inc., 152 Wash.2d 828, 832, 100 P.3d 791 (2004).

The Privileges and Immunities Clause
ś 14 Article I, section 12 provides that "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."
ś 15 The State maintains that the Thurston County Superior Court erroneously formulated and applied an independent constitutional analysis when deciding whether DOMA violates the privileges and immunities clause. Relying on Grant County Fire Protection District v. City of Moses Lake, 150 Wash.2d 791, 83 P.3d 419 (2004) (Grant County II), the State argues that the only cases where the privileges and immunities clause provides broader protection than the equal protection clause are cases involving a grant of positive favoritism to minorities. In all other cases, the State urges, the privileges and immunities clause provides the same protection and should be applied using the same analysis as the equal protection clause.
ś 16 Until Grant County II no recent decision, and none applying Gunwall,[4] had applied or described circumstances under which a separate independent state analysis might apply under the state privileges and immunities clause. In Grant County II we determined that an independent analysis applies only where the challenged legislation grants a privilege or immunity to a minority class, that is, in the case of a grant of positive favoritism.
ś 17 As we explained in Grant County II, the text of the federal constitution shows concern with "majoritarian threats of invidious discrimination against nonmajorities," while the state provision "protects as well against laws serving the interest of special classes of citizens to the detriment of the interests of all citizens." Grant County II, 150 Wash.2d at 806-07, 83 P.3d 419. We recognized our framers' "concern with avoiding favoritism" to a select group and that this "clearly differs from the main goal of the equal protection clause, which was primarily concerned with preventing discrimination against former slaves." Grant County II, 150 Wash.2d at 808, 83 P.3d 419 (citing Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 81, 21 L.Ed. 394 (1872)).
ś 18 We quoted with approval the concurrence in State v. Smith, 117 Wash.2d 263, 283, 814 P.2d 652 (1991) (Utter, J., concurring):
"Enacted after the Fourteenth Amendment, state privileges and immunities clauses were intended to prevent people from seeking certain privileges or benefits to the disadvantage of others. The concern was prevention of favoritism and special treatment for a few, rather than prevention of discrimination against disfavored individuals or groups."
Grant County II, 150 Wash.2d at 809, 83 P.3d 419 (emphasis added). "[T]he historical context as well as the linguistic differences indicates that the Washington State provision requires independent analysis from the federal provision when the issue concerns favoritism." Grant County II, 150 Wash.2d at 809, 83 P.3d 419.
*972 ś 19 We also observed in Grant County II that early state cases interpreting article I, section 12 "focused on the award of special privileges rather than the denial of equal protection." Grant County II, 150 Wash.2d at 810, 83 P.3d 419.
"The aim and purpose of the special privileges and immunities provision of Art. I, § 12, of the state constitution and of the equal protection clause of the fourteenth amendment of the Federal constitution is to secure equality of treatment of all persons, without undue favor on the one hand or hostile discrimination on the other."
Grant County II, 150 Wash.2d at 810, 83 P.3d 419 (quoting State ex rel. Bacich v. Huse, 187 Wash. 75, 80, 59 P.2d 1101 (1936), overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos, 92 Wash.2d 939, 603 P.2d 819 (1979)). Thus, article I, section 12 has been historically viewed as securing equality of treatment by prohibiting undue favor, while the equal protection clause has been viewed as securing equality of treatment by prohibiting hostile discrimination.
ś 20 We explained in Grant County II that the Washington provision was modeled after article I, section 20 of the Oregon State Constitution, which the Oregon Supreme Court has described as "`"the antithesis of the fourteenth amendment in that [the Oregon state constitution] prevent[s] the enlargement of the rights of some in discrimination against the rights of others, while the fourteenth amendment prevents the curtailment of rights."'" Grant County II, 150 Wash.2d at 807 n. 11, 83 P.3d 419 (quoting State v. Clark, 291 Or. 231, 236 n. 8, 630 P.2d 810 (1981) (quoting State v. Savage, 96 Or. 53, 59, 184 P. 567 (1919))).
ś 21 While derived from Oregon's provision, however, Washington's privileges and immunities clause is not identical to Oregon's. Article I, section 12's reference to corporations is not found in the Oregon provision. This difference in language shows our state's framers' concern with "undue political influence exercised by those with large concentrations of wealth, which they feared more than they feared oppression by the majority." Grant County II, 150 Wash.2d at 808, 83 P.3d 419 (citing Brian Snure, Comment, A Frequent Recurrence to Fundamental Principles: Individual Rights, Free Government, and the Washington State Constitution, 67 WASH. L. REV. 669, 671-72 (1992); Jonathan Thompson, The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection" Review of Regulatory Legislation?, 69 TEMP. L. REV. 1247, 1253 (1996)).
ś 22 Moreover, Washington's constitution was adopted over two decades after the Oregon State Constitution and in the interim important events occurred. First, the Fourteenth Amendment was adopted, providing federal constitutional protection from discrimination under state laws. Second, legislative abuses were rampant â the territorial legislature reportedly passed few laws in 1862-63 but enacted numerous pieces of special legislation; governors were criticized for abusing patronage power; there was criticism of the judiciary due to "absentee judges, political manipulations, and the lack of local control over appointments"; and the "presence of powerful corporations in Washington was often at the root of the governmental corruption." Snure, 67 WASH. L. REV. at 671. The history underlying our privileges and immunities clause is not the same as Oregon's.
ś 23 Accordingly, although plaintiffs urge that we apply an independent state analysis under article I, section 12 like Oregon's independent analysis in every context, we decline to do so because our state provision has different language and a different history.
ś 24 As we concluded in Grant County II, the concern underlying the state privileges and immunities clause, unlike that of the equal protection clause, is undue favoritism, not discrimination, and the concern about favoritism arises where a privilege or immunity is granted to a minority class ("a few"). Therefore, an independent state analysis is not appropriate unless the challenged law is a grant of positive favoritism to a minority class. In other cases, we will apply the same analysis that applies under the federal equal protection clause.
*973 ś 25 Plaintiffs argue, however, that adoption of the ERA alters the Gunwall analysis for article I, section 12. The Thurston County Superior Court agreed. Gunwall states that "[e]ven where parallel provisions of the two constitutions do not have meaningful differences, other relevant provisions of the state constitution may require that the state constitution be interpreted differently." Gunwall, 106 Wash.2d at 61, 720 P.2d 808.
ś 26 The ERA provides: "Equality of rights and responsibilities under the law shall not be denied or abridged on account of sex." Const. art. XXXI, § 1. Prior to the ERA, this court had held that a statute disqualifying pregnant women from unemployment insurance benefits discriminated against women based on sex. The court concluded that a classification based on sex is inherently suspect and must be subject to strict scrutiny. Hanson v. Hutt, 83 Wash.2d 195, 201, 517 P.2d 599 (1973) (superseded by the ERA). Following adoption of the ERA, the court held unconstitutional a statute that prohibited a father of a child born out of wedlock from joining a wrongful death action if he had failed to contribute to the support of the child. Guard v. Jackson, 132 Wash.2d 660, 940 P.2d 642 (1997). The court described Hanson and the strict scrutiny standard applied there. The court then opined that the voters adopting the ERA presumably intended to do more than repeat existing constitutional provisions. Guard, 132 Wash.2d at 663-64, 940 P.2d 642. Accordingly, the court found that the ERA establishes an absolute bar to sex discrimination subject to few exceptions (for actual physical differences and affirmative action programs designed to eliminate past discrimination). Guard, 132 Wash.2d at 664, 940 P.2d 642.
ś 27 Plaintiffs urge, and the trial court agreed, that Guard demonstrates that adoption of the ERA supports the view that the constitution as a whole calls for a broader interpretation of individual rights under the privileges and immunities clause than does the equal protection clause, and that a higher level of scrutiny is required. See Castle v. State, No. 04-2-00614-4, 2004 WL 1985215, *8 (Thurston County Super. Ct. Sept. 7, 2004).
ś 28 The argument is flawed, however. First, this court said in Hanson that the privileges and immunities clause and the equal protection clause are "substantially identical in their impact upon state legislation." Hanson, 83 Wash.2d at 200, 517 P.2d 599. Thus, it is obvious that there was no independent state analysis in Hanson that could have been modified by Guard. Second, and more importantly, Guard was decided solely under the ERA and contains no analysis or holding under the privileges and immunities clause. Guard simply does not indicate any broader protection for individual rights under the privileges and immunities clause than had existed before adoption of the ERA. Third, as Guard indicates, the ERA was intended by the voters to stand independent of other provisions, not simply to repeat protections of existing provisions. The ERA does not alter protections afforded under the privileges and immunities clause.
ś 29 We adhere to our holding in Grant County II that an independent state analysis applies under article I, section 12 only where the challenged law grants a privilege or immunity to a minority class, i.e., in the event of positive favoritism. DOMA does not involve the grant of a privilege or immunity to a favored minority class. Instead, the article I, section 12 issue is whether plaintiffs are discriminated against as members of a minority class. Accordingly, we apply the same constitutional analysis that applies under the equal protection clause of the United States Constitution.
ś 30 The level of scrutiny to be applied under an equal protection analysis depends on whether a suspect or semisuspect classification has been drawn or a fundamental right is implicated; if neither is involved, rational basis review is appropriate. Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); State v. Harner, 153 Wash.2d 228, 236, 103 P.3d 738, 742 (2004). Plaintiffs maintain they are members of a suspect class.[5]

*974 Suspect Class
ś 31 To qualify as a suspect class for purposes of an equal protection analysis, the class must have suffered a history of discrimination, have as the characteristic defining the class an obvious, immutable trait that frequently bears no relation to ability to perform or contribute to society, and show that it is a minority or politically powerless class. Hanson, 83 Wash.2d at 199, 517 P.2d 599; City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440-41, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); High Tech Gays v. Def. Indus. Sec. Clearance Office, 895 F.2d 563 (9th Cir.1990). Race, alienage, and national origin are examples of suspect classifications. City of Cleburne, 473 U.S. at 440, 105 S.Ct. 3249. Suspect classifications require heightened scrutiny because the defining characteristic of the class is "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy â a view that those in the burdened class are not as worthy or deserving as others." Id. There is no dispute that gay and lesbian persons have been discriminated against in the past.
ś 32 The parties dispute whether homosexuality is immutable. The State relies on the decision in High Tech Gays that homosexuality is behavioral, and thus not immutable. The plaintiffs counter that the Ninth Circuit has since "corrected" High Tech Gays and held that gay and lesbian persons constitute a suspect class. They rely on Hernandez-Montiel v. Immigration & Naturalization Serv., 225 F.3d 1084 (9th Cir.2000), overruled in part on other grounds by Thomas v. Gonzales, 409 F.3d 1177 (9th Cir.2005), where the court determined that asylum should be granted to an immigration applicant, reasoning among other things that as a gay man with a female sexual identity the applicant had a well-grounded fear of persecution as a member of a particular social group. The court concluded the applicant was a member of a particular social group because "[s]exual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them." Id. at 1093. This conclusion was drawn from other immigration cases and secondary authority.
ś 33 Notwithstanding Hernandez-Montiel, the Ninth Circuit has since referenced High Tech Gays for its holding that gay and lesbian persons do not constitute a suspect class. Flores v. Morgan Hill Unified Sch. Dist., 324 F.3d 1130, 1137 (9th Cir.2003) (citing High Tech Gays).
ś 34 The plaintiffs do not cite other authority or any secondary authority or studies in support of the conclusion that homosexuality is an immutable characteristic. They focus instead on the lack of any relation between homosexuality and ability to perform or contribute to society. But plaintiffs must make a showing of immutability, and they have not done so in this case.[6]
ś 35 Finally, with regard to the ability to obtain redress through the legislative process (the political powerless prong), several state statutes and municipal codes provide protection against discrimination based on sexual orientation and also provide economic benefit for same sex couples.[7] Recently, the legislature amended the Washington State Law Against Discrimination to prohibit discrimination on the basis of sexual orientation. Engrossed Substitute H.B. 2661, 59th Leg., Reg. Sess. (Wash.2006). In addition, the Intervenors point to evidence that a number of openly gay candidates were elected to national, state, and local offices in 2004.
ś 36 The enactment of provisions providing increased protections to gay and lesbian individuals *975 in Washington shows that as a class gay and lesbian persons are not powerless but, instead, exercise increasing political power. Indeed, the recent passage of the amendments to chapter 49.60 RCW is particularly significant given that, as the plaintiffs point out, the legislature had previously declined on numerous occasions to add sexual orientation to the laws against discrimination. We conclude that plaintiffs have not established that they satisfy the third prong of the suspect classification test.
ś 37 Our conclusion here, that plaintiffs have not established that they are members of a suspect class, accords with the decisions of the overwhelming majority of courts, which find that gay and lesbian persons do not constitute a suspect class. See Lofton v. Sec'y of the Dep't of Children & Family Servs., 358 F.3d 804, 818, 818 n. 4 (11th Cir.2004), cert. denied, 543 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005) (concluding that gay and lesbian persons are not a suspect class and citing cases from the 4th, 5th, 6th, 7th, 9th, and 10th Circuits that have reached the same conclusion). The Second and Eighth Circuits have reached the same conclusion. Able v. United States, 155 F.3d 628, 632 (2d Cir.1998); Richenberg v. Perry, 97 F.3d 256, 260 (8th Cir.1996). The Court of Appeals held in Singer, 11 Wash.App. 247, 522 P.2d 1187, that gay and lesbian persons do not constitute a suspect class. And even two state courts deciding that same-sex couples have a right to a civil union or marriage did not find a suspect class. Baker v. State, 170 Vt. 194, 744 A.2d 864 (1999) (under the state constitution's common benefits clause, plaintiffs seeking same-sex marriage are entitled to benefits and obligations like those accompanying marriage); Goodridge v. Dep't of Pub. Health, 440 Mass. 309, 798 N.E.2d 941 (2003) (denial of civil marriage to same-sex couples violates state equal protection principles). And, while the plaintiffs cite cases they say hold that gay and lesbian persons constitute a suspect class, most do not support the proposition or are otherwise distinguishable. In Tanner v. Oregon Health Sciences University, 157 Or.App. 502, 971 P.2d 435 (1998), the court applied an independent analysis under Oregon's privileges and, immunities clause and concluded that gay and lesbian persons constitute a suspect class. The analysis bears little resemblance to the analysis that applies under the equal protection clause. They cite Li v. State of Oregon, No. 0403-03057 (Multnomah County Circuit Ct.2004). But this trial court decision was reversed by the Oregon Supreme Court. Li v. State, 338 Or. 376, 110 P.3d 91 (2005). Children's Hosp. & Med. Ctr. v. Bonta, 97 Cal.App.4th 740, 769, 118 Cal.Rptr.2d 629 (2002) does not concern any issue involving gay and lesbian persons, and says only in passing, without authority, that the issue before it did not relate to a suspect class "such as race or sexual orientation." Baehr, 74 Haw. 530, 852 P.2d 44, has a lead opinion signed by two justices who concluded that gay and lesbian persons constitute a sex-based suspect class, a concurring opinion of one justice who concluded that a fact question existed as to whether homosexuality is biologically driven and thus a sex-based class, and a two-justice dissent that disagreed. Before the issue was resolved, the voters in Hawai`i passed a constitutional amendment leaving it to the state legislature to decide whether same-sex marriage would be allowed.[8]Brause v. Bureau of Vital Statistics, No. 3AN-95-6562 CI, 1998 WL 88743 (Alaska Super.Ct. Feb. 27, 1998) is a trial court decision finding that denial of marriage to same-sex couples violated the Alaska State Constitution. The court engaged in a fundamental rights analysis but said in dicta that it would also find that gay and lesbian persons constitute a suspect class. The court did not engage in any analysis or cite any authority regarding suspect classification, however. Nine months after the decision was filed, the voters in Alaska passed a constitutional amendment defining marriage as opposite-sex marriage.
ś 38 The plaintiffs also suggest that Miguel v. Guess, 112 Wash.App. 536, 51 P.3d 89 (2002), Romer, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855, and Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) indicate a trend toward heightened *976 scrutiny where gay and lesbian persons are concerned. Miguel and Romer are based on another constitutional principle, however. In Romer, the Court invalidated on equal protection grounds Colorado's constitutional Amendment 2, which prohibited all legislative, executive, or judicial action designed to protect gay and lesbian persons from discrimination. The Court noted that "if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." Romer, 517 U.S. at 631, 116 S.Ct. 1620. The Court said that Amendment 2 "fails, indeed defies" this inquiry. Id. at 632, 116 S.Ct. 1620. The court noted that central to equal protection is the principle that "government and each of its parts remain open . . . to all who seek its assistance," and "[a] law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection in the most literal sense." Id. at 633, 116 S.Ct. 1620. The Court found that there was no legitimate government purpose of Amendment 2 and held the amendment did not satisfy rational relation review.
ś 39 Similarly, in Miguel, where the plaintiff claimed her civil rights were violated as a result of discrimination based on being a lesbian, the court found that a discriminatory classification based on prejudice or bias is not rationally related to a legitimate governmental purpose as a matter of law. See also Cleburne Living Ctr., 473 U.S. at 448, 105 S.Ct. 3249 (noting that while private biases may be outside the reach the law, the law cannot give them effect). Both Miguel and Romer rest on the principle that equal protection is denied where the law's purpose is discrimination and it has no legitimate government purpose. Neither case supports the proposition that gay and lesbian persons constitute a suspect class. Indeed, as plaintiffs recognize, neither case addressed suspect classifications; the court in Miguel expressly declined to decide whether gay and lesbian persons constitute a suspect class. Miguel, 112 Wash.App. at 552 n. 3, 51 P.3d 89.
ś 40 In Lawrence, the Court held that Texas's sodomy law violated equal protection under a rational basis analysis, thus overruling its decision in Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Lawrence is widely viewed as reflecting changing societal attitudes toward gay and lesbian persons. The Court emphasized "an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex." Lawrence, 539 U.S. at 572, 123 S.Ct. 2472. However, the Court did not address suspect classification and invalidated the challenged law on the basis that it did not satisfy rational basis review, a standard that would not apply if the court had found an inherently suspect class.
ś 41 In light of the lack of a sufficient showing of immutability and the overwhelming authority finding that gay and lesbian persons are not a suspect class for purposes of the equal protection clause, we decline to conclude that gay and lesbian persons constitute an inherently suspect class for purposes of article I, section 12.

Fundamental Right
ś 42 Strict scrutiny is also required under an equal protection clause analysis where a fundamental right is burdened by the challenged law. State v. Harner, 153 Wash.2d 228, 235, 103 P.3d 738 (2004). The fundamental right to marriage "is part of the fundamental `right of privacy' implicit in the Fourteenth Amendment's Due Process Clause". Zablocki v. Redhail, 434 U.S. 374, 384, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). While the State agrees that marriage is a fundamental right, it says that it does not include same-sex marriage. Plaintiffs maintain they have the fundamental right to marry the person of their choice.
ś 43 Under a federal constitutional analysis, for a fundamental right to exist it must be "objectively, `deeply rooted in this Nation's history and tradition' . . . and `implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed.'" Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting Moore v. E. *977 Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion) and Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). A "`careful description' of the asserted fundamental liberty interest" is required, and the Court has noted that "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore `exercise the utmost care whenever we are asked to break new ground in this field ....'" Glucksberg, 521 U.S. at 720, 721, 117 S.Ct. 2258 (quoting Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Fundamental liberty interests include the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion. Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258 (citing cases).
ś 44 As the plaintiffs argue and the State agrees, history and tradition are not static. For example, in Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the Court held that Virginia's antimiscegenation statutes prohibiting interracial marriage violated the equal protection and due process clauses. The Court first concluded that the statutes rested solely on distinctions drawn according to race, and because they prohibited only interracial marriages involving white persons, their only justification was to "maintain White Supremacy." Loving, 388 U.S. at 11, 87 S.Ct. 1817. After the Court found race discrimination in violation of equal protection, the Court then determined that race discrimination was not a legitimate basis for depriving the Lovings of their fundamental right to marry. Loving, 388 U.S. at 11-12, 87 S.Ct. 1817. The Court stated that the Fourteenth Amendment requires that "the freedom of choice to marry not be restricted by invidious racial discrimination." Loving, 388 U.S. at 12, 87 S.Ct. 1817. At the time of the decision, Virginia was one of 16 states prohibiting and punishing marriages on the basis of racial classifications, and during the previous 15 years 14 states had repealed statutes outlawing interracial marriage. Loving, 388 U.S. at 6 n. 5, 87 S.Ct. 1817. As the State says, whatever the history and tradition of interracial marriage had been, by the time Loving was decided, it had changed.[9]
ś 45 Thus, recent history and tradition may also be relevant in deciding whether a fundamental right is at stake.[10]
ś 46 The State argues, however, that there is no history and tradition of same-sex marriage in this country, and the basic nature of marriage as a relationship between a man and a woman has not changed. With the exception of Massachusetts, no state permits same-sex marriage (though, as noted, the Vermont Supreme Court held that gay and lesbian couples "are entitled under Chapter I, Article 7 of the Vermont Constitution to obtain the same benefits and protections afforded *978 by ... law to married opposite-sex couples." Baker, 170 Vt. at 224, 744 A.2d 864). At present, the great majority of states have either statutes or constitutional amendments limiting marriage to opposite-sex couples. Courts in other jurisdictions recently faced with the issue have concluded that there is no tradition of same-sex marriage and no fundamental right to marriage that includes same-sex marriage. E.g., Dean v. Dist. of Columbia, 653 A.2d 307 (D.C. 1995); In re Kandu, 315 B.R. 123, 140 (Bankr.W.D.Wash.2004); Standhardt v. Superior Court, 206 Ariz. 276, 284, 77 P.3d 451 (Ariz.Ct.App.2003); Baehr, 74 Haw. at 556-57, 852 P.2d 44 (plurality opinion), 74 Haw. at 588, 852 P.2d 44 (Heen, J., dissenting).
ś 47 Nor is there a tradition or history of same-sex marriage in this state. Instead, prior to and after statehood, state laws reflected the common law of marriage between a man and woman. See Code of 1881 § 2380; former RCW 26.04.010 (Laws of 1963 ch. 230, § 1); RCW 26.04.210 and its antecedents (referring to affidavits required for issuance of marriage licenses and referring to the male and the female). Despite plaintiffs' reference to an 1854 statute that contained no express restriction on marriage other than consanguinity, bigamy, and age of consent, Laws of 1854 (first session), p. 404, there really is no serious claim that the early statutes defined anything but opposite-sex marriage.[11]
ś 48 Nearly all United States Supreme Court decisions declaring marriage to be a fundamental right expressly link marriage to fundamental rights of procreation, childbirth, abortion, and child-rearing. In Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), involving invalidation of a nonconsensual sterilization statute, the Court said "[m]arriage and procreation are fundamental to the very existence and survival of the race." In Loving, 388 U.S. at 12, 87 S.Ct. 1817, the Court said that "[m]arriage is one of the `basic civil rights of man,' fundamental to our very existence and survival" (quoting Skinner, 316 U.S. at 541, 62 S.Ct. 1110). In Zablocki, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618, the Court invalidated on equal protection and due process grounds a statute that prohibited marriage for any resident behind in child support obligations. The Court noted that
[i]t is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships.... [I]t would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society.
Zablocki, 434 U.S. at 386, 98 S.Ct. 673. The Court also quoted the statements made in Skinner and Loving. Zablocki, 434 U.S. at 383, 384, 98 S.Ct. 673. See also, Maynard v. Hill, 125 U.S. 190, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888) (marriage is "the foundation of the family and of society, without which there would be neither civilization nor progress").
ś 49 Plaintiffs reason, however, and the King County Superior Court agreed, that Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) demonstrates that the fundamental right to marry is not linked to procreation. In Turner, the Court invalidated a regulation that prohibited inmate marriage absent compelling reasons for marriage, holding that the fundamental right to marry was impermissibly burdened. Rejecting the contention that the interest at issue was inmate marriage, the Court said that inmate marriages were, like others, expressions *979 of emotional support and public commitment, and may for some inmates be an exercise of religious faith as well as an expression of personal dedication. Turner, 482 U.S. at 95-96, 107 S.Ct. 2254. In addition, the Court said, most inmates would eventually be released and thus most inmate marriages were formed in the expectation they would be fully consummated. Turner, 482 U.S. at 96, 107 S.Ct. 2254. Finally, the Court noted marriage often is a precondition to government benefits, property rights, and other benefits such as legitimation of children born out of wedlock.
ś 50 Like Skinner, Loving, and Zablocki, Turner involved burdens on individuals seeking opposite-sex marriage. While the Court did not expressly link marriage to procreation and other rights related to procreation and children as it had in other cases, we also do not find in Turner any signal that the case marked a turning point in the definition of marriage as a fundamental right. We do not agree that the Court in Turner intended its analysis to mean that marriage as a fundamental right is no longer anchored in the tradition of marriage as between a man and a woman.[12]
ś 51 Plaintiffs also rely on Lawrence. Lawrence did not address same-sex marriage at all but private adult consensual sexual conduct. Further, as noted, the Court did not apply strict scrutiny as would be expected if a fundamental right were at stake. Finally, the Court specifically said the case "does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." Lawrence, 539 U.S. at 578, 123 S.Ct. 2472.
ś 52 We agree, as plaintiffs maintain, that marriage is an evolving institution. They point, for example, to changes regarding recognition of common law marriages and departure from the historical denial of the right for slaves to marry. They point out other changes related to marriage and personal privacy, for example, decriminalization of extramarital sex, abandonment of tort actions for interference by third parties, and elimination of stigma and legal barriers relating to illegitimate children.
ś 53 However, although marriage has evolved, it has not included a history and tradition of same-sex marriage in this nation or in Washington State.
ś 54 The vast majority of states historically and traditionally have contemplated marriage only as opposite-sex marriage, and the majority of states, including Washington, have recently reaffirmed this understanding and tradition. Federal decisions have found the fundamental right to marry at issue only where opposite-sex marriage was involved. Loving, Zablocki, and Skinner tie the right to procreation and survival of the race. Plaintiffs have not established that at this time the fundamental right to marry includes the right to marry a person of the same sex. As we have noted, however, several state statutes and municipal codes provide protection to gay and lesbian persons. That some laws provide such protections show change is occurring in our society, but community standards at this time do not show a societal commitment to inclusion of same-sex marriage as part of the fundamental right to marry.
ś 55 Justice Fairhurst's dissent proposes, nevertheless, that there is a fundamental right to marry a person of the same sex. This is an astonishing conclusion, given the lack of any authority supporting it; no appellate court applying a federal constitutional analysis has reached this result. Moreover, the only cases Justice Fairhurst's dissent cites that actually say there is a fundamental right to marry a person of the same sex is Goodridge, supra, and a trial court decision, i.e., Brause, supra, an unpublished Alaska trial court order. Dissent (Fairhurst, J.) at 1021 n.24, 1022, 1026 n.29. Both cases were decided on state constitutional grounds, and in Goodridge the court explained that the state due process constitutional analysis that it applied differs from the federal due process analysis. Goodridge, 440 Mass. at 328-29, 328 n. 18, 798 N.E.2d 941.

*980 Rational Basis Review
ś 56 Plaintiffs have not established that gay and lesbian persons constitute a suspect class or that the fundamental right to marry includes the right to same-sex marriage. Accordingly, applying an analysis under article I, section 12 that is coextensive with that under the equal protection clause, the appropriate standard of review is rational basis review.
ś 57 Under rational basis review plaintiffs have the burden of proving that the classification drawn by the law is not rationally related to a legitimate state interest. DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 144, 960 P.2d 919 (1998). The statute is presumed constitutional. Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); State v. Shawn P., 122 Wash.2d 553, 561, 859 P.2d 1220 (1993). Under the rational basis standard, the court may assume the existence of any conceivable state of facts that could provide a rational basis for the classification. Bd. of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); Heller, 509 U.S. at 320, 113 S.Ct. 2637; Seeley v. State, 132 Wash.2d 776, 795, 940 P.2d 604 (1997). Production of empirical evidence is not required to sustain the rationality of a classification. Gossett v. Farmers Ins. Co., 133 Wash.2d 954, 979-80, 948 P.2d 1264 (1997) (citing Heller, 509 U.S. at 320, 113 S.Ct. 2637). In fact, "the rational basis standard may be satisfied where the `legislative choice ... [is] based on rational speculation unsupported by evidence or empirical data.'" DeYoung, 136 Wash.2d at 148, 960 P.2d 919 (alteration in original) (quoting Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).[13] In addition, within limits, a statute generally does not fail rational basis review on the grounds of over- or under-inclusiveness; "[a] classification does not fail rational-basis review because `it is not made with mathematical nicety or because in practice it results in some inequity.'" Heller, 509 U.S. at 321, 113 S.Ct. 2637 (quoting Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)); Campbell v. Dep't of Soc. & Health Servs., 150 Wash.2d 881, 901, 83 P.3d 999 (2004); Gossett, 133 Wash.2d at 979-80, 948 P.2d 1264.
ś 58 Plaintiffs first contend that Washington's DOMA, like Colorado's Amendment 2 at issue in Romer, was enacted for the purpose of discriminating against gay and lesbian persons â that DOMA arises from class-based animus. This is, they maintain, per se unreasonable, citing Romer, 517 U.S. at 633-34, 116 S.Ct. 1620, Cleburne, 473 U.S. at 448, 105 S.Ct. 3249, and Miguel, 112 Wash.App. at 553, 51 P.3d 89. Plaintiffs rely on legislative history, which they say is rife with evidence of DOMA's prejudicial underpinnings. They say that the act's prime sponsor distributed an article on the House floor saying that gays and lesbians are not normal, House Floor Debate at 23 (Wash. Mar. 18, 1997) (CP at 467), and told the legislature's only openly gay member that homosexuals should be put on a boat and shipped out of the country, House Floor Debate at 40 (Wash. Feb. 4, 1998), and that another legislator said that when individuals engage in homosexual activity they confirm a "disordered sexual inclination" that is "essentially self-indulgent," House Floor Debate at 44 (Wash. Feb. 4, 1998) (CP at 471). They also point to antigay sentiments expressed during legislative committee meetings.
ś 59 In connection with the argument that DOMA was enacted to discriminate, plaintiffs also contend that when there is evidence of some discriminatory intent, a presumption of invalidity arises and the burden shifts to the government to show that the same decision would have been made absent the discriminatory purpose. They say that Romer and Lawrence make clear that a burden is placed on the State where discrimination against gays and lesbians is concerned, even under a rational relationship analysis.
ś 60 Turning first to the plaintiffs' claim that DOMA was motivated by animus, we *981 cannot agree that the only reason the legislation was enacted was because of anti-gay sentiment. It is unfortunate that the dissents accept this argument, dissent (Fairhurst, J.) at 1019, dissent (Bridge, J.) at 1034, 1036, because it is demonstrably incorrect. A substantial number â 15 â of the legislators who voted for DOMA in 1998 also voted to add sexual orientation to the laws against discrimination in 2006.[14] Even if some of these legislators may have had a "change of heart," the far more likely explanation for the majority, if not all, is that they were not motivated by antigay sentiment in 1998 but instead were convinced for other reasons that marriage should not be extended to same-sex couples.[15] In assuming that everyone who voted for DOMA is a bigot, Justice Fairhurst's dissent is not only wrong, it sadly oversteps the bounds of judicial review.
ś 61 Turning next to the plaintiffs' proposed analytical framework, we conclude that it does not apply. Plaintiffs rely on cases that address burden shifting and a heightened level of scrutiny in the context of a law claimed to discriminate against members of a suspect or semisuspect class. E.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (race); Cook v. Babbitt, 819 F.Supp. 1 (D.D.C.1993) (gender). But to come within this framework, plaintiffs must show that they are members of a suspect class. Discrimination against a class, in and of itself, does not make the class a suspect class. And a law that affirmatively discriminates does not, for that reason alone, require heightened scrutiny or that the government bear the burden of establishing the validity of the challenged law. For example, discrimination against classes of persons based on age or disability does not implicate either a heightened standard of review or burden shifting. See Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312-14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (age); Garrett, 531 U.S. at 365-68, 121 S.Ct. 955 (disability). As we have concluded, the plaintiffs have not shown they are members of a suspect class.
ś 62 Plaintiffs also rely on Lawrence and Romer. Both of these cases were decided on rational basis grounds, and neither mentions any burden-shifting framework. Moreover, while in Romer Colorado's Amendment 2 was found to be motivated by animus and invalidated, the Court determined both that it was motivated solely by animus and that it lacked any legitimate governmental purpose. Romer, 517 U.S. at 634-35, 116 S.Ct. 1620. Romer exemplifies the principle that where legislation is subject to rational basis review, it will not be found unconstitutional on the basis that it was motivated by animus unless it also lacks any rational relationship to a legitimate governmental purpose.
ś 63 This principle was explained in Garrett, where the Court, addressing a claim premised on Cleburne, said that Cleburne does not "stand[ ] for the broad proposition that state decisionmaking reflecting `negative attitudes' or `fear' necessarily runs afoul of the Fourteenth Amendment." Garrett, 531 U.S. at 367, 121 S.Ct. 955 (quoting Garrett, 531 U.S. at 382, 121 S.Ct. 955 (Breyer, J., dissenting)). Instead, "[a]though such biases may often accompany irrational (and therefore unconstitutional) discrimination, their presence alone does not a constitutional violation make." Id. (emphasis added). The court emphasized: "`[M]ere negative attitudes,' or `fear,' unsubstantiated by factors which are properly cognizable in [the context], are not permissible bases" for differing treatment. Id. (quoting Cleburne, 473 U.S. at 448, 105 S.Ct. 3249). Thus, as the Court explained, under rational basis review, even if animus in part motivates legislative decision making, unconstitutionality does not follow if the law is otherwise rationally related *982 to legitimate state interests. Garrett, 531 U.S. at 367, 121 S.Ct. 955.
ś 64 Further, as the State points out, we view with caution comments of individual legislators said to show improper legislative intent in passing legislation, and "a court may not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." State v. Brayman, 110 Wash.2d 183, 204, 751 P.2d 294 (1988) (emphasis added).
ś 65 Whether some legislators voted for DOMA out of prejudice against gay and lesbian persons does not alone determine the constitutionality of DOMA under a rational basis equal protection analysis. If the law otherwise defines classifications rationally related to legitimate state interests, it does not violate the equal protection clause. Accordingly, the same is true applying an equal protection analysis under article I, section 12.
ś 66 A stated purpose of DOMA is to reaffirm the State's historical commitment to the institution of marriage between a man and woman. Laws of 1998, ch. 1, § 1. The State contends that procreation is a legitimate government interest justifying the limitation of marriage to opposite-sex couples. The State reasons that partners in a marriage are expected to engage in exclusive sexual relations with children the probable result and paternity presumed. See, e.g., Singer, 11 Wash.App. at 259, 522 P.2d 1187; Standhardt, 206 Ariz. at 287, 77 P.3d 451; Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185 (1971). The State reasons that no other relationship has the potential to create, without third party involvement, a child biologically related to both parents, and the legislature rationally could decide to limit legal rights and obligations of marriage to opposite-sex couples. The legislature could also have found that encouraging marriage for opposite-sex couples who may have relationships that result in children is preferable to having children raised by unmarried parents. See Morrison v. Sadler, 821 N.E.2d 15, 25 (Ind.Ct.App.2005) (the "institution of opposite-sex marriage both encourages such couples to enter into a stable relationship before having children and to remain in such a relationship if children arrive during the marriage unexpectedly"); Hernandez v. Robles, 2006 N.Y. slip op. 5239, at *6-7, ___ N.Y.3d ___, at ___-___, ___ N.Y.S.2d ___, ___ N.E.2d ___, 2006 WL 1835429 (2006). In addition, the need to resolve the sometimes conflicting rights and obligations of the same-sex couple and the necessary third party in relation to a child also provides a rational basis for limiting traditional marriage to opposite-sex couples.
ś 67 Plaintiffs maintain, however, that the right to procreate does not hinge on marital status. Individuals may marry regardless of fertility or intent to procreate. The sterile and elderly are allowed to marry, and married couples are not required to have children. See Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (right of married couples to use contraception). Washington law does not restrict sex to marriage. Moreover, plaintiffs correctly say, same-sex couples can and do legally procreate through assisted reproduction and adoption. See RCW 26.33.140 (adoption not limited to married couples). And unfit biological parents may lose custody of children. In addition, nonbiological bonding with children has been recognized. See, e.g., In re Parentage of L.B., 155 Wash.2d 679, 122 P.3d 161 (2005), cert. denied, ___ U.S. ___, 126 S.Ct. 2021, 164 L.Ed.2d 806 (2006).
ś 68 Plaintiffs also rely on Goodridge, where the Massachusetts court rejected the argument that procreation justified limitation of marriage to opposite-sex couples. The court said that "[t]he `marriage is procreation' argument singles out the one unbridgeable difference between same-sex and opposite-sex couples, and transforms that difference into the essence of legal marriage." Goodridge, 440 Mass. at 333, 798 N.E.2d 941. The court held that "it is the exclusive and permanent commitment of the marriage partners to one another, not the begetting of children, that is the sine qua non of civil marriage." Goodridge, 440 Mass. at 332, 798 N.E.2d 941.
ś 69 But as Skinner, Loving, and Zablocki indicate, marriage is traditionally linked to procreation and survival of the human race. Heterosexual couples are the only couples who can produce biological offspring of the *983 couple. And the link between opposite-sex marriage and procreation is not defeated by the fact that the law allows opposite-sex marriage regardless of a couple's willingness or ability to procreate. The facts that all opposite-sex couples do not have children and that single-sex couples raise children and have children with third party assistance or through adoption do not mean that limiting marriage to opposite-sex couples lacks a rational basis. Such over- or under-inclusiveness does not defeat finding a rational basis.
ś 70 The rational basis standard of review is "highly deferential to the legislature." In re Det. of Thorell, 149 Wash.2d 724, 749, 72 P.3d 708 (2003). As noted, under this standard any conceivable set of facts may be considered that support the classification drawn, and over-and under-inclusiveness generally does not foreclose finding a rational basis for legislation. Under the highly deferential rational basis inquiry, encouraging procreation between opposite-sex individuals within the framework of marriage is a legitimate government interest furthered by limiting marriage to opposite-sex couples.
ś 71 The State also argues that rearing children in a home headed by their opposite-sex parents is a legitimate state interest furthered by limiting marriage to opposite-sex couples because children tend to thrive in families consisting of a father, mother, and their biological children. The State cites testimony before the House Law and Justice Committee on February 4, 1998, during the hearing on HB 1130, some of which cited studies said to support this proposition.
ś 72 Plaintiffs maintain, however, that the argument discounts all same-sex couples who bear and raise children. They urge that while protecting children is a "paramount" state concern, "[r]estricting marriage to opposite-sex couples . . . cannot plausibly further this policy." Goodridge, 440 Mass. at 333-34, 798 N.E.2d 941. The Massachusetts court in Goodridge reasoned that "`[t]he demographic changes of the past century make it difficult to speak of an average American family. The composition of families varies greatly from household to household.'" Goodridge, 440 Mass. at 334, 798 N.E.2d 941 (quoting Troxel v. Granville, 530 U.S. 57, 63, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). The court in Goodridge also noted that the State had responded to the changes by moving to strengthen families in its many variations, for example, through paternity statutes, grandparent visitation statutes, and repudiating common law disadvantages attending illegitimacy. Goodridge, 440 Mass. at 334, 798 N.E.2d 941.
ś 73 But given the rational relationship standard and that the legislature was provided with testimony that children thrive in opposite-sex marriage environments, the legislature acted within its power to limit the status of marriage. That is, the legislature was entitled to believe that providing that only opposite-sex couples may marry will encourage procreation and child-rearing in a "traditional" nuclear family where children tend to thrive. We reiterate that the rational basis standard is a highly deferential standard. This deference is based on the separation of powers doctrine. See Cleburne, 473 U.S. at 441-42, 105 S.Ct. 3249 (where rational basis review is the applicable standard "the courts have been very reluctant . . . with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent [legitimate state] interests should be pursued"). It cannot be overemphasized that our state constitution provides for a representative democracy and that the people, who have consented to be governed, speak through their elected representatives. When no fundamental right or suspect class exists, the public consensus, as evidenced by legislation adopted after robust debate, must be given great deference. See Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258.
ś 74 We emphasize that it is not the province of this court to pass on the merits of the arguments and studies presented to the legislature as it considered whether to enact DOMA, contrary to the apparent belief reflected in Justice J.M. Johnson's concurrence. We note, nonetheless, that the studies and arguments that the concurrence recites as if embodying unassailable truths are in fact assailed by the petitioners. It is particularly inappropriate for this court to accept as true (or untrue) the arguments *984 made and conclusions drawn by those advocating passage of DOMA, or to make its own inquiry into the validity or reliability of any studies presented to the legislature. The court's responsibility, instead, is to assure that DOMA was enacted in accord with constitutional constraints and that the legislature properly exercised its power. In short, while the legislature was entitled to rely on the arguments and studies presented to the legislature, this court can and must do no more than assure itself that the rational basis standard is satisfied.
ś 75 And at the risk of sounding monotonous, we repeat that the rational basis standard is extremely deferential. There are many examples of laws upheld on rational basis grounds where strong policy arguments opposing such laws have been advanced. But legislative bodies, not courts, hold the power to make public policy determinations, and where no suspect classification or fundamental right is at stake, that power is nearly limitless. The United States Supreme Court explained in Garrett, 531 U.S. at 367-68, 121 S.Ct. 955, for example, that since the disabled do not constitute a suspect class (and there is no fundamental right to special accommodations), there is no constitutional requirement that states must make special accommodations for the disabled "so long as their actions toward such individuals are rational. They could quite hardheadedly â and perhaps hardheartedly â hold to job-qualifications requirements which do not make allowance for the disabled."[16] The Court has also upheld laws providing for mandatory retirement at a certain age on rational basis grounds even where some individuals are unquestionably of sufficient health and ability to continue the particular employment. E.g., Murgia, 427 U.S. at 315-17, 96 S.Ct. 2562 (mandatory retirement at age 50 for Massachusetts State Police). The Court explained that it is not up to a court to determine whether such a statute is wise, whether it best fulfills the relevant social and economic objectives, or whether a more just and humane system might be developed. Murgia, 427 U.S. at 317, 96 S.Ct. 2562 (citing Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)).
ś 76 Our own case law is in accord. For example, in a case brought by a terminally ill man challenging the unavailability of marijuana for medical uses, this court declined, when applying rational basis review, to second-guess the legislature's classification of marijuana as a schedule I controlled substance where it involved legislative conclusions concerning complicated and controversial scientific and moral issues. Seeley, 132 Wash.2d at 796-808, 940 P.2d 604. Nor do we second-guess the legislature in cases where the wisdom of its acts seems questionable. In In re License Revocation of Kindschi, 52 Wash.2d 8, 12, 319 P.2d 824 (1958), the court concluded on rational basis review that the legislature is entitled to enact a law making income tax fraud a ground for revoking or suspending a doctor's license because there is a rational basis between such fraudulent conduct and one's trustworthiness to practice medicine.
ś 77 Finally, Justice Fairhurst's dissent incorrectly asserts that we have engaged in an incorrect analysis because, the dissent believes, the question is not whether allowing opposite-sex couples the right to marry furthers governmental interests in procreation and raising children in a healthy environment but, rather, whether those interests are furthered by denying same-sex couples the right to marry. Initially, the dissent's rewording of the issue fails to acknowledge that over-and under-inclusiveness do not invalidate an enactment under rational basis review. Moreover, the correct inquiry under rational basis review is whether allowing opposite-sex couples to marry furthers legitimate governmental interests. As the United States Supreme Court has explained: "In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." Romer, 517 U.S. at 632, 116 S.Ct. 1620 (emphasis added). Granting the right to marry to opposite-sex couples clearly furthers the governmental interests *985 advanced by the State. We add that the constitutional inquiry means little if the entire focus, and perhaps outcome, may be so easily altered by simply rewording the question.
ś 78 We do not dispute that same-sex couples raise children or that the demographics of "family" have changed significantly over the past decades. We recognize that same-sex couples enter significant, committed relationships that include children, whether adopted, conceived through assisted reproduction, or brought within the family of the same-sex couple after the end of a heterosexual relationship. We do not doubt that times have changed and are changing, and that courts and legislatures are increasingly faced with the need to answer significant legal questions regarding the families and property of same-sex couples. See, e.g., In re Parentage of L.B., 155 Wash.2d 679, 122 P.3d 161 (after end of same-sex relationship, one of former partners sought parental rights); Vasquez v. Hawthorne, 145 Wash.2d 103, 33 P.3d 735 (2001) (claim to estate of decedent brought by decedent's alleged gay life-partner); Gormley v. Robertson, 120 Wash.App. 31, 83 P.3d 1042 (2004) (property distribution following end of same-sex meretricious relationship); In re Dependency of G.C.B., 73 Wash.App. 708, 870 P.2d 1037 (1994) (noting placement of a child in foster care with a same-sex couple); RCW 26.33.140(2) (providing that any person may be an adoptive parent).
ś 79 We are also acutely aware, from the records in these cases and the briefing by the plaintiffs and the amici supporting them, that many day-to-day decisions that are routine for married couples are more complex, more agonizing, and more costly for same-sex couples. A married person may be entitled to health care and other benefits through a spouse.[17] A married person's property may pass to the other upon death through intestacy laws or under community property laws or agreements. Married couples may execute community property agreements and durable powers of attorney for medical emergencies without fear they will not be honored on the basis the couple is of the same sex and unmarried. Unlike heterosexual couples who automatically have the advantages of such laws upon marriage, whether they have children or not, same-sex couples do not have the same rights with regard to their life partners that facilitate practical day-to-day living, involving such things as medical conditions and emergencies (which may become of more concern with aging), basic property transactions, and devolution of property upon death.
ś 80 But plaintiffs have affirmatively asked that we not consider any claim regarding statutory benefits and obligations separate from the status of marriage. We thus have no cause for considering whether denial of statutory rights and obligations to same-sex couples, apart from the status of marriage, violates the state or federal constitution.
ś 81 We conclude that limiting marriage to opposite-sex couples furthers the State's interests in procreation and encouraging families with a mother and father and children biologically related to both.
ś 82 The plaintiffs have not established that DOMA is unconstitutional under article I, section 12 of the Washington State Constitution.

Due Process and Privacy; Article I, Sections 3 and 7
ś 83 Plaintiffs maintain that the right to due process under article I, section 3, and the right to privacy under article I, section 7 together protect an individual's liberty interest to structure his or her life in the most intimate and defining ways without interference by the State. Thus, they contend, DOMA violates the right of personal autonomy *986 protected by the privacy and due process clauses of the state constitution.
ś 84 The state constitution's due process clause provides "[n]o person shall be deprived of life, liberty, or property, without due process of law." Const. art. I, § 3. Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."
ś 85 Initially, plaintiffs do not propose a constitutional analytical framework under article I, section 3 and article I, section 7, together, that differs from an analysis under each of the provisions separately. They also do not make a Gunwall argument in an attempt to show that an independent state analysis is appropriate under the due process clause, article I, section 3.[18] We therefore rely on our conclusion above under a federal constitutional analysis that the fundamental right to marriage does not include the right to same-sex marriage. In the absence of a fundamental right at stake, the due process inquiry is whether the law bears a reasonable relationship to a legitimate state interest. Glucksberg, 521 U.S. at 722, 117 S.Ct. 2258; In re Pers. Restraint of Metcalf, 92 Wash.App. 165, 176-77, 963 P.2d 911 (1998). As we concluded in connection with our inquiry under article I, section 12, where we applied a federal equal protection analysis, DOMA satisfies rational basis review. Thus, we conclude that DOMA does not violate article I, section 3.
ś 86 Turning to article I, section 7, we have said in the context of search and seizure cases that there is no need to consider whether to apply an independent state constitutional analysis in a new context. State v. McKinney, 148 Wash.2d 20, 26, 60 P.3d 46 (2002). The only relevant question is whether article I, section 7 affords enhanced protection in the particular context. McKinney 148 Wash.2d at 26, 60 P.3d 46.
ś 87 We conclude that the same is true in the context of privacy interests and that McKinney provides guidance for deciding whether a protected privacy right exists. There, we reasoned that whether there had been an unconstitutional search of drivers' records in violation of article I, section 7 depended upon whether there had been an intrusion into private affairs. We resolved this question through a two-step analysis driven by the often noted principle that privacy interests protected under article I, section 7 are "`those privacy interests which citizens of [Washington] have held, and should be entitled to hold, safe from governmental trespass.'" McKinney, 148 Wash.2d at 27, 60 P.3d 46 (quoting State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984)). Thus, a court should first examine the historical protection afforded, i.e., the inquiry into what interests citizens have held, and then ask whether the expectation of privacy is one that citizens should be entitled to hold. McKinney, 148 Wash.2d at 27-32, 60 P.3d 46.
ś 88 As we explained earlier in this opinion, there is no history of marriage in this state that includes same-sex marriage. Thus, the citizens of Washington have not held a privacy interest in marriage that includes a right to marry a person of the same sex.
ś 89 Turning to whether the right to marry the person of choice who is of the same sex is an expectation that citizens are entitled to hold, plaintiffs argue that citizens of this State should expect that the State will not interfere with the way they structure their lives in its most intimate and defining way, including the choice of a spouse. Except for search and seizure cases, nearly every state case they cite regarding privacy rights rests on federal constitutional analysis or an analysis coextensive with a federal analysis. See, e.g., In re Custody of Smith, 137 Wash.2d 1, 15, 969 P.2d 21 (1998), aff'd sub nom. Troxel, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (third party visitation rights; federal constitutional analysis); Bedford v. Sugarman, 112 Wash.2d 500, 507-12, 772 P.2d 486 (1989) (constitutionality of law providing for in-kind assistance to indigent alcohol and drug addicts; court generally described the constitutional right of privacy under the United *987 States Constitution and specifically declined to apply article I, section 7 in the absence of a Gunwall argument); In re Welfare of Colyer, 99 Wash.2d 114, 120, 660 P.2d 738 (1983) (court adds in a single sentence that "[s]upport for th[e court's] holding is also found in our state constitution," citing article I, section 7); State v. Koome, 84 Wash.2d 901, 530 P.2d 260 (1975) (statute requiring parental consent for abortion unconstitutional; decided under federal law); Voris v. Wash. State Human Rights Comm'n, 41 Wash.App. 283, 290, 704 P.2d 632 (1985) (claim that anti-discrimination statute pertaining to renting property violated privacy rights of association in the home; court cited United States Supreme Court and state decisions, with no mention of article I, section 7).
ś 90 In O'Hartigan v. Department of Personnel, 118 Wash.2d 111, 117-18, 821 P.2d 44 (1991), also cited by the plaintiffs, the court held that a rational basis standard applied in resolving a claim that the applicant's privacy rights were violated by a requirement that she submit to a polygraph exam as part of her application for a law enforcement position. The court also observed that the right to privacy under the federal constitution includes the right to autonomous decision making, recognized as a fundamental right. O'Hartigan, 118 Wash.2d at 117, 821 P.2d 44. "This right involves issues related to marriage, procreation, family relationships, child rearing and education." Id. (citing Whalen v. Roe, 429 U.S. 589, 600 n. 26, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)); see also State v. Farmer, 116 Wash.2d 414, 429, 805 P.2d 200 (1991) (observing that "[t]he United States Supreme Court recognizes such a fundamental right of privacy to exist in matters relating to freedom of choice regarding one's personal life"; recognizing a "similar" right of privacy under article I, section 7). Plaintiffs also rely heavily, if not primarily, on federal cases, including Lawrence, Loving, Zablocki, and Turner.
ś 91 State law has always been, however, that marriage is between a man and a woman. DOMA reaffirms what has historically been the law of Washington and the historical and continuing understanding of its citizens that marriage is between a man and woman. Although we recognize a right of privacy in personal autonomy, we are not persuaded that it includes the right to marry a person of the same sex. And, as explained earlier in this opinion, the federal cases upon which plaintiffs rely do not support their claim of a right to marry the person of their choice who is of the same sex. There is evidence that times are changing, but we cannot conclude that at this time the people of Washington are entitled to hold an expectation that they may marry a person of the same sex.
ś 92 Plaintiffs have not established that a right to marry the person of their choice who is of the same sex is a right that citizens of this State have held or are entitled to hold.
ś 93 Plaintiffs suggest, though, that article I, section 32 also supports their claim of a privacy interest. Article I, section 32 provides that "[a] frequent recurrence to fundamental principles is essential to the security of individual rights ...." Plaintiffs urge that this provision "has been cited as a reason for analyzing principles supporting a right to privacy," Seeley, 132 Wash.2d at 811, 940 P.2d 604, but do not develop the argument to any significant degree. Further, their reference to Seeley is a bit misleading. In Seeley we noted that "Washington jurisprudence has yet to see a consistent approach to art. I, § 32" and disclosed that the opinions that had cited the provision as a reason for analyzing principles supporting a right to privacy were dissenting and concurring opinions. Seeley, 132 Wash.2d at 811, 812, 940 P.2d 604 (citing opinions). Plaintiffs do not provide a convincing argument that article I, section 32 leads to a different result in this case.
ś 94 We conclude that plaintiffs have not established that they have a privacy right under article I, section 3 and article I, section 7 to marry the person of their choice who is of the same sex. Because plaintiffs have not shown that they have a cognizable privacy interest in the decision to marry the person of their choice who is of the same sex, DOMA is not facially unconstitutional under article I, section 3 and article I, section 7.
ś 95 ERA; Article XXXI, Section 1 of the Washington State Constitution
*988 ś 96 The ERA states: "Equality of rights and responsibility under the law shall not be denied or abridged on account of sex." Const. art. XXXI, § 1.
ś 97 The plaintiffs contend that DOMA violates Washington State Constitution's ERA. Both trial courts declined to find a violation of the ERA, citing Singer, 11 Wash.App. 247, 522 P.2d 1187, as precedent. In Singer, the Court of Appeals reasoned that the purpose of the ERA is to overcome discriminatory treatment of men and women on account of sex. Singer, 11 Wash.App. at 257, 522 P.2d 1187. The court explained that the ERA
insures that existing rights and responsibilities, or such rights and responsibilities as may be created in the future, which previously might have been wholly or partially denied to one sex or to the other, will be equally available to members of either sex. The form of discrimination or difference in legal treatment which comes within the prohibition of the ERA necessarily is of an invidious character because it is discrimination based upon the fortuitous circumstance of one's membership in a particular sex per se.
Singer, 11 Wash.App. at 259, 522 P.2d 1187. The court concluded that denial of a marriage license to the two appellants, who were both male, was not based on their sex but upon the fact they were both of the same sex. Singer, 11 Wash.App. at 259, 522 P.2d 1187.
ś 98 Plaintiffs contend that DOMA discriminates against them because while a man may marry a woman who is his choice to be his spouse, a woman, on account of her sex, cannot marry a woman who is her choice to be her spouse. The State responds that the ERA treats men and women the same.
ś 99 The purpose of the ERA "is to end special treatment for or discrimination against either sex." Marchioro v. Chaney, 90 Wash.2d 298, 305, 582 P.2d 487 (1978) (emphasis added); accord, e.g., Guard, 132 Wash.2d at 664, 940 P.2d 642; Blair v. Wash. State Univ., 108 Wash.2d 558, 565, 740 P.2d 1379 (1987). The single inquiry under the ERA is whether "classification by sex" is "discriminatory," or stated in the "language of the amendment, Has equality been denied or abridged on account of sex?" Marchioro, 90 Wash.2d at 305, 582 P.2d 487. "[I]f equality is restricted or denied on the basis of sex, the classification is discriminatory." Brayman, 110 Wash.2d at 201, 751 P.2d 294.
ś 100 Men and women are treated identically under DOMA; neither may marry a person of the same sex. DOMA therefore does not make any "classification by sex," and it does not discriminate on account of sex. Singer, 11 Wash.App. at 259, 522 P.2d 1187; see Baker, 170 Vt. at 215 n. 13, 744 A.2d 864; Dean, 653 A.2d at 363 n. 2 (Steadman, J., concurring) (concluding it "stretch[es] the concept of gender discrimination to assert that it applies to treatment of same-sex couples differently from opposite-sex couples").
ś 101 The ERA is clear that the prohibited discrimination/favoritism must be according to classifications based on sex. But even if the ERA were not clear, there is specific legislative history relating to HJR No. 61, which became the ERA when passed by the voters, regarding whether the legislature intended that the amendment permit same-sex marriage. In a colloquy on the Senate floor, Senator Pete Francis, the principal Senate sponsor of the measure, was asked whether under the ERA same-sex couples could marry. Senate Journal, 42nd Leg., 2nd Ex.Sess., at 347 (Wash.1972). Senator Francis replied, "I do not see that this would get at that at all." Id. In response to another question, Senator Francis said that the ERA was concerned with sex discrimination, "not to a person's sexual activities or orientation or interests." Id. This history indicates that the legislature did not intend that the ERA would require granting same-sex couples the right to marry. Moreover, following the legislature's approval of HJR 61, the Washington State Legislative Council prepared a report studying the impact of the ERA on state laws. The report listed hundreds of statutes that would or could violate the ERA but did not identify statutory recognition of marriage as between a man and a woman as violative of the ERA. Wash. State Leg. Council, The Potential Impact of House Joint Resolution No. 61 â the Equal Rights Amendment â on *989 the Laws of the State of Washington (Oct. 16, 1972).
ś 102 There is also history regarding the voters' passage of the ERA. We have previously considered statements in favor of ballot measures in determining the effect of the measure and have specifically done so with regard to the ERA. Marchioro, 90 Wash.2d at 305, 582 P.2d 487. In the State of Washington Voters Pamphlet, General Election 52 (Nov. 7, 1972), the "Statement for" HJR 61 states that "the Basic Principle of the Era . . . is that both sexes be treated equally under the law. . . . Laws which render benefits to one sex could in most cases be retained, and extended to everyone. Laws which restrict and deny rights to one sex would be eliminated." Thus, the ERA was described as preventing favoritism of or discrimination against sex-based classes. DOMA does not draw any classifications based on sex. It does not render benefits to just one sex, nor does it restrict or deny rights of one sex.[19]
ś 103 Plaintiffs maintain, however, that Loving supports their argument that DOMA violates the ERA. Plaintiffs reason that in Loving the Court held Virginia's antimiscegenation statute invalid even though the law treated the races equally. A black person could not marry a white person, and a white person could not marry a black person. Plaintiffs say that the Court nonetheless held that the statute impermissibly based the right to marry on distinctions drawn according to race. Plaintiffs reasons that just as Loving directs that race is always an impermissible ground for denying marriage, so is sex.
ś 104 Loving is not analogous. In Loving the Court determined that the purpose of the antimiscegenation statute was racial discrimination, "and the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race." Loving, 388 U.S. at 9, 87 S.Ct. 1817. The Court also said that the Lovings fundamental freedom of choice to marry may "not be restricted by invidious racial discriminations." Loving, 388 U.S. at 12, 87 S.Ct. 1817. If plaintiffs' case were truly analogous to Loving, we would first have to find that DOMA discriminates on the basis of sex and then conclude that the right to marriage is violated because of the restriction due to sex discrimination. However, as the State urges, DOMA treats men and women the same.
ś 105 Other courts have also rejected the argument that Loving is analogous. E.g., Baker, 291 Minn. at 314, 191 N.W.2d 185 (Virginia's antimiscegenation statute was invalidated on the grounds of patent racial discrimination); Hernandez, 2006 N.Y. slip op. 5239, at * 17-18, ___ N.Y.3d at ___-___, ___ N.Y.S.2d ___, ___ N.E.2d ___, (Loving addressed a racially discriminatory statute; in contrast, with regard to the plaintiffs' challenge to the law limiting marriage to opposite-sex couples: "[p]laintiffs do not argue here that the legislation they challenge is designed to subordinate either men to women or women to men as a class"); Baker, 170 Vt. at 215 n. 13, 744 A.2d 864.
ś 106 The plaintiffs also contend, however, that DOMA is embedded in sexism just as much as miscegenation laws were based on racism. Plaintiffs urge that keeping marriage as an exclusively heterosexual institution is based on gender-role stereotypes and exclusion of those who do not conform to them. This argument is unpersuasive. First, there is nothing in DOMA that speaks to gender stereotyping within marriage. Such stereotyping as exists does so apart from DOMA. Second, plaintiffs fail to show that gay and lesbian persons are excluded from marriage on account of or in order to perpetuate gender stereotyping. See Baker, 170 Vt. at 215 n. 13, 744 A.2d 864 (noting that it is one thing to show that repealed marriage statutes subordinated women to men *990 within the marital relationship, but quite another to show that same-sex couples are excluded from marriage laws because of incorrect and discriminatory assumptions about gender roles).
ś 107 Plaintiffs have not established sex-based discrimination in violation of the ERA.

CONCLUSION
ś 108 The question we resolve today is whether the legislature may limit the definition of marriage to include only heterosexual unions. The case law that controls our inquiry compels our conclusions.
ś 109 The issue of same-sex marriage has been the subject of intense debate throughout the nation. Although times are changing, the plaintiffs have not established that as of today sexual orientation is a suspect classification or that a person has a fundamental right to a same-sex marriage. Thus, the State is required to demonstrate only a rational basis to justify the legislation. Under this highly deferential standard, any conceivable state of facts providing a rational basis for the classification may be considered. The legislature was entitled to believe that limiting marriage to opposite-sex couples furthers the State's legitimate interests in procreation and the well-being of children.
ś 110 The cases on which the plaintiffs primarily rely, involving race and privacy, do not support the result they urge. As discussed above, Loving involved Virginia criminal laws which prohibited and punished interracial marriage and Lawrence involved a Texas criminal sodomy law. In both cases, the United States Supreme Court found the laws unconstitutional because there was no justification for the racial distinctions or the intrusion into private sexual behavior. In contrast, in this case the State has established that DOMA was enacted to codify the common law, to promote procreation, and to encourage stable families.
ś 111 All parties agree that the legislature has the authority to define marriage within constitutional limits. However, we note that the record is replete with examples as to how the definition of marriage negatively impacts gay and lesbian couples and their children. The plaintiffs and their amici have clearly demonstrated that many day-to-day decisions that are routine for married couples are more complex, more agonizing, and more costly for same-sex couples, unlike married couples who automatically have the advantages and rights provided to them in a myriad of laws and policies such as those surrounding medical conditions (e.g., the right to be present in the hospital and to help make difficult decisions), probate (e.g., the right to inherit property), and health insurance (e.g., the ability to obtain coverage for a spouse through employment policies). Many local governments and businesses have recognized the difficulties facing same-sex couples and, nationally, many leading companies provide for equivalent work benefit packages for gay and lesbian employees. As discussed above, however, the plaintiffs expressly requested that this court not consider whether denial of statutory rights and obligations to same-sex couples that apply to married couples violates the state or federal constitution. Thus, our opinion does not address those issues. There may be "more just and humane" ways to further the State's interests, Murgia, 427 U.S. at 317, 96 S.Ct. 2562, but the State has met its burden in demonstrating that DOMA meets the minimum scrutiny required by the constitution. However, given the clear hardship faced by same sex couples evidenced in this lawsuit, the legislature may want to reexamine the impact of the marriage laws on all citizens of this state.
ś 112 Applying the current case law that governs our decision and the narrow issues on which the plaintiffs requested we rule, we hold that the plaintiffs have not established that the Washington State Defense of Marriage Act is unconstitutional under the state privileges and immunities clause, article I, section 12, the state due process clause, article I, section 3, the state constitution's privacy provision, article I, section 7, or the state's Equal Rights Amendment, article XXXI, section 1. We reverse the decision of the King County Superior Court in Andersen and the decision of the Thurston County Superior Court in Castle.
Concurring: ALEXANDER, C.J. and C. JOHNSON, J.
*991 ALEXANDER, C.J. (concurring).
ś 113 Although many pages of opinion have been written in this case, the issue with which we are here confronted is really quite narrow. The question before us is this: is the provision in Washington's marriage statute, RCW 26.04.010, which clearly states that marriage is between a "male and a female," unconstitutional? Put another way, have the petitioners met their burden of overcoming the presumption that this statutory provision is constitutional? The answer to both questions is clearly "no," for reasons stated very articulately by Justice Madsen in the majority opinion. If we were to conclude otherwise, as do the dissenters, we would be usurping the function of the legislature or the people as defined in article II of the constitution of the state of Washington.
ś 114 I quickly add, though, that there is nothing in the opinion that I have signed which should be read as casting doubt on the right of the legislature or the people to broaden the marriage act or provide other forms of civil union if that is their will.
J.M. JOHNSON, J. (separate opinion concurring in judgment only).
ś 115 This is a difficult case only if a court disregards the text and history of the state and federal constitutions and laws in order to write new laws for our State's citizens. Courts are not granted such powers under our constitutional system. Our oath requires us to uphold the constitution and laws, not rewrite them.
ś 116 Marriage is the union of one man and one woman, and every Washington citizen has a constitutional right to enter into such a marriage,[1] subject only to limited regulation under the police power (for example, restricting underage or close family marriage). This understanding of marriage has been continuously recognized throughout the history of the United States and of the state of Washington, including Washington territorial law. The unique and binary biological nature of marriage and its exclusive link with procreation and responsible child rearing has defined the institution at common law and in statutory codes and express constitutional provisions of many states.[2]
ś 117 When the institution of marriage was first challenged in the United States Supreme Court through claims to religiously endorsed polygamy, this historical definition of marriage as the union of one man and one woman was confirmed. The same understanding has been confirmed in every subsequent case in that court when marriage has been considered in many other contexts.
ś 118 The appellate judges and justices in the highest courts of all the states, and justices of the United States Supreme Court, take an oath to uphold the constitution and laws. The issue presented today has been before many of these courts. The understanding of marriage expressed above and elaborated below has been continuously upheld,[3] with only one notorious exception.[4] A correct understanding of constitutional principles should not be determined by a numerical count of judges, but the fact our conclusion has been shared by all these appellate judges and justices adds to our certainty in the judgment today.
ś 119 Here, two trial courts held that Washington's historic definition of marriage and the 1998 Defense of Marriage Act (DOMA) are unconstitutional and that Washington *992 must recognize as "marriage" relationships violating that definition. King County, the State of Washington, and Intervenors Senator Val Stevens, et al., appealed. The respondents are gay and lesbian plaintiffs in each trial court whose numerous constitutional arguments challenged Washington marriage law. The two trial judges agreed that Washington's marriage law was unconstitutional but on different grounds.
ś 120 Trial courts may reflect the dominant political ideas of their local community. We have two such decisions before us, and many other state supreme courts have had to correct similar trial court rulings. Both opinions below were transparently result-oriented; the two courts agreed that it was time for marriage in Washington to be redefined but could not agree on a constitutional analysis to support such result. This decision is based on the constitution and laws.
ś 121 Our opinion goes beyond Justice Madsen's opinion in analyzing and rejecting all constitutional claims to achieve finality. We also apply a different article I, section 12 analysis, which we believe is better supported by precedent. Based on all applicable authority in this court and from the United States Supreme Court, we concur in a judgment reversing both trial courts, upholding Washington marriage law, and dismissing all challenges.

I. MARRIAGE UNDER THE CONSTITUTION AND PROCEDURES BELOW
ś 122 For more than 125 years our state laws and our constitution and its amendments have been predicated on the same definition of marriage: the union of one man and one woman. For example, the territorial Code of Washington provides: "Marriage is a civil contract which may be entered into by males of the age of twenty-one years, and females of the age of eighteen years, who are otherwise capable." Code of 1881, § 2380 (emphasis added). A similar definition of marriage underlies the United States Constitution and federal laws.
ś 123 In 1996, several state court decisions threatened to disrupt this understanding. In one response, Congress enacted and President Clinton signed the federal Defense of Marriage Act,[5] which explicitly provides that for purposes of all federal laws, marriage means only a legal union between a man and a woman as husband and wife. The act also reaffirmed that states are not required to recognize same-sex marriages from other states.
ś 124 In 1998, our state's legislature adopted Washington's DOMA,[6] which simply reaffirms this long-standing view of marriage. To declare the latter statute unconstitutional would declare marriage as Washington citizens have always known it, unconstitutional. It is worthy of note that the courts below could not or did not, fashion a remedy for their extraordinary pronouncements nor even consider the far reaching effects on Washington's family law.
ś 125 In Andersen v. King County, No. 04-2-04964-4, 2004 WL 1738447 (King County Super. Ct. Aug. 04, 2004), 16 individuals sought marriage licenses from King County. Their requests were denied because each sought to marry a person of the same sex. They filed suit in King County Superior Court seeking a writ of mandamus requiring issuance of marriage licenses and a declaratory judgment. They claimed that the prohibition against same-sex marriage violates the state constitution. The court allowed intervention by two state legislators and other individuals and organizations seeking to defend Washington's marriage law.
ś 126 The trial court granted summary judgment in favor of plaintiffs. The King County court held DOMA unconstitutional, under the privileges and immunities and due process clauses of the state constitution, on the basis that Washington marriage law denies the plaintiffs a fundamental right to marry. The trial court did not include an order directing any remedy. The State, county, and intervenors petitioned for direct review, which this court granted.
*993 ś 127 In Castle v. State, No. 04-2-00614-4, 2004 WL 1985215 (Thurston County Super. Ct. Sept. 7, 2004), plaintiffs are 22 gay and lesbian individuals who want to marry a person of the same sex or who claim they were married in other states.[7] A suit against the State was brought in Thurston County Superior Court seeking a declaratory judgment under the state constitution's privileges and immunities and due process clauses, and the Equal Rights Amendment. That court denied intervention of legislators and supporters of traditional marriage. The Thurston County Superior Court determined under state constitutional analysis that plaintiffs constitute a suspect class, that plaintiffs' fundamental right to same-sex marriage is violated, and that Washington marriage law violates the privileges and immunities clause. The court granted the plaintiffs' motion for summary judgment but stayed the decision before considering any specific remedy. The State sought direct review, which was granted. The two cases were consolidated.
ś 128 At its core, the claims involve not only the purported right to a "marriage" with a person of the same sex but also a claim of raw judicial power to redefine public institutions such as marriage. The lower courts, and the dissenters, cannot create a new fundamental right to same-sex "marriage" without assuming in the courts the power to redefine marriage and presumably any other right of our citizens under the United States and Washington Constitutions.
ś 129 This court does not possess that power â no court does. Separation of powers is a fundamental constitutional principle. The necessary corollary is the obligation to recognize only the legitimate power of each branch of government.
ś 130 The weighty record of history, overwhelming societal consensus, and the strong force of legal authorities from Washington courts and its legislature, as well as from the United States Supreme Court, do not allow such a cavalier and arbitrary redefinition of marriage by a court. Though advanced with fervor and supported by special interests loudly advocating the latest political correctness, the arguments (and the dissenters) cannot overcome the plain legal and constitutional principles supporting Washington's definition of marriage.

II. THERE IS NO VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE
ś 131 Respondents first claim a right or privilege to marry a person of the same sex under the constitution of Washington. This claim categorically fails an honest independent analysis of article I, section 12 of our state constitution.
ś 132 The Washington Constitution privileges and immunities clause provides:
No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.
WASH. CONST. art. I, § 12. "Appropriate constitutional analysis begins with the text and, for most purposes, should end there as well." Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997). This text requires a two-part analysis: (1) Does a law grant a citizen, class, or corporation "privileges or immunities," and if so, (2) Are those "privileges or immunities" equally available to all? Of course if no "privilege or immunity" is granted by the challenged law in the first place, the clause has no application and the second question is never reached.
ś 133 First, note that DOMA does not "grant" any right at all; the right to marriage between a man and a woman long predates DOMA.[8] Secondly, relevant to this analysis, there is no right or "privilege" to same-sex marriage.
ś 134 The threshold question, therefore, is what entitlement under Washington marriage law is a "privilege or immunity" and *994 whether respondents' claim qualifies. Fortunately, there is a rich and long history for the terms of art "privilege" and/or "immunity," as well as ample precedent, which gives these terms form and substance. Marriage between a man and a woman is a right or privilege, these same-sex claims are not, and history and all case law confirm this.
ś 135 The term "privileges and immunities" first found its way into American law in the Articles of Confederation of the United States of America, adopted in 1778. Article IV of the articles provided:
The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States . . . .
These terms were firmly ensconced in English law. See, e.g., 2 BLACKSTONE'S COMMENTARIES *129 editor's cmt. 5 (St. George Tucker ed., Rothman Reprints, Inc. 1969) (1803).
ś 136 The Articles of Confederation were replaced by the United States Constitution, which provides in part: "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." U.S. CONST. art. IV, § 2.[9] Alexander Hamilton even discussed the clauses in The Federalist No. 80, at 405 (Alexander Hamilton).
ś 137 Justice Bushrod Washington in Corfield v. Coryell, 6 F. Cas. 546, 551-52, 4 Wash. C.C. 371 (C.C.E.D.Pa.1823) provided the classic statement of the law on privileges and immunities under article IV of the United States Constitution:
The inquiry is, what are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of the citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold, and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental: to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised. These, and many others which might be mentioned, are, strictly speaking, privileges and immunities. . . .[10]
*995 ś 138 From early in our nation's history, many individual state constitutions also included privileges and immunities clauses, although the text of these clauses often differs slightly. W.J. Meyers, The Privileges and Immunities of Citizens in the Several States, 1 Michigan Law Review 286 (1902) catalogues many state court decisions construing state privileges and immunities clauses in terms of what was, and was not, considered to be a privilege or immunity. Professor Meyers concludes, "Roughly, the `privileges and immunities' belonging to a citizen by virtue of citizenship are `personal' rights, that is, private rights, as distinguished from public rights." Id. at 290.
ś 139 We have stated on numerous occasions that "[s]tate cases and statutes from the time of the constitution's ratification, rather than recent case law, are more persuasive in determining" the protections of a constitutional provision. Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 120, 937 P.2d 154, 943 P.2d 1358 (1997). An important early decision of the Washington Supreme Court, construing our own privileges and immunities clause, was neither cited by the dissenters nor by Justice Madsen. This decision, State v. Vance, 29 Wash. 435, 70 P. 34 (1902), was specifically relied upon and quoted at length in our most recent decision on the issue. Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wash.2d 791, 83 P.3d 419 (2004) (Grant County II). Indeed, Vance served as the primary precedential basis for the holding in that case.
ś 140 In both Vance and Grant County II, the court addressed the seminal question of whether the entitlement or right at issue was a "privilege or immunity" as those terms are used in the state constitution, expressly rejecting the idea that any disparity in treatment necessarily falls within the clause. Grant County II, 150 Wash.2d at 812-14, 83 P.3d 419 (concluding that the statutory authorization allowing landowners to petition for municipal annexation does not involve a fundamental attribute of an individual's state citizenship).
Thus, there is no privilege, i.e., fundamental right of state citizenship, at issue in this case, and the claim of a violation of article I, section 12 fails for this reason.
Grant County II, 150 Wash.2d at 814, 83 P.3d 419.
ś 141 These cases require us to similarly focus first upon what is a "privilege or immunity." If there is no constitutional privilege or immunity at issue, the case is decided.
ś 142 As stated in Vance and repeated in Grant County II, the most apt analogy from the United States Constitution is its privilege and immunities clause, not the equal protection clause. Applying the "equal protection" analysis to a privilege and immunity claim, as reflected in some other opinions, amounts to rewriting constitutional text.[11] (For this claim, equal protection analysis is separately applied, infra, p. 996.)
ś 143 To apply the constitutional text to the case at bar is not difficult. The privileges and immunities challenge brought against DOMA is that the act confers the "privilege" of marriage to opposite-sex couples while withholding it to same-sex couples. The apparent defect in this argument, however, is that same-sex marriage cannot be argued to be a "privilege" in the sense that term is used in our state constitution to encompass fundamental rights which belong to the citizens of the state.
ś 144 The same result is reached if we apply the same words as they have been understood in the federal constitution. See discussion in Vance, 29 Wash. at 458, 70 P. 34. There is no fundamental right to same-sex marriage under the United States Constitution as the United States Supreme Court cases discussed infra, p. 998, further establish.
ś 145 Many cases in this court, and the United States Supreme Court, do support *996 the conclusion that marriage between one man and one woman is a right or privilege. However, there is no basis whatsoever to conclude that same-sex "marriage" is historically fundamental in the sense that it does "belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose the Union, from the time of their becoming free, independent, and sovereign." Corfield, 6 F. Cas. at 551. Even Justice Fairhurst's dissent concludes there is not a shred of historical precedent to satisfy that proposition, concluding rather that the history is precisely the opposite, that of hostility (and that DOMA is "motivated solely by animus"). Dissent (Fairhurst, J.) at 1019.
ś 146 Nor is Justice Madsen's claim that "history and tradition are not static," Madsen, J., op. at 977 coherent, at least outside the context of a George Orwell novel. Our history and tradition are real and ascertainable. This court and the United States Supreme Court have always applied these principles to inform the understanding of the privileges and immunities clause, rather than current political notions. Under our constitutional separation of powers, such issues are for the legislature and/or the people, and here the legislature has clearly spoken.[12] This is not to suggest the constitutional right of marriage may be redefined at will by legislative process; that may be a case for a different day.

III. FOURTEENTH AMENDMENT EQUAL PROTECTION ANALYSIS
ś 147 The superior court in Andersen purported to rely on cases that apply the United States Constitution's Fourteenth Amendment guarantee of equal protection. Washington marriage law and DOMA easily satisfy this test as well. The level of scrutiny applied depends upon whether the law is drawn using a suspect class or whether a fundamental right is implicated. Where a law involves no such classification and no fundamental right is implicated, rational basis review is applied. Otherwise, strict scrutiny is applied. DOMA satisfies either test as demonstrated, infra.

A. Suspect Class

ś 148 Where a law is challenged because of a legislative classification of persons, suspect class analysis may be applied. At the outset, it is not true that DOMA defines any such class, which is allowed â or not allowed â to marry. Professed homosexuals, like all Washingtonians, are clearly allowed to marry in Washington. See, e.g., In re Parentage of L.B., 121 Wash.App. 460, 464, 89 P.3d 271 (2004), aff'd in part, rev'd in part on other grounds, 155 Wash.2d 679, 122 P.3d 161 (2005).
ś 149 Every Washingtonian may marry subject to reasonable police power restrictions. A person may not marry someone under age 17 (RCW 26.04.010), may not marry if already married (RCW 26.04.020(1)(a)), may not marry a close relative (RCW 26.04.020(1)(b)), and may not marry if "the parties are persons other than a male and a female" (RCW 26.04.020(1)(c)).
ś 150 The last prohibition, like the bigamy/polygamy prohibition, is definitional. A "marriage" means a marriage between one man and one woman (and the only marriage of each spouse). There is no class favored or disfavored under this statute, thus there can be no "suspect class."
ś 151 Assuming arguendo the last provision (RCW 26.04.020(1)(c)) could be viewed as excluding a group, the group must also qualify as a "suspect" class in order to require heightened scrutiny, and claimants do not qualify.
ś 152 "Suspect class" has been limited to "race, alienage, or national origin" because those "factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Suspect classes that have been recognized have a history of discrimination and exhibit an obvious, immutable *997 trait frequently bearing no relation to the ability to relate to society, and constitute a politically powerless class. Id. at 400; High Tech Gays v. Def. Indus. Sec. Clearance Office, 895 F.2d 563, 573 (9th Cir.1990).
ś 153 Conversely, where the distinguishing characteristics of the group impacted by a law are "relevant to interests the State has the authority to implement, the courts have been very reluctant . . . to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." Cleburne, 473 U.S. at 441-42, 105 S.Ct. 3249. See Thomasson v. Perry, 80 F.3d 915, 928 (4th Cir.1996) ("[T]he Supreme Court has made clear that `respect for the separation of powers' should make courts reluctant to establish new suspect classes." (quoting Cleburne, 473 U.S. at 441, 105 S.Ct. 3249)). Washington follows federal law when determining a suspect class. Seeley v. State, 132 Wash.2d 776, 791, 940 P.2d 604 (1997); State v. Shawn P., 122 Wash.2d 553, 559-60, 859 P.2d 1220 (1993).
ś 154 DOMA does not create an inherently suspect legislative class nor is DOMA drawn along the lines of any suspect class. DOMA does not distinguish between persons of heterosexual orientation and homosexual orientation nor does the prohibition on marrying a partner who is already married or who is underage.
ś 155 DOMA's terms apply to all alike as individuals. Under DOMA every adult has the ability to marry a person of the opposite sex. The married couple in In re Parentage of L.B. were both avowedly homosexual at one time but they married â one man and one woman. No inquiry was made into their sexual orientation. It cannot be said that an individual with a homosexual orientation is deprived of the ability to enter a state-recognized marriage, absent an a priori redefinition of marriage.[13]
ś 156 DOMA did not change the law of marriage in Washington. See Singer v. Hara, 11 Wash.App. 247, 262, 522 P.2d 1187 ("to define marriage to exclude homosexual or any other same-sex relationships is not to create an inherently suspect legislative classification requiring strict judicial scrutiny to determine a compelling interest."), review denied, 84 Wash.2d 1008 (1974).
ś 157 Assuming arguendo that DOMA did imply some classification, no Washington appellate court has ever found sexual orientation to be a suspect classification. See, e.g., Miguel v. Guess, 112 Wash.App. 536, 552 n. 3, 51 P.3d 89 (2002); Singer, 11 Wash.App. at 262, 522 P.2d 1187. Even the trial court in Andersen agreed that the "substantial weight of appellate authority runs contrary to" respondents' claim that homosexuals or homosexual orientation constitute a suspect class. Andersen, No. 04-2-04964-4, 2004 WL 1738447, at *5. The trial court in Andersen applied the traditional test for suspect-class designation and held that "in view of the record herein, this Court is not in a position to announce a potentially far-reaching new rule that homosexuality defines a suspect class for purposes of constitutional analysis. It will decline to do so." Id.
ś 158 Looking to federal law, it is also clear that sexual orientation is not a suspect or quasi-suspect class. No federal court has specifically found sexual orientation to be a suspect classification.[14] After examining the decisions of the different federal judicial circuit courts of appeal, the Eleventh Circuit recently noted that "[A]ll of our sister circuits that have considered the question have declined to treat homosexuals as a suspect *998 class." Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 818 (11th Cir.2004), cert. denied, 543 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005). See also Flores v. Morgan Hill Unified Sch. Dist., 324 F.3d 1130, 1137 (9th Cir.2003) (referencing High Tech Gays for the holding that "homosexuals are not a suspect or quasi-suspect class, but are a definable group entitled to rational basis scrutiny for equal protection purposes.").[15]
ś 159 Justice Madsen's opinion correctly concludes that there is no precedent to support the plaintiff's contention that homosexuality is a suspect class. As indicated above, it is not even a class for the purposes of the DOMA statute.
ś 160 The logic and underlying constitutional rationale of both state and federal case authority do require the conclusion that sexual orientation is not a suspect class for the purposes of the Washington Constitution.

B. Fundamental Right

ś 161 Given the claims here, the importance of marriage, and the strong interests in finality of our decision today, it is appropriate to also employ the fundamental rights analysis. These rights deemed "fundamental" for equal protection[16] purposes and qualifying for heightened judicial scrutiny include those liberties that are "objectively, `deeply rooted in this Nation's history and tradition."' Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997) (quoting Moore v. East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion)). An inquiry into the understanding of the people further reflects the respect for the people expressed in our state constitution's article I, section 1 declaration of rights: "All political power is inherent in the people." See also, e.g., U.S. CONST. preamble and amend. IX; THE DECLARATION OF INDEPENDENCE para. 2 (July 4, 1776).
ś 162 Rights expressly affirmed in our federal and state constitutions or acknowledged through long-standing public practice rightly receive protection. Both constitutions specifically protect rights of the people beyond those enumerated in the text of the Bill of Rights. WASH. CONST. art. I, § 30; U.S. CONST. amend. IX. In order to assure against erosion of these fundamental rights, they may be amended only through procedures set forth in each constitution.
ś 163 Conversely, where courts attempt to mandate novel changes in public policy through judicial decree, they erode the protections of our constitutions and frustrate the constitutional balance, which expressly includes the will of the people who must ratify constitutional amendments. Examination of history and tradition is therefore necessary to identify fundamental rights as the basis for judicial decision-making. This inquiry must not hinge upon the judges' subjective feelings but must be based upon objective consideration of historical understanding.
ś 164 United States Supreme Court precedent has stressed this deeply rooted historical nature of fundamental rights analysis. Fundamental rights are those "`implicit in the concept of ordered liberty,'" such that "`neither liberty nor justice would exist if they were sacrificed.'" Glucksberg, 521 U.S. at 721, 117 S.Ct. 2258 (quoting Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). Fundamental liberty *999 interests reflect a "strong tradition" founded on "[t]he history and culture of Western civilization," which are "now established beyond debate as an enduring American tradition." Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).
ś 165 The creation of new constitutional rights has serious ramifications and, if created by court decree rather than pursuant to constitutional amendment procedures, does not have the legitimacy of public debate and/or legislative action. Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258. Policy preferences of judges must not be advanced through the guise of newly created rights grounded in fads of political correctness.
ś 166 Thus, relying upon "[o]ur Nation's history, legal traditions, and practices" as "`guideposts for responsible decisionmaking,'" the United States Supreme Court has recognized marriage between one man and one woman as a fundamental right.[17]Glucksberg, 521 U.S. at 721, 117 S.Ct. 2258.
ś 167 The fundamental right of a man and woman to marry is linked with the related fundamental right to procreate, as noted in Skinner. Id. at 541, 62 S.Ct. 1110 ("[m]arriage and procreation are fundamental to the very existence and survival of the race"); Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978).
ś 168 Every United States Supreme Court decision concerning the right to marry has assumed marriage as the union of one man and one woman. Every party in every right to marry case that the Supreme Court has ever decided included one man in union with one woman. Those decisions do not support any claim other than the right to marry a person of the opposite sex.[18]
ś 169 In addition to the right to marry cases, other important United States Supreme Court cases have also relied upon the customary definition of marriage as the union of one man and one woman. See, e.g., Murphy v. Ramsey, 114 U.S. 15, 45, 5 S.Ct. 747, 29 L.Ed. 47 (1885) (discussing "the basis of the idea of the family, as consisting in and springing from the union for life of one man and one woman"); Davis v. Beason, 133 U.S. 333, 341, 10 S.Ct. 299, 33 L.Ed. 637 (1890).
ś 170 The United States Supreme Court has directly rejected the argument that a fundamental right to marry extends to same-sex unions. In Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185 (1971), appeal dismissed, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972), the Supreme Court dismissed for lack of a substantial federal question an appeal of a Minnesota State Supreme Court decision that rejected the claim made here that "the right to marry without regard to the sex of the parties is a fundamental right of all persons." Baker, 291 Minn. at 312-15, 191 N.W.2d 185. The Minnesota Supreme Court reversed and held the state's marriage statute did not violate the due process clause or the equal protection clause. The Supreme Court dismissed the appeal. Thus, the same-sex union as a constitutional right argument was so frivolous as to merit dismissal without further argument by the Supreme Court. A similar result is required today.[19]
*1000 ś 171 In all later cases, the United States Supreme Court made clear it was not establishing a fundamental right to recognition of homosexual relationships â let alone same-sex marriage. When invalidating a criminal statute prohibiting homosexual sodomy, the court stated, "[This case] does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." Lawrence v. Texas, 539 U.S. 558, 578, 604, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).
ś 172 Justice Sandra Day O'Connor further stated that "preserving the traditional institution of marriage" is a "legitimate state interest" and "other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group." Id. at 585, 123 S.Ct. 2472 (O'Connor, J., concurring).[20]
ś 173 Indeed, the Supreme Court disclaimed that fundamental rights analysis extends to same-sex couples. Id. at 593, 123 S.Ct. 2472 (Scalia, J., dissenting) ("[w]e have held repeatedly, in cases the Court today does not overrule, that only fundamental rights qualify for this so-called heightened scrutiny' protection â that is, rights which are `deeply rooted in this Nation's history and tradition"' (quoting Glucksberg, 521 U.S. at 721, 117 S.Ct. 2258)). Other authorities have reiterated the conclusion that Lawrence did not create or even suggest a right to marry a person of the same sex.[21]
ś 174 Thus, the body of credible appellate authority in this nation stands against the asserted equal protection right to marry a person of the same sex, and the effort to redefine marriage has been overwhelmingly rejected by courts in other jurisdictions.[22] Even the Goodridge plurality in Massachusetts declined to create such a new fundamental right.[23]
*1001 ś 175 The commitment to marriage as a union of one man and one woman has been emphatically reiterated in states. In the few years these cases were pending, 11 states considered constitutional amendments to confirm the understanding of marriage as between one man and one woman. All 11 measures were passed by the people of their states. At least one more state has since added a similar amendment to its constitution. (A complete listing of state constitutional amendments and statutes is attached as Appendix A.)
ś 176 Supreme Court precedent does prohibit imposing obstacles to marriage of one man and one woman where those restrictions are based solely upon invidious discrimination and not related to any legitimate governmental interests. In Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), an antimiscegenation law barring marriage between white and other races was based upon racial discriminatory purposes bearing no relationship to governmental interests in fostering stable marriages of one man and one woman.[24]
ś 177 We vigorously reject any attempt to link the discriminatory antimiscegenation laws in Loving with this State's DOMA. The Washington Court of Appeals in Singer correctly noted:
The Loving and Perez courts [Perez v. Sharp, 32 Cal.2d 711, 198 P.2d 17 (1948) ] did not change the basic definition of marriage as the legal union of one man and one woman; rather, they merely held that the race of the man or woman desiring to enter that relationship could not be considered by the state in granting a marriage license.
11 Wash.App. at 255 n. 8, 522 P.2d 1187. Numerous other courts have all rejected the claim that the decision in Loving somehow challenged state laws reaffirming marriage as the union of one man and one woman.[25]
ś 178 Careful review of the historical context of Loving further undermines the dissents' disturbing attempt to link constitutionally void, racist laws with a historical definition of marriage as between a man and woman. Antimiscegenation laws were anathema to the "color-blind" constitution articulated in Justice John Marshall Harlan's dissent in Plessy v. Ferguson.[26] Antimiscegenation laws infringed upon the union of one man and one woman by injecting racial status as a qualification. Such laws contradicted the fact that a man and a woman of any race have the natural right to marry and have children. This right is protected by the United States and Washington State Constitutions.
ś 179 Racially discriminatory antimiscegenation laws also violate the right to marriage between a man and a woman. Here, in contrast, the State's DOMA simply confirms the common law understanding of marriage as a union of a man and woman. It is the dissent that would abrogate the common law understanding through judicial fiat.
ś 180 Justice Fairhurst's dissent would reframe the issue as whether marriage should be construed "broadly" or "narrowly." Dissent (Fairhurst, J.) at 1021. Inclusion of same-sex couples within the definition of "marriage" by redefining the right "broadly" has no support in case law. Indeed, the polygamy claims were better supported since those claims were also founded in a claim of a right to practice an established religion, which allowed polygamy. The free exercise of religion is protected by the first amendment to the United States Constitution. There is no similar claim for same-sex marriage.
ś 181 The fundamental right to enter into a marriage union of one man and one woman, *1002 like other fundamental rights, needs no further ("broader") definition. Below we shall briefly show that the legislative recodification of this definition of marriage in DOMA is constitutionally justified by a record establishing a rational basis, or alternatively, by compelling state interests.

C. Rational Basis

ś 182 Rational basis scrutiny is the most deferential analysis for equal protection purposes, but rational basis scrutiny does not preclude judicial review. See Island County v. State, 135 Wash.2d 141, 156, 955 P.2d 377 (1998) (Sanders, J., concurring). Laws solely based on animus toward a particular group and wholly lacking a legitimate governmental purpose would not meet the rational basis test. See, e.g., Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).
ś 183 Here, there are numerous rational bases supporting the legislature's reaffirmation of marriage as the union of one man and one woman. The complementary nature of the sexes and the unique procreative capacity of one man and one woman as a reproductive unit provide one obvious and nonarbitrary basis for recognizing such marriage. The binary character of marriage exists first because there are two sexes.[27] A society mindful of the biologically unique nature of the marital relationship and its special capacity for procreation has ample justification for safeguarding this institution to promote procreation and a stable environment for raising children. Less stable homes equate to higher welfare and other burdens on the State.
ś 184 Only opposite-sex couples are capable of intentional, unassisted procreation, unlike same-sex couples. Unlike same-sex couples, only opposite-sex couples may experience unintentional or unplanned procreation. State sanctioned marriage as a union of one man and one woman encourages couples to enter into a stable relationship prior to having children and to remain committed to one another in the relationship for the raising of children, planned or otherwise.[28]
ś 185 Although society's continuing existence depends upon children, marriage has never been considered as solely a mechanism to increase the number of births. Modern circumstances confirm that marriage is needed in today's society more than ever. As amicus notes:
widespread contraceptive and abortion rights may actually make more salient, not less, the traditional role of marriage in encouraging men and women to make the next generation that society needs. The more legal, cultural, and technological choice individuals have about whether or not to have children, the more need there is for a social institution that encourages men and women to have babies together, and creates the conditions under which those children are likely to get the best care.
Amicus of Families Northwest at 14-15.
ś 186 It was reasonable for the Washington Legislature to conclude that the biological nature of one man and one woman as a reproductive unit provides an objective and nonarbitrary basis for defining marriage. The State's interests in support of marriage would be undermined if marriage were so *1003 malleable in meaning as to include any consensual relationship claimed to be "`exclusive and permanent.'" Dissent (Fairhurst, J.) at 1023 (quoting Goodridge, 440 Mass. at 332, 798 N.E.2d 941).
ś 187 Marriage redefined to mean any "permanent"[29] intimate personal relationship between two consenting persons has no firmer basis than a similar relationship between three or more persons, which has been long rejected. The stakes were clear to the Supreme Court in facing the challenges to marriage presented in the polygamy cases. As Chief Justice Morrison R. Waite stated:
Upon [marriage] society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal. In fact, according as monogamous or polygamous marriages are allowed, do we find the principles on which the government of the people, to a greater or less extent, rests.
Reynolds v. United States, 98 U.S. (8 Otto) 145, 165-66, 25 L.Ed. 244 (1878). Several later United States Supreme Court decisions vigorously rejected suggested alteration to the fundamental definition of marriage.[30]
ś 188 The legislature enacted DOMA as a reasonable declaration of state marriage policy and an acknowledgment of the federal DOMA's framework for the recognition of marriage in the United States. The State's DOMA follows the federal DOMA, passed by Congress and signed by President Clinton in 1996.[31] The federal DOMA was enacted pursuant to the full faith and credit clause of the United States Constitution and has been upheld as constitutional in the face of challenges in federal courts. See Wilson, 354 F.Supp.2d 1298; Kandu, 315 B.R. 123. See also Smelt, 447 F.3d 673.
ś 189 The federal DOMA does two things. First, it expressly defines marriage as the union of one man and one woman for federal purposes. Second, it gives express federal law approval to states to define marriage and determine what marriages they recognize pursuant to the full faith and credit clause. States are not required to recognize "marriages" not consisting of one man and one woman even if permitted in other states. Although the federal statute clarifies the states' powers in defining and recognizing marriage, the statute does not dictate what particular marriage policies states should adopt.
ś 190 The legislative history for Washington's DOMA reflects that it was contemplated in the context of the federal DOMA. Washington's DOMA reasonably reiterates this State's understanding of marriage in light of constitutional federalism principles recognized in the federal DOMA.
ś 191 Another rational basis requiring us to uphold DOMA is that the statute was found as necessary to ensure that decisions about marriage remain with the people of Washington. Legislators swear an oath to uphold and defend the constitution and laws of the State. Consistent with that oath, the legislators ensured that the people of Washington retain control over their institutions rather than permit foreign state judges to become de facto determinants of marriage policy.
ś 192 The legislative history of our State's DOMA also shows consideration of the Hawaii Supreme Court's decision in Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44 (1993), superseded by constitutional amendment. Haw. Const. art. I, § 23 (amended 1998).
ś 193 Legislators were concerned that without DOMA, such other states' court decisions might be enforced in Washington. The Hawaii court had expressly criticized the *1004 Washington decision in Singer.[32] Our legislature rationally concluded that explicitly reaffirming this State's understanding of marriage would both reflect the consensus of the people and keep the issue of marriage within the control of Washingtonians. Washington marriage should remain a decision for citizens of this State, not any other state or its courts.[33]
ś 194 Legislators found the interests so strong as to require express definition of marriage as the union of one man and one woman in order to remove any possible legal uncertainties. Despite or because of the long-standing understanding of marriage as between one man and one woman, our statutes did not explicitly say marriage is the union of one man and one woman.[34]
ś 195 Legislators concluded that DOMA would reinforce the understanding of marriage in any potential court contest.[35] The legislative record indicates concern that the Court of Appeals decision in Singer would be argued as limited authority because of the court which ruled.[36] The record also shows express concern that this court would be cited authority from other states argued to overrule the Singer holding.[37]
ś 196 DOMA provides certainty, which is particularly important since this state has generally followed the rule that the jurisdiction where the contract is executed is controlling in most adjudications involving the validity of marriage. Willey v. Willey, 22 Wash. 115, 117, 60 P. 145 (1900); In re Estate of Wilbur, 8 Wash. 35, 37, 35 P. 407 (1894). This State does not recognize common-law marriages, but we have recognized the validity of such marriages between a man and a woman if contracted in other states. Peffley-Warner v. Bowen, 113 Wash.2d 243, 249, 778 P.2d 1022 (1989); In re Estate of Gallagher, 35 Wash.2d 512, 514-15, 213 P.2d 621 (1950). Legislators specifically referred to this recognition of foreign-state marriages.[38] A strong conviction was expressed *1005 that this precedent should not extend to same-sex "marriages" from other states.[39]
ś 197 Where foreign law clearly violates our State's strong public policy, there is an important and well-established exception to the rule for recognizing foreign law. This exception probably requires that Washington courts would not recognize same-sex "marriage" even in the absence of DOMA.[40] Still, enactment of DOMA was based upon a rational concern about precedent recognizing some marriages from foreign jurisdictions which Washington did not allow.
ś 198 Hawaii voters subsequently enacted a constitutional amendment reaffirming marriage as a union of one man and one woman, as have all other states where voters or the legislature have been allowed to decide. See App. A. The Massachusetts decision, however, has not yet been reversed, and confirms that our legislature did not engage in speculative concerns by enacting DOMA.
ś 199 Similar concerns were evidenced by the United States Congress (and President Clinton) and by other states when enacting DOMA statutes or constitutional amendments reaffirming marriage as a union of one man and one woman.[41] The aberrant plurality opinion of the Massachusetts court and the decisions by trial courts here confirm the validity of these concerns.
ś 200 The record also establishes that Washington's marriage definition confirmed in DOMA was rationally supported. Studies presented to the legislature support marriage as a union of one man and one woman. The legislature was offered evidence that children tend to thrive best in families consisting of mothers, fathers, and their biological children.[42]
ś 201 The current state of scientific findings was further illuminated by intervenor's expert, Dr. Jeffrey B. Satinover. See Clerk's Papers (CP) at 531. For the purposes of scientific study, no simple dichotomy can be drawn between opposite-sex couples and same-sex couples. Since same-sex pairing takes place along sexual lines rather than across sexual lines, and because of the nonfungible differences between men and women, serious scientific inquiry should take into account three distinct communities with "starkly unequal demographics, differential impact on children, and different multigenerational capacity." See CP at 533.
ś 202 Before redefining a social institution, the legislature should consider ramifications flowing from all three of these couple communities and the resulting impact on the social fabric and on children.
ś 203 The first obvious and relevant fact is that female couple households are necessarily fatherless and male couple households are *1006 necessarily motherless. Each of these differences from the optimum mother/father setting for stable family life may offer distinctive disadvantages.
ś 204 Studies summarized in the record before one trial court demonstrated that an absent father "is associated with quantifiable deficits in children at every stage of the lifecycle, persisting not only in the adulthood of the child, but even into the next generation." CP at 539.[43] A similar problem has been indicated of families without a mother, although the number of male unions with children is far smaller. CP at 539.[44]
ś 205 Direct comparisons between opposite-sex homes and same-sex homes further support the former as a better environment for children. For example, studies show an average shorter term commitment and more sexual partners for same-sex couples.[45]
ś 206 The United States Supreme Court has addressed the proposition that one man and one woman are the optimal setting for raising a family.[46] The relationship between behavioral problems and the absence of fathers in the home have been addressed by other courts.[47]
ś 207 The Washington Legislature could rationally reject outright or conclude that further study is required before engaging in a dramatic alteration of our society's social fabric with profound negative or unforeseeable consequences.
ś 208 Our constitutional system mandates separation of powers. It is for the legislature to weigh the evidence and relative merits of social science and statistics, taking into account the public interests. We recognize that competing interpretations of the studies have been offered to this court.
ś 209 For purposes of legitimate judicial review, it is sufficient to note that the legislature held hearings with testimony supplemented by documentation, including studies that support the conclusion that mother-father households are the optimal setting for family and children.
ś 210 More fundamentally, it is rational that our legislature insists upon compelling evidence before making a sweeping alteration in marriage.[48] Obviously, those who would *1007 overturn the prevailing definition of marriage did not present compelling evidence to the legislature to support such change.
ś 211 This court must uphold the legislature's determination, which is both rational and based on legitimate interests (and does not destroy or redefine existing rights).

D. No Improper Motives Prompted DOMA

ś 212 Justice Fairhurst's dissent also insists DOMA was enacted through improper motives of "animus." Dissent (Fairhurst, J.) at 1019. Presumably, this conclusion extends to the United States Congress and President Clinton who enacted and signed the federal DOMA, as well as to other state legislatures who have enacted DOMA versions. To state this paranoid proposition is to rebut it.
ś 213 Courts must not indulge in speculation about illicit and subjective motives of legislators. Not only is this a separation of powers constraint but it involves the recognition that subjective motives are far more difficult to discern than the objective public purposes in legislation. "`It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (quoting United States v. O'Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). The legislative record here offers overwhelming evidence that DOMA was enacted in accord with proper public purposes, not the argued supposedly improper motives.
ś 214 It is disturbing that the dissenters would make this conclusion about the Washington Legislature, particularly where expansive, objective evidence supports the opposite conclusion. Legislative proponents of DOMA extensively cited the rational bases for DOMA discussed supra, pp. 1002-1007. Proponents of the bill expressly opposed discrimination against persons with homosexual orientation and indeed such legislation to that effect was passed while this case was pending.[49] It is beyond the province of the judiciary to take one side in a legislative dispute. It is sufficient here to recognize the objective evidence available in the record only supports the conclusion that DOMA was enacted pursuant to proper public purposes.[50]

E. Compelling State Interests Support Washington Marriage Law

ś 215 DOMA's reaffirmation of marriage as the union of one man and one woman also furthers compelling state interests. The legislature formally declared that compelling governmental interests support DOMA.
(1) It is a compelling interest of the state of Washington to reaffirm its historical commitment to the institution of marriage as a union between a man and a woman as husband and wife and to protect that institution.[51]
This determination is amply supported by the record and by the historic understanding of marriage's role in society.
ś 216 If a statute did classify according to a suspect class or infringe on a fundamental right, the statute will be subjected to strict scrutiny. Cleburne, 473 U.S. at 440, 105 S.Ct. 3249; San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 16-17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Under strict scrutiny a state must prove the classification or infringement of a right is narrowly tailored to advance a compelling governmental interest; otherwise, the statute is invalid. Cleburne, *1008 473 U.S. at 440, 105 S.Ct. 3249; Rodriguez, 411 U.S. at 16-17, 93 S.Ct. 1278.
ś 217 Although we cannot find that DOMA was drawn according to a suspect class or infringes upon a fundamental right, the trial court's holding in Andersen, the briefing of the parties, and the importance of the case warrant further analysis of DOMA under strict scrutiny. Washington marriage law and DOMA must be upheld because the legislature expressly found it furthers compelling state interests, and that determination is correct.
ś 218 The Supreme Court discussed the importance of marriage in rebutting challenges to marriage posed by polygamy. These cases prompted the Supreme Court to identify the compelling state interests in marriage between one man and one woman. See, e.g., Reynolds, 98 U.S. at 165-66, quoted supra, p. 1003; Murphy, 114 U.S. at 45, 5 S.Ct. 747, quoted supra, p. 1003; Beason, 133 U.S. at 344-45, 10 S.Ct. 299. See also Wilbur, 8 Wash. at 37, 35 P. 407.
ś 219 Marriage is a particularly public institution:
"it [civil marriage] is not so much the result of private agreement, as of public ordination. In every enlightened government it is preeminently the basis of civil institutions in every enlightened government, and thus an object of the deepest public concern. In this light, marriage is more than a contract. It is not a mere matter of pecuniary consideration. It is a great public institution, giving character to our whole civil polity."
Maynard v. Hill, 125 U.S. 190, 213, 8 S.Ct. 723, 31 L.Ed. 654 (1888) (quoting Noel v. Ewing, 9 Ind. 37, 48 (1857)). As the bedrock institution of society, marriage serves compelling state interests, many of which were already discussed, supra, p. 1002, in context of the legislative record herein.
ś 220 The State's compelling interest in marriage has also been reaffirmed in recent decisions rejecting another proposed redefinition of marriage.
Monogamy is inextricably woven into the fabric of our society. It is the bedrock upon which our culture is built. In light of these fundamental values, the State is justified, by a compelling interest, in upholding and enforcing its ban on plural marriage to protect the monogamous marriage relationship.
Potter v. Murray City, 760 F.2d 1065, 1070 (10th Cir.1985), cert. denied, 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (citations omitted). See Bronson v. Swensen, 394 F.Supp.2d 1329 (D.Utah 2005) (holding "precedent in Potter dictates the finding that there is a compelling state interest in the protection of monogamous marriage."). See also State v. Green, 2004 UT 76, 99 P.3d 820. "First and foremost, the State has a compelling interest in regulating and preserving the institution of marriage as that institution has been defined by the State." Id. at 836 (Durrant, J., concurring). Marriage in each of these cases was between one man and one woman.
ś 221 Other recent authorities have recognized the State's compelling interest in marriage as the union of one man and one woman, particularly in light of its exclusive link to procreation and child rearing.[52] As one court noted, "it seems beyond dispute that the state has a compelling interest in encouraging and fostering procreation of the race and providing status and stability to the environment in which children are raised. This has always been one of society's paramount goals." Adams v. Howerton, 486 F.Supp. 1119, 1124 (C.D.Cal.1980) (rejecting the claim that homosexual unions should be recognized as marriages for immigration purposes), aff'd on other grounds, 673 F.2d 1036 (9th Cir. 1982).
ś 222 The legislature correctly held the State has compelling governmental interests to promote marriage as the union of one man and one woman. Those compelling interests include interests considered in the "rational basis" discussion, supra, pp. 1002-1007, and *1009 were summarized by the legislature itself (Laws of 1998, ch. 1, § 2). These compelling interests are well identified in United States Supreme Court decisions considering marriage, which are compelling and properly binding on this court. Washington marriage law and DOMA pass even a strict scrutiny test.

IV. DUE PROCESS, PRIVACY, AND FUNDAMENTAL RIGHTS (ARTICLE I, SECTIONS 3, 7, AND 32)
ś 223 Neither article I, section 3 nor article I, section 7 creates a right to redefine marriage to include same-sex couples. Even the dissenters do not disagree with this conclusion, but the claims of respondents will also be briefly rebutted in interests of finality.

A. Article I, Section 3

ś 224 Article I, section 3 provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." There is no fundamental "liberty" interest implicated here, much less any "deprived" interest. Each Washingtonian enjoys the same right to marry one person of the opposite sex. There is no right to redefine "marriage," and the State has both legitimate and compelling interests in adopting laws defining marriage as the union of one man and one woman. Thus, Washington marriage and DOMA do not violate this provision.

B. Article I, Section 7

ś 225 Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The right protected by that provision is the right to be free from unreasonable intrusion into one's private affairs. See State v. Ferrier, 136 Wash.2d 103, 112, 960 P.2d 927 (1998). Disturbance of one's private affairs occurs when the government intrudes upon those "privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass." State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984).
ś 226 There is no unreasonable government trespass in DOMA. Indeed, there is no trespass of any kind. Same-sex couples are not prevented from having any sort of private relationship that they choose. What respondents seek here is official and public recognition of their same-sex relationships. Article I, section 7 is not a device for creating such rights of public recognition.
ś 227 An article I, section 7 inquiry considers "`those privacy interests which citizens of [Washington] have held, and should be entitled to hold, safe from governmental trespass.'" State v. McKinney, 148 Wash.2d 20, 27, 60 P.3d 46 (2002) (alteration in original) (quoting Myrick, 102 Wash.2d at 511, 688 P.2d 151). Claims for a right to same-sex "marriage" unequivocally fail both steps. There is clearly no history of "marriage" that includes persons of the same-sex. DOMA does not intrude upon private relationships but instead concerns the public recognition of marriage. DOMA is constitutional under article I, section 7.

C. Article I, Section 32

ś 228 Respondent's argument based upon article I, section 32 is also unsupportable. Article I, section 32 actually supports the State's continued ability to define marriage as it has historically: the union of one man and one woman.
ś 229 Article I, section 32 declares that "[a] frequent recurrence to fundamental principles is essential to the security of individual rights." The legislative finding in DOMA confirms the intent to remain consistent with "historical commitment to the institution of marriage as a union between a man and a woman as husband and wife ...." Laws of 1998, ch. 1, § 2(1).
ś 230 The fundamental rights analysis, supra, pp. 998-1002, also reflects the mandate of this section of our constitution and demonstrates overwhelming justification for the recognition of marriage as the union of one man and one woman.[53] Only a judicial rewriting of "fundamental principles" would result *1010 in marriage finding definition in the shifting sands of political correctness. The claim for same-sex "marriage" is not consistent with the mandate of article I, section 32.

V. EQUAL RIGHTS AMENDMENT (ARTICLE XXXI, SECTION 1)
ś 231 Finally, respondents' argument under article XXXI, section 1â the "Equal Rights Amendment" (ERA)â also fails. That amendment did not create a right to redefine marriage to include same-sex couples, and the legislative history confirms that was not the intent of the voters who ratified the ERA nor the intent of that amendment.
ś 232 The nearly contemporaneous decision in Singer concluded correctly that marriage as the union of one man and one woman did not violate the ERA. The legislative history supports this conclusion. Particularly important is the voters pamphlet explanation by proponents of the amendment. Statements are required by our Washington Constitution article II, section 1(e). In the 1972 official voters pamphlet, the "Statement for" House Joint Resolution 61 states that "the Basic Principle of the Era ... is that both sexes be treated equally under the law. . . . Laws which restrict and deny rights to one sex would be eliminated." STATE OF WASH., VOTERS PAMPHLET, General Election 52 (Nov. 7, 1972).
ś 233 DOMA is constitutional under the ERA because it applies to both sexes equally. The ERA plainly prohibits legislation that favors one sex at the expense of the other or that discriminates against one sex to the advantage of the other. See, e.g., Marchioro v. Chaney, 90 Wash.2d 298, 305, 582 P.2d 487 (1978) ("Under the equal rights amendment, the equal protection/suspect classification test is replaced by the single criterion: Is the classification by sex discriminatory?"), aff'd, 442 U.S. 191, 99 S.Ct. 2243, 60 L.Ed.2d 816 (1979); Darrin v. Gould, 85 Wash.2d 859, 877, 540 P.2d 882 (1975) ("under our ERA discrimination on account of sex is forbidden" (emphasis added)).
ś 234 Neither trial court here found a violation of the ERA, nor can we. Washington's marriage law and DOMA neither favor nor discriminate against men or women, and do not violate the ERA.

VI. CONCLUSION
ś 235 Washington's long-standing definition of marriage as the union of one man and one woman and DOMA are both constitutional. Respondents' numerous challenges under the state and federal constitutions all fail.
ś 236 We conclude that the legislature was justified in enacting DOMA to clarify and reaffirm Washington marriage law by a compelling governmental interest in preserving the institution of marriage, as well as the healthy families and children it promotes. This conclusion may not be changed by mere passage of time or currents of public favor and surely not changed by courts.
ś 237 Finally, we conclude that neither the due process or right to privacy clauses in article I, section 3 and section 7 nor the equal rights amendment to our state constitution creates a right to marry a person of the same sex. Indeed, these claims are even less persuasive when viewed correctly through the eyes and understanding of those who authored and ratified our constitution (and the ERA amendment).
ś 238 We add the important conclusion that this decision is required by the relevant constitutional provisions, the history of our laws and precedent in this court, and the United States Supreme Court. This decision is final.[54] The decisions of both trial courts are reversed and these actions dismissed.
SANDERS, J., concurs.

APPENDIX A
(* indicates states with constitutional amendments)
*1011 Alabama: Const. amend. 761 (2006)
*Alaska: Const. art. I § , 25
Arizona: Ariz.Rev.Stat. § 25-101 (West Group 2000)
*Arkansas: Const. amend. 83, § 1
California: Cal. Fam.Code § 308.5 (Thomson/West 2004)
Colorado: Colo.Rev.Stat. § 14-2-104 (Lexis-Nexis 2005)
Connecticut: no law or constitutional amendment restricting marriage to one man and one woman
Delaware: Del.Code Ann. title 13, § 101 (Michie 1999)
Florida: Fla. Stat. § 741.212 (2005)
*Georgia: Const. art. I, § IV, para. I
*Hawaii: Const. art. I, § 23
Idaho: Idaho Code Ann. § 32-202 (Michie 2006)
Illinois: 750 Ill. Comp. Stat. Ann. 5/201 (Thomson/West 2004)
Indiana: Ind.Code Ann. § 31-11-1-1 (2005)
Iowa: Iowa Code Ann. § 595.2 (West Group 2001)
*Kansas: Const. art. XV, § 15
*Kentucky: Const. § 233a
*Louisiana: Const. art. XII, § 15
Maine: Me.Rev.Stat. Ann. title 19A, § 701 (West 1998)
Maryland: Md.Code Ann., Family Law § 2-201 (LexisNexis 2004)
Massachusetts: no law or constitutional amendment restricting marriage to one man and one woman
*Michigan: Const. art. I, § 1.I(25) (Lexis-Nexis 2006)
Minnesota: Minn.Stat. Ann. § 517.03 (Thomson/West 2006)
*Mississippi: Const. art. 14, § 263A
*Missouri: Const. art. I, § 33
*Montana: Const. art. XIII, § 7
*Nebraska: Const. art. I, § 29
*Nevada: Const. art. I, § 21
New Hampshire: N.H.Rev.Stat. Ann. § 457:1-:2 (Thomson/West 2004)
New Jersey: no law or constitutional amendment restricting marriage to one man and one woman
New Mexico: no law or constitutional amendment restricting marriage to one man and one woman
New York: no law or constitutional amendment restricting marriage to one man and one woman
North Carolina: N.C. Gen.Stat. Ann. § 51-1.2 (LexisNexis 2005)
*North Dakota: Const. art. XI, § 28
*Ohio: Const. art. XV, § 11
*Oklahoma: Const. art. II, § 35
*Oregon: Const. Art. XV, § 5a
Pennsylvania: 23 Pa. Cons.Stat. Ann. § 1704 (West Group 2001)
Rhode Island: no law or constitutional amendment restricting marriage to one man and one woman
South Carolina: S.C.Code Ann. § 20-1-15 (Thomson/West 2005)
South Dakota: S.D. Codified Laws § 25-1-1 (2004)
Tennessee: Tenn.Code Ann. § 36-3-113 (2005)
*Texas: Const. art. I, § 32
*Utah: Const. art. I, § 29
Vermont: Vt. Stat. Ann. title 15, § 8 (Lexis-Nexis 2002)
Virginia: Va.Code Ann. § 20-45.2 (Lexis-Nexis 2004)
Washington: RCW 26.04.010
West Virginia: W. Va.Code 48-2-104 (Lexis-Nexis 2004)
Wisconsin: no law or constitutional amendment restricting marriage to one man and one woman
Wyoming: Wyo. Stat. Ann. § 20-1-101 (LexisNexis 2005)
States with constitutional amendments pending for election in 2006:
*1012 Idaho
South Carolina
South Dakota
Tennessee
Virginia
Wisconsin

APPENDIX B
Arizona: Standhardt v. Superior Court of Ariz., 206 Ariz. 276, 77 P.3d 451 (Ct.App. 2003), review denied, 2004 Ariz. LEXIS 62 (2004)
Arkansas: Hatcher v. Hatcher, 265 Ark. 681, 580 S.W.2d 475 (1979)
California: Lockyer v. City and County of S.F., 33 Cal.4th 1055, 17 Cal.Rptr.3d 225, 95 P.3d 459 (2004)
Florida: Kantaras v. Kantaras, 884 So.2d 155 (Fla.Dist.Ct.App.2004), review denied, 898 So.2d 80 (2005)
Illinois: In re Marriage of Simmons, 355 Ill.App.3d 942, 292 Ill.Dec. 47, 825 N.E.2d 303 (2005)
Indiana: Morrison v. Sadler, 821 N.E.2d 15 (Ind.Ct.App.2005)
Kentucky: Jones v. Hallahan, 501 S.W.2d 588 (Ky.App.1973)
Minnesota: Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185 (1971)
New Jersey: Lewis v. Harris, 378 N.J.Super. 168, 875 A.2d 259 (App.Div.2005)
New York: Hernandez v. Robles, 2006 N.Y. slip. op. 5239, ___ N.Y.3d ___, ___ N.Y.S.2d ___, ___ N.E.2d ___, (Ct.App. July 6, 2006)
Ohio: Irwin v. Lupardus, 1980 WL 355015, No. 41379, 1980 Ohio App. LEXIS 12106 (June 26, 1980) (unpublished)
Oregon: Li v. State, 338 Or. 376, 110 P.3d 91 (2005)
Pennsylvania: De Santo v. Barnsley, 328 Pa.Super. 181, 476 A.2d 952 (1984)
Texas: Littleton v. Prange, 9 S.W.3d 223 (Tex.App.1999)
Vermont: Baker v. State, 170 Vt. 194, 744 A.2d 864 (1999)
But see
Hawaii: Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44, reconsideration granted in part, 74 Haw. 650, 875 P.2d 225 (1993), superseded by constitutional amendment. Haw. Const. art. I, § 23 (amended 1998)
Massachusetts: Goodridge v. Dep't of Pub. Health, 440 Mass. 309, 798 N.E.2d 941 (2003); c.f. Cote-Whitacre v. Dep't of Pub. Health, 446 Mass. 350, 844 N.E.2d 623 (2006)
FAIRHURST, J. (dissenting).
ś 239 In these consolidated cases, 19 gay and lesbian couples petitioned to receive the same right that all heterosexual Washington residents enjoyâ the right to marry the person of one's choice. See Clerk's Papers (CP) at 93-130 (Castle v. Washington, No. 04-02-00614-4, 2004 WL 1985215, Mem. Opinion on Constitutionality RCW 26.02.010 and RCW 26.02.020[1] (unpublished order) (Thurston County Super. Ct. Sept. 7, 2004)) [hereinafter CP (Castle )]; CP at 876-901 (Andersen v. King County, No. 04-2-04964-4-SEA, 2004 WL 1738447, Mem. Opinion and Order on Cross Mots. for Summ. J. (unpublished order) (King County Super. Ct. Aug. 4, 2004)) [hereinafter CP (Andersen)]. In each case, the trial court found on multiple grounds that the denial of that right, as codified in RCW 26.04.010(1) and .020(1)(c), was unconstitutional. Yet, Justice Madsen's plurality opinion (plurality) reverses those trial courts based on "[t]he case law" that purportedly "controls our inquiry." Plurality at 990. Neither an objective analysis of relevant law nor any sense of justice allows me to agree with the plurality.
ś 240 The plurality and concurrence condone blatant discrimination against Washington's gay and lesbian citizens in the name of encouraging procreation, marriage for individuals in relationships that result in children, and the raising of children in homes headed by opposite-sex parents, while ignoring the fact that denying same-sex couples the right to marry has no prospect of furthering *1013 any of those interests.[2] With the proper issue in mindâ whether denying same-sex couples the right to marry will encourage procreation, marriage for individuals in relationships that result in children, or child rearing in households headed by opposite-sex parentsâ I would hold that there is no rational basis for denying same-sex couples the right to marry.
ś 241 I would hold further that the right to marry the person of one's choice is a fundamental right, the denial of which has historically received heightened scrutiny. It is error to artificially limit the inquiry, as the plurality and concurrence do, to whether there is a fundamental right to same-sex marriage.[3] It is equally incorrect to limit the definition of the right to marry to the right to marry a person of the opposite sex. Because the Defense of Marriage Act's (DOMA's) denial of the right to marry to same-sex couples is not rationally related to any asserted state interest, it is also not narrowly tailored to any compelling state interest.
ś 242 Therefore, for both of these reasons, I would affirm the two trial courts in declaring RCW 26.04.010(1) and .020(1)(c) unconstitutional. The plurality uses the excuse of deference to the legislature to perpetuate the existence of an unconstitutional and unjust law. I dissent.

ANALYSIS
ś 243 Marriage is a right "older than the Bill of Rightsâ older than our political parties, older than our school system." Griswold v. Connecticut, 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). "Without question, civil marriage enhances the `welfare of the community.' It is a `social institution of the highest importance.'" Goodridge v. Dep't of Pub. Health, 440 Mass. 309, 322, 798 N.E.2d 941 (2003) (quoting French v. McAnarney, 290 Mass. 544, 546, 195 N.E. 714 (1935)).
ś 244 Civil marriage is a legal status given to individuals who seek the State's recognition of their committed relationships.[4]See Wash. Statewide Org. of Stepparents v. Smith, 85 Wash.2d 564, 568-69, 536 P.2d 1202 (1975); In re Marriage of J.T., 77 Wash.App. 361, 363, 891 P.2d 729 (1995). This legal status is accompanied by numerous legal, social, and financial benefits and obligations, many of which cannot be secured *1014 outside of marriage.[5] Indeed the Andersen respondents reference 423 state statutes that grant rights or impose duties based in part on marital status. Br. of Resp'ts at 26.
ś 245 There is no substitute for the legal protections provided by the State to married couples and their families. There is no equally respected social union. Nor is there a comparable public acknowledgment of a couple's decision to commit their lives to each other.
ś 246 But, in 1996, in response to Hawaii's conclusion in Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44 (1993), that denial of marriage licenses to same-sex couples was gender discrimination,[6] the United States Congress passed the Defense of Marriage Act (federal DOMA), Pub.L. No. 104-199, 110 Stat. 2419 (1996).[7] The federal DOMA defined marriage as being only between a man and a woman and allowed states to refuse to recognize same-sex marriages authorized in other places.[8]Id. In 1998, Washington followed suit, explicitly referencing the federal DOMA and enacting its own DOMA. LAWS OF 1998, ch. 1.[9] Laws of 1998, chapter 1, section 2(1) states that "[i]t is a compelling interest of the state of Washington to reaffirm its historical commitment to the institution of marriage as a union between a man and a woman as husband and wife and to protect that institution." Section 2(2) then recognized Singer v. Hara, 11 Wash.App. 247, 522 P.2d 1187 (1974), where the Court of Appeals held that the Washington marriage statute did not allow same-sex marriage and that the 1972 Equal Rights Amendment (ERA) to the Washington Constitution, article XXXI, section 1, did not require it, and stated the legislature's intent to codify Singer. Further, that section explicitly "establish[ed] public policy against same-sex marriage in statutory law that clearly and definitively declares same-sex marriages will not be recognized in Washington."[10] LAWS OF 1998 ch. 1, § 2(2).
ś 247 To that end, DOMA amended RCW 26.04.010(1) to define marriage as "a civil contract between a male and a female who have each attained the age of eighteen years, and who are otherwise capable." (emphasis added). Then, amending RCW 26.04.020, DOMA explicitly prohibited marriage between parties "other than a male and a female"â i.e., same-sex couples. Thus, DOMA "defends" and "protects" marriage from an *1015 entire class of people, homosexuals. RCW 26.04.020(1)(c).
ś 248 Respondents argue that denial of their right to marry violates several provisions of the Washington Constitution: (1) article I, section 12, the privileges and immunities clause; (2) article I, section 7, the private affairs clause; (3) article I, section 3, the due process clause; and (4) article XXXI, section 1, the ERA. The plurality analyzes each argument in turn and concludes that no independent state constitutional analysis is appropriate, no heightened scrutiny is justified under any of respondents' arguments, and that DOMA's denial of the right to marry to same-sex couples is rationally related to the State's interests in encouraging procreation, marriage for individuals in relationships that result in children, and the raising of children in homes headed by opposite-sex parents.
ś 249 By doing so, the plurality shirks its responsibility to the people of this state to enforce the rule of law embodied in our constitution and to uphold the fundamental principles of justice. See CONST. art. IV, § 1. Although not explicit, our state's constitution establishes a framework for the separation of powers. See CONST. art. II ("Legislative Department"); CONST. art. III ("The Executive"); CONST. art. IV ("The Judiciary"). However, the doctrine of separation of powers is also complemented and modified by the theory of checks and balances. See In re Salary of the Juvenile Dir., 87 Wash.2d 232, 238, 552 P.2d 163 (1976). While it is the legislature's duty to make public policy decisions and enact laws, when the legislature enacts a law violative of our state's constitutional guaranties this court can and must invalidate the law.[11]See State v. Wheeler, 145 Wash.2d 116, 132, 34 P.3d 799 (2001) (Sanders, J., dissenting) ("`[W]e must never forget that it is a constitution we are expounding,' and it is the protection of the constitutional rights of the litigants before us which is our ultimate responsibility. The Constitution speaks the language of principle. And so must we.") (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819)).
ś 250 As our nation's history reflects, it is often left to the judicial branch to ensure acts of our legislature or the executive are not violative of the constitutional rights of the people. See, e.g., Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (holding that segregation in public schools on the basis of race violated the federal constitution's equal protection guaranty); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (holding Virginia's antimiscegenation statutes violated federal equal protection and due process guaranties); Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (holding Texas' sodomy statute violated due process guaranties). This task is not one undertaken lightly, nor easily completed, but it is our task.

A. Denying same-sex couples the right to marry fails rational basis review
ś 251 The challenged statutes do not rationally relate to nor further any legitimate governmental interest. DOMA creates a class-based distinction which grants opposite-sex couples certain and substantial "privileges" while explicitly denying those same privileges to same-sex couples.[12]See *1016 CONST. art. I, § 12 ("No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.").[13] The privileges and immunities clause, like the federal constitution's equal protection counterpart, requires that similarly situated persons receive like treatmentâ a statute may not grant a privilege to one class of persons that is denied to another class.[14]See State v. Manussier, 129 Wash.2d 652, 672, 921 P.2d 473 (1996). For the purposes of article I, section 12, privileges are "those fundamental rights which belong to the citizens of the state by reason of [their state] citizenship." State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902).
ś 252 A statutory classification must have a rational basis. Under rational basis review, the classification "must be rationally related to a legitimate state interest, and will be upheld unless the classification rests on grounds wholly irrelevant to the achievement of a legitimate state objective." DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 144, 960 P.2d 919 (1998); see also Manussier, 129 Wash.2d at 673, 921 P.2d 473. However, a "reasonable ground must exist for making a distinction between those who fall within the class and those who do not." State ex rel. Bacich v. Huse, 187 Wash. 75, 80, 59 P.2d 1101 (1936). "The search for the link between classification and objective gives substance to the Equal Protection Clause." Romer v. Evans, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Finding this link, or rational basis, ensures that "classifications are not drawn for the purpose of disadvantaging the group burdened by the law." Id. at 633, 116 S.Ct. 1620.[15]
ś 253 Despite the deference afforded to the legislature, the rational basis standard is not without teethâ "the court's role is to assure that even under this deferential standard of review the challenged legislation is constitutional."[16]DeYoung, 136 Wash.2d at 144, 960 P.2d 919. Moreover, this court tends to afford more deference to the legislature when considering economic statutes than it does when considering regulations curtailing personal civil liberties. Yakima County Deputy Sheriff's Ass'n v. Bd. of Commr's, 92 Wash.2d 831, 839, 601 P.2d 936 (1979) (Utter, CJ., concurring); see also Lawrence, 539 U.S. at 579-80, 123 S.Ct. 2472 (O'Connor, J., concurring). However, we have not been afraid to declare even economic statutes unconstitutional under rational basis review.[17]
*1017 ś 254 Especially relevant here is DeYoung, where we considered an eight-year statute of repose for medical malpractice actions, which the State opined was rationally related to protecting insurance companies. 136 Wash.2d at 147, 960 P.2d 919. We reasoned that although a rational basis can be based on unsupported speculation, "the relationship of a classification to its goal must not be so attenuated as to render the distinction arbitrary or irrational." Id. at 149, 960 P.2d 919. We then concluded that because the statute could reduce insurance claims by only 0.2 percent, the relationship between the statute and the goal of protecting insurance companies was too attenuated and the statute was thus without a rational basis. Id. at 149-50, 960 P.2d 919.
ś 255 The plurality here attempts to minimize and distinguish away this court's analysis in DeYoung by pointing out that in that case, evidence "affirmatively showed that the challenged legislation could not rationally be thought to have furthered the identified legislative interests." Plurality at 980 n.13. But that conclusion in DeYoung is not the basis to distinguish it from this case. Rather, it supports holding similarly hereâ that the statutory denial of the right to marry to same-sex couples cannot rationally further the proffered state interests. The relationship between the denial of the right to marry to same-sex couples and the purported state interests is simply too attenuated to be rational. Contrary to the plurality's conclusion, DeYoung supports and demands that this court declare DOMA, which curtails civil liberties and demands even more scrutiny, unconstitutional.
ś 256 In a sweeping motion, the plurality accepts as legitimate the interests the State puts forth for denying same-sex couples the right to marryâ encouraging procreation, encouraging marriage for individuals in relationships that result in children, and encouraging the raising of children in homes headed by opposite-sex parents.[18] Plurality at 982, 983, 985. Even if we accept the proffered interests as legitimate, the plurality and the State fail to address or explain the issue this case raises, that is, how those interests are furthered by denying same-sex couples the right that heterosexual couples already enjoy.[19] That failure is in part due to the plurality's incorrect framing of the issue.
*1018 ś 257 Contrary to the plurality's discussion, this case does not present the issue of whether allowing opposite-sex couples the right to marry is rationally related to the State's supposed interests in encouraging procreation, marriage for relationships that result in children, and traditional child rearing. Undoubtedly, state-sanctioned, opposite-sex marriage has a conceivable rational basis-some opposite-sex couples can procreate, and the State may have a legitimate interest in encouraging procreation and family stability by allowing such couples to marry.
ś 258 But DOMA in no way affects the right of opposite-sex couples to marryâ the only intent and effect of DOMA was to explicitly deny same-sex couples the right to marry. Therefore, the question we are called upon to ask and answer here, which the plurality fails to do, is how excluding committed same-sex couples from the rights of civil marriage furthers any of the interests that the State has put forth.[20] Or, put another way, would giving same-sex couples the same right that opposite-sex couples enjoy injure the State's interest in procreation and healthy child rearing?
ś 259 These inquiries do not constitute heightened scrutiny, nor do they investigate overinclusiveness and underinclusiveness. This is rational basis review, as this court has conducted before but, for reasons entirely unclear, refuses to do so now. Overinclusiveness and underinclusiveness analysis first presumes that a rational relationship exists between the undeniably discriminatory statute and a legitimate state interest. The State has failed to articulate how the exclusion of same-sex couples from the right to marry is rationally related to any legitimate interests.
ś 260 Analyzing each proffered state interest in turn, it becomes clear that not one is furthered by denying same-sex couples the right to marry. First, the plurality identifies encouraging procreation as a legitimate state interest. Plurality at 982. But there is no logical way that denying the right to marry to same-sex couples will encourage heterosexual couples to procreate with greater frequency. Second, the plurality points to encouraging marriage for relationships that result in children as a valid state interest. Id. But denying same-sex couples the right to marry also will not encourage couples who have children to marry or to stay married for the benefit of their children. Finally, the plurality declares that DOMA may be rationally related to the State's interest in encouraging the raising of children in homes headed by opposite-sex couples. Plurality at 982. Even if such a goal is valid, which seems unlikely, denying same-sex couples the right to marry has no hope of increasing such child rearing. The denial of the right to marry to an entire class of persons is completely unrelated to the proffered state interests. Thus, DOMA is not merely underinclusive and/or overinclusive, it is wholly irrational.
ś 261 DOMA does not further the asserted interests because, despite DOMA's intent to "defend" marriage, the exclusionary language in RCW 26.04.010(1) does not lend the institution of marriage its power. Rather, marriage draws its strength from the nature of the civil marriage contract itself and the recognition of that contract by the State. The civil contract and its subsequent recognition are what further the State's asserted interests in procreation, marriage for individuals in relationships that result in children, and child rearing in households headed by opposite-sex parents. The respondents in these cases do not challenge the existence of civil marriage contracts for opposite-sex couples or the recognition of those contracts by the State but, instead, challenge their exclusion from the ability to form those contracts and to have them recognized.
ś 262 Rather than furthering legitimate interests, denial of the right to marry will certainly harm children of same-sex couples, couples to whom the State has given its blessing to adopt or beget children through artificial means, but upon whom the State has turned its back once those children are *1019 integrated into their families. It is those children who actually do and will continue to suffer by denying their parents the right to marry. Accord Goodridge, 440 Mass. at 335, 798 N.E.2d 941 ("Excluding same-sex couples from civil marriage will not make children of opposite-sex marriages more secure, but it does prevent children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of `a stable family structure in which children will be reared, educated, and socialized.'" (quoting id. at 381, 798 N.E.2d 941 (Cordy, J., dissenting))); Baker v. State, 170 Vt. 194, 744 A.2d 864, 882 (1999) ("If anything, the exclusion of same-sex couples from the legal protections incident to marriage exposes their children to the precise risks that the State argues the marriage laws are designed to secure against." (emphasis added)). In that way, DOMA degrades the interests asserted by the State rather than furthers them. That degradation discerns an even greater attenuation between the statute and its goals than was the 0.2 percent relationship in DeYoung, which this court concluded was irrational. The relationship is simply too attenuated. Thus, DOMA fails rational basis review and violates article I, section 12 of the Washington Constitution.[21]
ś 263 Having determined there is no rational basis for denying same-sex couples the right to marry, I conclude that DOMA was motivated solely by animus toward homosexuals. When no rational basis supports a discriminatory statute, this court may presume that the statute is motivated by animus. See Romer, 517 U.S. at 632-35, 116 S.Ct. 1620 (holding that a constitutional amendment to the Colorado Constitution that made antidiscrimination laws protecting homosexuals unconstitutional raised "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected" and was a "status-based enactment divorced from any factual context from which [the Court] could discern a relationship to legitimate state interests."). Animus is per se irrational and cannot support a statutory classification. United States Dep't of Agric. v. Moreno, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (holding that a statutory classification limiting participation in the Food Stamp Act to households composed of related individuals could not be sustained by legislative history indicating that the classification was intended to prevent "hippies" from participating); Miguel v. Guess, 112 Wash.App. 536, 553, 51 P.3d 89 (2002) ("A discriminatory classification that is based on prejudice or bias is not rational as a matter of law."), review denied, 148 Wash.2d 1019, 64 P.3d 650 (2003).
ś 264 Therefore, I would hold that DOMA's arbitrary denial of privileges associated with the right to marry to same-sex couples as a class violates article I, section 12 of the Washington Constitution and affirm the two trial courts.

B. DOMA also fails the heightened scrutiny associated with interference with the fundamental right to marry
ś 265 If a statutory classification interferes with a fundamental right, then the statutory classification must be narrowly tailored to effectuate a compelling state interest. Zablocki *1020 v. Redhail, 434 U.S. 374, 388, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); Manussier, 129 Wash.2d at 672-73, 921 P.2d 473. Fundamental rights are those deeply rooted in history and tradition and implicit in the concept of ordered liberty.[22]Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).
Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society.... The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing.
Poe v. Ullman, 367 U.S. 497, 542, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).
ś 266 It is indisputable that marriage is a fundamental right. "Marriage is ... something more than a civil contract subject to regulation by the state; it is a fundamental right of free men." Perez v. Sharp, 32 Cal.2d 711, 714, 198 P.2d 17 (1948) (emphasis added). The right to marry has been recognized as fundamental by both state and federal courts. See, e.g., Turner v. Safley, 482 U.S. 78, 94-99, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); Boddie v. Connecticut, 401 U.S. 371, 383, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (describing marriage as a fundamental human relationship); Zablocki, 434 U.S. at 384, 98 S.Ct. 673 ("[T]he right to marry is of fundamental importance for all individuals." (emphasis added)); Loving, 388 U.S. at 12, 87 S.Ct. 1817 ("The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations." (emphasis added)); Griswold, 381 U.S. at 485-86, 85 S.Ct. 1678; Maynard v. Hill, 125 U.S. 190, 205, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888) (characterizing marriage as "the most important relation in life" and the "foundation of the family and of society, without which there would be neither civilization nor progress."); Davis v. Dep't of Employment Sec., 108 Wash.2d 272, 280, 737 P.2d 1262 (1987) ("The right to marry is fundamental."); Levinson v. Wash., Horse Racing Comm'n, 48 Wash.App. 822, 824, 740 P.2d 898 (1987) ("The right to marry is a fundamental constitutional right.").
ś 267 The plurality admits that courts have historically recognized a fundamental right to marry, but holds that that right extends only to individuals wishing to marry a partner of the opposite sex. Plurality at 978-979.[23] In its analysis, the plurality asks whether history and tradition support a fundamental right to "same-sex marriage," and concludes that it does notâ "[t]he vast majority of states historically and traditionally have contemplated marriage only as opposite-sex marriage, and *1021 the majority of states, including Washington, have recently reaffirmed this understanding and tradition." Plurality at 979. The circularity of this reasoning reveals its fatal flaw: our history necessarily cannot include a right to same-sex marriage when that right historically has been denied.[24]
ś 268 By defining the right at issue so narrowly, the plurality departs from the Supreme Court's analysis of governmental intrusions on fundamental rights where it has been careful to broadly define the right at hand. For example, in Meyer v. Nebraska, 262 U.S. 390, 399-403, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), and Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Court considered whether there was a fundamental right to decisions in educating one's children, not whether there was a fundamental right to have your children learn German or attend a private school. Likewise, in Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 536, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the Court asked whether there was a fundamental right to be free from unwarranted government intrusion into decisions whether to have children, not whether a convicted criminal had a fundamental right to reproduce. In Zablocki, 434 U.S. at 383, 98 S.Ct. 673, and Turner, 482 U.S. at 95-96, 107 S.Ct. 2254, the Court considered whether there was a fundamental right to be free from unwarranted governmental intrusion in decisions to marry, not whether delinquent fathers or inmates had a fundamental right to marry. Perhaps most relevant and important here, in Loving, the Court asked whether there was a fundamental right to marry, not whether there was a fundamental right to interracial marriage. Loving, 388 U.S. at 12, 87 S.Ct. 1817.
ś 269 In Lawrence the Supreme Court recently again recognized the importance of broadly defining the right at issue. 539 U.S. at 566-67, 123 S.Ct. 2472. The Lawrence Court corrected the error that it made in Bowers v. Hardwick, of too narrowly defining the implicated right. Bowers v. Hardwick, 478 U.S. 186, 190, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), overruled by Lawrence, 539 U.S. at 558, 123 S.Ct. 2472 (2003). The plurality here makes the same error as the Bowers Court of too narrowly defining the implicated right.
ś 270 In Bowers, the Court asked "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy." 478 U.S. at 190, 106 S.Ct. 2841. In its analysis of that issue, the Court scorned the Eleventh Circuit Court of Appeals for construing the Constitution "to confer a right of privacy that extends to homosexual sodomy." Id. The Court reasoned that none of the privacy cases, which dealt with decisions in child rearing and education, family relationships, procreation, marriage, contraception, and abortion, concerned rights resembling a right to homosexual sodomy. Id. at 190-91, 106 S.Ct. 2841. The Court went on to explain that the right to homosexual sodomy was neither "`implicit in the concept of ordered liberty'" nor "`deeply rooted in this Nation's history and tradition."' Id. at 191-92, 106 S.Ct. 2841 (quoting Moore v. East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)).
ś 271 But in Lawrence, the Supreme Court recognized that its contrived framing of the issue in Bowers was a "failure to appreciate *1022 the extent of the liberty at stake."[25]Lawrence, 539 U.S. at 566-67, 123 S.Ct. 2472. "To say that the issue in Bowers was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse." Id. at 567, 123 S.Ct. 2472. Thus, the Court reframed its look at history and tradition and concluded there was "an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex." Id. at 572, 123 S.Ct. 2472.
ś 272 Rather than learning from the embarrassments of history, the plurality instead repeats the same transgressions. By narrowly redefining the right at stake, the plurality makes the same analytical error that the Supreme Court repeatedly has declared incorrect. Instead of considering government intrusion on the fundamental right to marry, the plurality considers the existence of a fundamental right to same-sex marriage, which necessarily is unsupported by our history and tradition. See Lawrence, 539 U.S. at 574, 123 S.Ct. 2472; plurality at 977-978, 979. But this case is no more about the fundamental right to same-sex marriage than Bowers was about the fundamental right to homosexual sodomy. See Bowers, 478 U.S. at 199, 106 S.Ct. 2841 (Blackmun, J., dissenting).
Clearly, the right to choose one's life partner is quintessentially the kind of decision which our culture recognizes as personal and important. ...
The relevant question is not whether same-sex marriage is so rooted in our traditions that it is a fundamental right, but whether the freedom to choose one's own life partner is so rooted in our traditions.
Brause v. Bureau of Vital Statistics, No. 3AN-95-6562 CI, 1998 WL 88743, at *4 (unpublished order) (Alaska Super.Ct. Feb. 27, 1998). By asking whether there is a fundamental right to same-sex marriage, the plurality fails "to appreciate the extent of the liberty at stake." Lawrence, 539 U.S. at 567, 123 S.Ct. 2472.
ś 273 The plurality's conclusion that there is only a right to marry a person of the opposite sex also contradicts the broad application of the right to marry by the Supreme Court as well as other courts. Contrary to the plurality's interpretation here, those cases support a broad right to marry the person of one's choice. Over 50 years ago, long before the Supreme Court declared bans on interracial marriage unconstitutional in Loving, the Supreme Court of California held that "the right to marry is the right to join in marriage with the person of one's choice . . . restrict[ing] the scope of his choice . . . thereby restricts his right to marry." Perez, 32 Cal.2d at 715, 198 P.2d 17 (holding that an antimiscegenation statute unjustifiably impaired the fundamental right to marry, not the fundamental right to interracial marriage).
ś 274 In Loving, decided in 1967, the Supreme Court made it clear that the right to marry included the right to marry the person of one's choice, not the person of one's choice within a class of people that society thought should intermarry or even who had historically done so. Loving, 388 U.S. at 12, 87 S.Ct. 1817. The Court did not analyze the right to interracial marriage, but instead discussed marriage generally, as "one of the `basic civil rights of man,' fundamental to our very existence and survival." Id. (quoting Skinner, 316 U.S. at 541, 62 S.Ct. 1110). The Court concluded that "the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State." Id. Notably, this *1023 court has itself characterized Loving as protecting individuals' "ability to marry the person of their choosing." Bremerton v. Widell, 146 Wash.2d 561, 580, 51 P.3d 733 (2002) (Madsen, J.) (emphasis added).[26]
ś 275 The Supreme Court later noted that its opinion in Loving "could have rested solely on the ground that the statutes discriminated on the basis of race in violation of the Equal Protection Clause. But the Court went on to hold that the laws arbitrarily deprived the couple of a fundamental liberty protected by the Due Process Clause, the freedom to marry." Zablocki, 434 U.S. at 383, 98 S.Ct. 673 (citing Loving, 388 U.S. at 11-12, 87 S.Ct. 1817). The Zablocki Court restated the Loving Court's depiction of the right at issueâ "`one of the "`basic civil rights of man'"'" (quoting Loving, 388 U.S. at 12, 87 S.Ct. 1817 (quoting Skinner, 316 U.S. at 541, 62 S.Ct. 1110))â and declared the right to marry to be "of fundamental importance for all individuals." Zablocki, 434 U.S. at 383-84, 98 S.Ct. 673.
ś 276 In Turner, decided in 1987, the Supreme Court expanded the right to marry the person of one's choice by making clear that marriage is not solely about procreation and therefore should not be limited to couples that can procreate.[27] Its reasoning is particularly instructive here. In declaring that the fundamental right to marry extended to inmates, the Court reasoned that "inmate marriages, like others, are expressions of emotional support and public commitment. These elements are an important and significant aspect of the marital relationship." Turner, 482 U.S. at 95-96, 107 S.Ct. 2254. Moreover, "marital status often is a pre-condition to the receipt of government benefits.... These incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement" or by inability to independently procreate. Id. at 96, 107 S.Ct. 2254. Thus, the Court focused on the support, commitment, and spirituality behind marriage, as well as the government benefits and property rights associated therewith, rather than a capacity to procreate in concluding that the right to marry extended to inmates. Likewise, the Massachusetts Supreme Judicial Court recently declared that "it is the exclusive and permanent commitment of the marriage partners to one another, not the begetting of children, that is the sine qua non of civil marriage." Goodridge, 440 Mass. at 332, 798 N.E.2d 941.
ś 277 It is at least erroneous, if not disingenuous, for the plurality to read the Supreme Court's repeated recognition of the fundamental right to marry as only a means to further the fundamental right to procreate. Plurality at 978-979. Rather, the Court has established that "the right to marry is part of the fundamental `right of privacy' implicit in the Fourteenth Amendment's Due Process Clause." Zablocki, 434 U.S. at 384, 98 S.Ct. 673. In Skinner, another case cited by the plurality, the court stated that "[m]arriage and procreation are fundamental to the very existence and survival of the race," but did not necessarily link one to the other. 316 U.S. at 541, 62 S.Ct. 1110. In Loving, the third case cited by the plurality, it is less than clear that the Court was only referring to procreation when it noted that "[m]arriage is one of the `basic civil rights of man,' fundamental to our very existence and survival." 388 U.S. at 12, 87 S.Ct. 1817 (quoting Skinner, 316 U.S. at 541, 62 S.Ct. 1110). Any reference to procreation is also glaringly absent in the court's earlier observation that, "[t]he freedom to marry has long *1024 been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." Id.
ś 278 Moreover, one of the Supreme Court's most noted opinions for describing the importance of the right to marry held that the right of marital privacy included the right not to conceive children and overturned a state's ban on contraceptives. Griswold, 381 U.S. at 486, 85 S.Ct. 1678. In acknowledging the unique qualities that render marriage a fundamental right worth protecting, the Griswold court omitted any reference to procreation or even the gender of the spouses. "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects." Id. As a result, I conclude that there is nothing inherent in the fundamental right to marry that would justify a law that excludes same-sex couples from also enjoying that right.
ś 279 In addition to implicating the fundamental right to marry, Supreme Court precedent reveals that the liberty to construct and define one's own family is also at issue in this case. The Supreme Court has held that:
Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.... These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.
Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (emphasis added). Our Washington Constitution is at least as protective of our citizens' due process rights as the Fourteenth Amendment in this context.
ś 280 This court cannot ignore that "freedom of personal choice in matters of marriage and family life is one of the liberties protected" by due process. Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639-40, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). The Fourteenth Amendment precludes government intrusion into the deeply personal realms of consensual adult expressions of intimacy and the choice of one's intimate partner. Lawrence, 539 U.S. at 577-78, 123 S.Ct. 2472. These most personal and intimate choices are at the heart of the right to privacy.
ś 281 The Constitution protects individual privacy in personal decisions relating to marriage. Lawrence, 539 U.S. at 574, 123 S.Ct. 2472; see also Griswold, 381 U.S. at 484-85, 85 S.Ct. 1678 (whether or not to procreate); Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (whether to bear a child); Lawrence, 539 U.S. at 578, 123 S.Ct. 2472 (among consenting adults, with whom to engage in sexual conduct); Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 278-79, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (whether to refuse medical treatment). No choice could be more private, and indeed fundamental, than the choice of marital partner. As a result, this case falls at the intersection between the fundamental right to marry and the fundamental liberty interest in making one's own personal decisions relating to intimate partners. Therefore, this court must consider both the individual's liberty interest in choosing a marital partner as well as his or her right to marry.
ś 282 Furthermore, "history and tradition" should not control us where that history and tradition merely reflect that a popular majority is willing to denigrate the rights of a minority group. The plurality repeatedly declares that the history and traditions of the United States and of the state of Washington do not support acceptance of same-sex marriage justifying a fundamental right to same-sex marriage. See, e.g., plurality at 977-978, 979. "`[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry.'" Lawrence, 539 U.S. at 572, 123 S.Ct. 2472 (alteration in original) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 857, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (Kennedy, J., concurring)). Although, as the plurality states, history and tradition might change, we need not wait for a popular majority to change its view. See plurality at 979. Those involved in writing the Fifth and Fourteenth *1025 Amendments "knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom." Lawrence, 539 U.S. at 579, 123 S.Ct. 2472.
ś 283 The plurality claims that the Supreme Court's consideration in Loving of bans on interracial marriage is distinct from our consideration of bans on same-sex marriage because "whatever the history and tradition of interracial marriage had been, by the time Loving was decided, it had changed." Plurality at 977. But how much had history and tradition really changed? In 1958, just nine years before Loving, a Gallop Poll showed that 96 percent of white Americans opposed interracial marriage between blacks and whites. Nicholas D. Kristof, Marriage: Mix and Match, N.Y. TIMES, Mar. 3, 2004, at A23. At the time the Supreme Court held antimiscegenation statutes unconstitutional, 16 states still had them. Loving, 388 U.S. at 6 n. 5, 87 S.Ct. 1817. Even five years after Loving, in 1972, another Gallop Poll reported that 75 percent of all white Americans opposed interracial marriage between blacks and whites. Charlotte Astor, Gallup Poll: Progress in Black/White Relations, But Race is Still an Issue, Electronic J. U.S. Info. Agency, Aug. 1997, http://usinfo.state.gov/journals/itsv/0897/ijse/gallup.htm. Yet today we understand antimiscegenation laws to be pure ignorance, discrimination, and hate.
ś 284 We should not have to go through the same painful process of waiting for popular opinion to catch up with the constitution to declare denial of the right to marry unconstitutional. It was not the change in popular perception that created a fundamental right to marry the person of one's choice or caused the Supreme Court to recognize that right in Loving. See Perez, 32 Cal.2d at 736, 198 P.2d 17 (Carter, J., concurring) ("[T]he statutes now before us never were constitutional."). The fact that many states had repealed their antimiscegenation statutes at the time of Loving may have made the Court's decision less controversial, but the number of states with laws against interracial marriage was not the basis for the decision. If anything, antimiscegenation statutes and their demise in Loving should tell us that we should not rely solely on history to determine the extent of a fundamental right where historically that right has been denied. See Goodridge, 440 Mass. at 328, 798 N.E.2d 941 ("As it did in Perez and Loving, history must yield to a more fully developed understanding of the invidious quality of the discrimination.").
ś 285 Historical ignorance and discrimination cannot be used, as the plurality does, as an excuse for continued denial of the fundamental right to marry and the liberty interest in choosing an intimate partner. See plurality at 979 ("[T]here is no history and tradition of same-sex marriage in this country, and the basic nature of marriage as a relationship between a man and a woman has not changed."). The plurality refuses to extend the fundamental right to marry to same-sex couples because "community standards at this time do not show a societal commitment to inclusion of same-sex marriage as part of the fundamental right to marry."[28] Plurality at 979. But popular opinion cannot dictate our interpretation of the constitutionâ "[a] citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." Lucas v. Forty-Fourth Gen. Assembly of Colo., 377 U.S. 713, 736, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964), aff'd in part and vacated in part on other grounds, 379 U.S. 693, 85 S.Ct. 715, 13 L.Ed.2d 699 (1965). As the Goodridge court noted, "history cannot and does not foreclose the constitutional question." 440 Mass. at 320, 798 N.E.2d 941. "If *1026 the question whether a particular act or choice is protected as a fundamental right were answered only with reference to the past, liberty would be a prisoner of history." Note, Litigating the Defense of Marriage Act: The Next Battleground for Same-Sex Marriage, 117 HARV. L. REV. 2684, 2689 (2004).
ś 286 Based upon the historical recognition of the fundamental right to marry and the Supreme Court's continued broad protection of that right, I would hold that the fundamental right to marry extends to same-sex couples.[29] Indeed, "the right to marry means little if it does not include the right to marry the person of one's choice," Goodridge, 440 Mass. at 327-28, 798 N.E.2d 941. Because DOMA's denial of same-sex couples' right to marry is not rationally related to any legitimate state interest, it also necessarily cannot be narrowly tailored to effectuate a compelling state interest. Therefore, DOMA's denial of these 19 couples' fundamental right to marry arbitrarily denies them privileges associated with that right in violation of article I, section 12 of the Washington Constitution. Furthermore, DOMA's denial of their fundamental right to marry deprives them of liberty without due process in violation of article I, section 3 of the Washington Constitution.
ś 287 Many individuals and organizations have prophesized the downfall of society as we know it if and when Washington recognizes that the fundamental right to marry extends to same-sex couples. See, e.g., concurrence at 992 ("To declare [DOMA] unconstitutional would declare marriage as Washington citizens have always known it, unconstitutional."). If this court were to conclude that DOMA is unconstitutional, that decision would not declare the institution of civil marriage unconstitutional. Even without DOMA, opposite-sex couples would continue to marry, procreate, and parent, if they so choose, and continue to further the interests identified by the State. This fact alone underscores the lack of a rational relationship between DOMA and those identified interests.
ś 288 Rather than altering marriage for opposite-sex couples, the changes that will transpire when this court deems DOMA unconstitutional will occur in the lives of the same-sex couples who seek legal recognition of their relationship through civil marriage. Same-sex couples will be allowed to marry and to partake of the more than 423 legal, social, and financial benefits and obligations that are currently denied to them because they cannot marry. By determining that DOMA wrongfully excludes these couples from enjoying the fundamental right of marriage, this court would only be performing its proper function of judicial review. "The history of constitutional law `is the story of the extension of constitutional rights and protections to people once ignored or excluded.'" Goodridge, 440 Mass. at 339, 798 N.E.2d 941 (quoting United States v. Virginia, 518 U.S. 515, 557, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996)).
*1027 ś 289 Debate has also ensued over what remedy this court should employ if it were to void DOMA. Both the Andersen and Castle plaintiffs request a declaratory judgment that RCW 26.04.010 and RCW 26.04.020(1)(c) are unconstitutional. Additionally, the Andersen plaintiffs specifically request that this court order King County to issue marriage licenses to the couples and affirm the trial court grant of this relief. CP (Andersen) at 907. If this court were to determine that DOMA is unconstitutional, that determination would not alter the status of marriage as a fundamental right in the state of Washington unless the United States Supreme Court overrules itself. The mere fact that DOMA both codifies the right to marry and simultaneously restricts access to that fundamental right is not a sufficient reason to continue to uphold those statutes. See, e.g., Dunn v. Blumstein, 405 U.S. 330, 333, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (decision finding a section of the Tennessee Constitution and two Tennessee statutes unconstitutional because they granted the fundamental right to vote only to individuals residing in Tennessee for more than 12 months).
ś 290 Although this court's determination that DOMA is unconstitutional would be a permissible check on the authority of the legislature, this court lacks the authority to rewrite this state's marriage statutes. See WASH. CONST. art. II, § 1; In re Parentage of C.A.M.A., 154 Wash.2d 52, 69, 109 P.3d 405 (2005) ("We show greater respect for the legislature by preserving the legislature's fundamental role to rewrite the statute rather than undertaking that legislative task ourselves."). Therefore, this court should hold that DOMA is unconstitutional because the fundamental right to marry extends to same-sex couples but leave remedying the marriage statutes to the legislature.

CONCLUSION
ś 291 Because DOMA unjustifiably denies the fundamental right to marry to Washington's gay and lesbian citizens, I would hold that it violates article I, section 12 and article I, section 3 of the Washington Constitution and affirm the two trial courts.[30] Unfortunately, the plurality and concurrence are willing to turn a blind eye to DOMA's discrimination because a popular majority still favors that discrimination. "[W]e must be ever on our guard, lest we erect our prejudices into legal principles." New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). I dissent.
BRIDGE, OWENS and CHAMBERS, JJ., concur.
BRIDGE, J. (concurring in dissent).
ś 292 The impact of this case upon the plaintiff couples and their children is both far reaching and deeply saddening. The impact extends to all of Washington's gay and lesbian citizens and to the many fair-minded Washington citizens who hoped for a different result in this case. And, I dare say, the result that we reach today will be remembered more for what it does not do than for what it does.
ś 293 What we are called upon to do here is address the availability of the civil contract of marriageâ the only characterization of the issue presented that permits governmental intrusion into what is otherwise a personal, private relationship between two people. The State's intrusion is governed by the articles of our constitution. What we ought not to address is marriage as the sacrament or religious riteâ an area into which the State is not entitled to intrude at all and which is governed by articles of faith. What we have not done is engage in the kind of critical analysis the makers of our constitution contemplated when interpreting the limits on governmental intrusion into private civil affairs; what we have done is permit the religious and moral strains of the Defense of Marriage Act (DOMA) to justify the State's intrusion. As succinctly put by amici the Libertarian Party of Washington State and the Log Cabin Republicans of Washington: "To ban gay civil marriage because some, but *1028 not all, religions disfavor it, reflects an impermissible State religious establishment." Amicus Curiae Br. of the Libertarian Party of Washington State et al. at 11. After all, we permit civil divorce though many religions prohibit itâ why such fierce protection of marriage at its beginning but not its end?
ś 294 If the DOMA is really about the "sanctity" of marriage, as its title implies, then it is clearly an unconstitutional foray into state-sanctioned religious belief. If the DOMA purports to further some State purpose of preserving the family unit, as the plurality would interpret it, then I cannot imagine better candidates to fulfill that purpose than the same-sex couples who are the plaintiffs in these consolidated actions.
ś 295 I agree with Justice Fairhurst that the DOMA wholly fails a rational basis review. And, I agree that our nation's jurisprudence suggests we should hold that where a union is not prohibited by age or bloodlines (restrictions grounded in legitimate state interests in the protection of minors and preventing congenital birth defects), it is a fundamental right of an individual to marry the person of his or her choice. Justice Fairhurst also correctly notes that the plurality and concurrences disingenuously frame the question before us. Dissent (Fairhurst, J.) at 1013. They ask not whether the right to marry is fundamental, or whether a prohibition on same-sex marriage strengthens the putative state interest in the frequency and longevity of heterosexual marriage (a dubious policy clearly at odds with our liberalized laws of marital dissolution), but whether there is a fundamental right to "same-sex" marriage. Just as the United States Supreme Court majority did in Bowers v. Hardwick 20 years ago, today's plurality and Justice J.M. Johnson's concurrence frame the issue before us so as to ignore not only petitioners' fundamental right to privacy but also the legislature's blatant animosity toward gays and lesbians. See Bowers v. Hardwick, 478 U.S. 186, 199, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Blackmun, J., dissenting). The passage of time and prudent judgment revealed the folly of Bowers, a mistake born of bigotry and flawed legal reasoning. Lawrence v. Texas, 539 U.S. 558, 562-78, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). Alas, the same will be said of this court's decision today.
ś 296 Yet while I wholeheartedly agree with Justice Fairhurst's conclusions that it is the status of marriage itself that is a fundamental right, that the choice of one's spouse implicates fundamental liberty interests, and that the DOMA does not even satisfy rational basis review, I write separately, in this significant issue of our time, to set forth additional grounds for holding the DOMA unconstitutional.

Constitutional Duty of This Court
ś 297 The plurality and concurrences justify their result by asserting that it is not our place to require equality for Washington's gay and lesbian citizens by declaring the DOMA unconstitutional. Of course, had the United States Supreme Court adopted the plurality's position, there would have been no Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); there would have been no Lawrence, 539 U.S. at 579, 123 S.Ct. 2472, in which the Court recognized that "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." Indeed, it was the California Supreme Court in 1948 that first declared an antimiscegenation law unconstitutional, Perez v. Sharp, 32 Cal.2d 711, 198 P.2d 17, 29 (1948), a position adopted by the United States Supreme Court in Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), 20 years later. Had the Court adopted the current plurality's mindset, it would not have rectified a long list of now obvious wrongs. See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (overturning a city zoning ordinance because it discriminated against the developmentally disabled, finding no rational basis for the ordinance in negative public attitudes toward the disabled); Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (overturning Texas legislation that excluded undocumented children from public schools); Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (striking down *1029 Wisconsin statute prohibiting marriage absent judicial determination that all support obligations had been met); Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (overturning Oklahoma underage drinking legislation because it discriminated against men); Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (overturning New York statute that imposed a flat ban on employment of aliens in competitive exam-based civil service positions); United States Dep't of Agric. v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (rejecting portion of the food stamp act that excluded households containing unrelated individuals); Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (overturning a federal statute that discriminated against female members of the armed services); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (invalidating Texas statute that made procuring an abortion a crime absent a threat to the life of the mother); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (overturning portion of the Idaho probate code that discriminated against women); Harper v. Va. State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (overturning a Virginia poll tax); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (striking down a statute prohibiting the use of birth control); Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950) (overturning Texas legislation restricting admission to the University of Texas School of Law to white students); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (striking down Oklahoma's criminal sterilization law); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (invalidating statute prohibiting parents from sending their children to private schools).
ś 298 The plurality too easily dismisses the proper role of the judiciary to protect the constitutional rights of those who have been historically disenfranchised from the political process. "[T]he whims of the majority cannot be invoked to interfere with fundamental rights" and "we must be ever on our guard, lest we erect our prejudices into legal principles." Amicus Br. of the Libertarian Party of Washington State et al. at 5 (citing W. Va. State Bd. of Educ., v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)); New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). This is never more true than when legislation is specifically targeted at a politically unpopular minority.[1] Courts have a duty to take a searching look at any such legislation. Lawrence, 539 U.S. at 580, 123 S.Ct. 2472 (O'Connor, J., concurring) ("When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review."); Romer v. Evans, 517 U.S. 620, 633-35, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Judges William L. Downing and Richard D. Hicks, the authors of the trial court opinions in these cases, are to be commended for their uncommon courage and common sense in facing this issue head on.
ś 299 Legal authorities do not dispute the fact that gays and lesbians have been subjected to a history of discrimination. High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 573 (9th Cir.1990); see EVAN GERSTMANN, THE CONSTITUTIONAL UNDERCLASS: GAYS, LESBIANS, AND THE FAILURE OF CLASS-BASED EQUAL PROTECTION 66 (1999) (noting that no court has ever denied that gays and lesbians have suffered a history of discrimination). Indeed, the plurality here does not dispute it. Plurality at 974. Nevertheless, it is essential to briefly explore the history of prejudice against gays and lesbians in this countryâ as the plurality does notâ because we cannot decide this case in a vacuum.
ś 300 After Prohibition ended in 1933, it was illegal in many states for bars and restaurants to serve gay and lesbian patrons. GEORGE CHAUNCEY, WHY MARRIAGE? THE HISTORY SHAPING TODAY'S *1030 DEBATE OVER GAY EQUALITY 7 (2004). In the 1930s, Hollywood prohibited the production of films that made even the slightest reference to homosexuality, a ban that survived into the 1960s. Id. at 5-6. During the McCarthy era, individuals suspected of being gay and lesbian were purged from government offices at an even higher rate than suspected communists; until the late 1990s, gays and lesbians could be barred from federal employment solely on the basis of their sexual orientation. Id. at 6-7. Until 2003, sexual practices associated with homosexuality were cause for criminal prosecution in many states. See Lawrence, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508.
ś 301 As recently as 2004, hate crimes motivated by bias against sexual orientation accounted for 15 percent of all hate crimes committed that year; within that 15 percent, approximately 97 percent of the crimes committed were against homosexuals as opposed to heterosexuals. FED. BUREAU OF INVESTIGATION, HATE CRIME STATISTICS 2004, 6-7 (2005). Until January 2006, gay and lesbian Washingtonians feared their livelihoods might be in jeopardy if their sexual orientation were disclosed. See ENGROSSED SUBSTITUTE H.B. (ESHB) 2661, 59th Leg., Reg. Sess., at 2-3 (Wash. 2006) (prohibiting discrimination against homosexuals in the workplace, a practice previously condoned by this court in Gaylord v. Tacoma Sch. Dist. No. 10, 88 Wash.2d 286, 559 P.2d 1340 (1977)).
ś 302 In Washington, openly gay and lesbian men and women continue to hold political office in numbers lower than their presumed percentage of the population. Br. of Amici Curiae Pride Foundation et al. at 18 n.20; see Susan Paynter, Gregoire Address to Gays is a Good Start, SEATTLE POST-INTELLIGENCER, Nov. 18, 2005, at D1 (only four openly gay members in Washington's legislature). Their ability to serve in our nation's armed forces is truncated. 10 U.S.C. § 654. In many states, gays and lesbians continue to fear their children will be removed from their custody as a result of their sexual orientation. Donald K. Sherman, Sixth Annual Review of Gender and Sexuality Law: Child Custody and Visitation, 6 Geo. J. Gender & L. 691, 706-10 (2005) (surveying states in which a parent's homosexuality may or will negatively effect custody and visitation). Likewise, they may encounter significant struggles in efforts to adopt. Teemu Ruskola, Minor Disregard: The Legal Construction of the Fantasy That Gay and Lesbian Youth Do Not Exist, 8 YALE J.L. & FEMINISM 269, 297-302 (1996) (discussing statutory bans on homosexual adoption). And today in Washington, they are denied the economic, social, and emotional benefits of a legal marriage. Plurality at 990. Historically, homosexuals have been the object of what Justice Brennan calls "pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is `likely. . . to reflect deep-seated prejudice rather than . . . rationality.'" Rowland v. Mad River Local Sch. Dist., 470 U.S. 1009, 1014, 105 S.Ct. 1373, 84 L.Ed.2d 392 (1985) (Brennan, J., dissenting) (dissenting in a denial of certiorari in a case involving discrimination against homosexuals (quoting Plyler, 457 U.S. at 216 n. 14, 102 S.Ct. 2382)). When reviewing laws that discriminate against gays and lesbians, there is no justification for courts to ignore the "pernicious and sustained hostility" gays and lesbians suffered through the decades and continue to face. Id.
ś 303 The plurality asserts that gays and lesbians today are not politically powerless. Plurality at 974-975. Yet the DOMA relies on the notion that the institution of marriage needs to be defended from gays and lesbians, rather like anti-papal laws once sought to "defend" a protestant way of life from an onslaught of Catholic immigrants, and segregation laws sought to "defend" white-privilege from people of color. See Peter H. Schuck, Uri and Caroline Bauer Memorial Lecture: The Perceived Values of Diversity, Then and Now, 22 CARDOZO L. REV.1915, 1924-25 (2001). Like those antiquated laws of yesteryear, today's decision validates a legislative enactment largely born of animus and ignorance and is evidence in and of itself of the lack of meaningful political power gays and lesbians hold. But there are other indicators. In Washington, there are only four openly gay legislatorsâ none in a statewide executive or judicial capacity. Paynter, supra, *1031 at D1. As the plurality notes, the legislature recently passed a bill prohibiting discrimination against gays and lesbians in jobs, finance, and housing, but that law was the culmination of a 30-year battle and a narrow, one-vote win. And we cannot ignore the fact that while gays and lesbians in Washington now have an avenue of recourse when faced with discrimination in housing, lending, and on the job, there are many other inequalities the law does not address for gays and lesbians, particularly those involved in a same-sex relationship.[2] What is more, gays and lesbians nationwide have not enjoyed the same kind of small victories; Washington is just one of only 17 states to pass an antigay discrimination bill. Chris McGann, A Long-Awaited Win for Gay Rights; Senate OKs State Anti-Bias Bill, SEATTLE POST-INTELLIGENCER, Jan. 28, 2006, at A1.
ś 304 The plurality focuses only on the ability of gays and lesbians to "attract the attention of the lawmakers," Cleburne Living Center, 473 U.S. at 445, 105 S.Ct. 3249. Plurality at 974-975. But a limited number of protective laws do not a powerful contingent make, particularly where they do not provide comprehensive equal rights. The critical and commercial success of television shows like Will and Grace (NBC 1998-2006) and films like Brokeback Mountain (Focus Features 2005) notwithstanding, the place of gays and lesbians in our cultural and social landscape continues to be marked by disparity. As noted above, heterosexuals have little reason to fear they will be attacked if their sexual orientation is discovered; gays and lesbians, on the other hand, were second only to people of color in Washington's 2004 statewide statistics for reported hate crime incidents, experiencing more criminal animosity than religious or ethnic groups. HATE CRIME STATISTICS, supra, at 58. In Seattle, a locality that has had antidiscrimination laws on the books on behalf of gays and lesbians for many years, hate crimes motivated by sexual orientation were equal to those motivated by race. Id. at 59. This is sadly strong evidence indicating that the attention of lawmakers does not always translate into personal and political power.
ś 305 Those who believe gays and lesbians enjoy substantial political power often point to the perceived economic success of gays and lesbians, claiming it translates into political clout. Romer, 517 U.S. at 645-46, 116 S.Ct. 1620 (Scalia, J., dissenting) ("[B]ecause those who engage in homosexual conduct tend to ... have high disposable income ... they possess political power much greater than their numbers, both locally and statewide."). But in reality, evidence suggests that gays and lesbians as a class are no more economically advantaged than similarly situated heterosexuals. In fact, studies show that gay men, at least, make 17 to 28 percent less than straight men. M.V. LEE BADGETT, MONEY, MYTHS, AND CHANGE: THE ECONOMIC LIVES OF LESBIANS AND GAY MEN 45-46 (2001).[3] Yet, a commonly produced stereotype involves that of the urban, affluent gay couple. Not only is it unlikely that gays and lesbians as a group enjoy a markedly higher disposable income indicative of political power, but the reliance on this largely false stereotype suggests that laws discriminating against gays and lesbians are rooted in prejudice, not rationality.[4]
*1032 ś 306 The political vigor of gays and lesbians remains lackluster. We have never had an openly gay president, and there are very few openly gay members on any high courtâ in Washington, D.C., Washington State, or elsewhere. See William C. Duncan, "A Lawyer Class": Views on Marriage and "Sexual Orientation" in the Legal Profession, 15 BYU J. PUB. L. 137, 147-49 (2001). There has never been an openly gay or lesbian individual in the United States Senate, and only three currently serve in the House of Representatives. Gays and Lesbians Win Big at the Polls, THE ADVOCATE, Dec. 7, 2004, at 16. Nationwide, 511,000 people hold office at the local, state, and national level. Of those, a mere 305 are openly gay. Lornet Turnbull, Gay and Lesbian Officials to Meet, SEATTLE TIMES, Nov. 18, 2005, at B1. Despite laudable civil rights successes over the years, gays and lesbians remain a political underclass in our nation.[5]
ś 307 "A prime part of the history of our Constitution . . . is the story of the extension of constitutional rights and protections to people once ignored or excluded." United States v. Virginia, 518 U.S. 515, 557, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Both the historical and current circumstances of gay and lesbian people in this country establish they are a minority that has not enjoyed political protection. This country's judiciary, led by the United States Supreme Court, has not shied away from protecting such minorities from discrimination, even when doing so required invalidation of politically popular legislation. The judiciary has been similarly resolute when faced with legislation that infringes upon a fundamental right protected by our constitution. It is not only our prerogative, but our duty under the tripartite system of government to provide prompt relief for violations of individual civil rights.

State Interests Supporting the DOMA
ś 308 While Justice Fairhurst's dissent concludes that there is no rational relationship between the purposes behind the DOMA and the legislation itself, a conclusion with which I agree, I want to here express discomfort with the lack of legitimate state interest supporting the DOMA. Whatever bases the plurality and Justice J.M. Johnson's concurrence assert to support the DOMA, the legislative history of the law reveals that it stems, in substantial part, from thinly-veiled animosity against a minority group, animosity that is rooted in moral and religious objections to same-sex relationships. Its very title asserts as muchâ "defense" of marriageâ "defense" from what? Against whom? The DOMA ought to be recognized for the discriminatory enactment that it is, and rejected as such.
ś 309 To many, same-sex relationships and same-sex marriages are contrary to religious teachings. But none of the plaintiffs in the *1033 cases before us today seek acceptance of same-sex marriage within a particular religious community. They seek access to civil marriage. Some churches and religious organizations may refuse to solemnize same-sex unions, and that is their right in the free exercise of religion under our constitution. A religious or moral objection to same-sex marriage is not, however, a legitimate state interest that can support the DOMA.[6]
ś 310 First, it is important to emphasize the secular nature of civil marriage. As early as the Enlightenment, marriage began to be seen as a private contract. STEPHNIE COONTZ, MARRIAGE, A HISTORY: FROM OBEDIENCE TO INTIMACY OR HOW LOVE CONQUERED MARRIAGE 146-47 (2005); CHAUNCEY, supra, at 79-80.[7] In early America, New England's religious dissenters rejected church regulation of marriage. CHAUNCEY, supra, at 80. In the southern colonies, the Church of England retained its authority over civil marriage a bit longer, but after the American Revolution, "all states recognized marriage as a purely civil matter." Id. Americans could choose to subject themselves to their church's religious laws, but doing so was purely voluntary. Id. As a legal matter, "marriages had legal standing only as a civil contract and status." Id.
ś 311 In Washington, the secular nature of civil marriage was recognized by the territorial legislature as early as 1854. In re Estate of Wren, 163 Wash. 65, 72, 299 P. 972 (1931) (describing law enacted by the first legislature of the territory of Washington in 1854, which defined marriage as a civil contract). To this day, the legislature defines marriage as a civil contract and it does not require religious solemnization for a marriage to be valid. RCW 26.04.010, .050; Wash. Statewide Org. of Stepparents v. Smith, 85 Wash.2d 564, 569, 536 P.2d 1202 (1975). "It is apparent that the purpose of this statute was to make it clear that marriage is governed by civil law rather than by ecclesiastical law." Statewide Org. of Stepparents, 85 Wash.2d at 569, 536 P.2d 1202.[8] When partners enter into the civil marriage contract, they assume rights, duties, and obligations defined by the State. Krieg v. Krieg, 153 Wash. 610, 611, 278 P. 223 (1929) (emphasizing that the marriage contract is unusual in that it is one in which the State has an interest and the State may impose conditions upon the contract).
ś 312 As the Supreme Judicial Court of Massachusetts recognized, the State's interest in civil marriage arises from its police power. Goodridge v. Dep't of Pub. Health, 440 Mass. 309, 798 N.E.2d 941, 954 (2003). Civil marriage "anchors an ordered society by encouraging stable relationships over transient ones." Id. Civil marriage is central to the way in which the State "identifies individuals, provides for the orderly distribution *1034 of property, ensures that children and adults are cared for and supported whenever possible from private rather than public funds, and tracks important epidemiological and demographic data." Id. Civil marriage is a state-conferred legal status, the existence of which gives rise to benefits and burdens reserved exclusively to the citizens engaged in the marital relationship. Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44, 58 (1993). Because a marriage license only acts as a trigger for state-conferred benefits, the State's role is not to endorse certain morals, lifestyles, or relationships when it grants a marriage license, but rather it should only identify those entitled to the benefits of marital status. Baker v. State, 170 Vt. 194, 744 A.2d 864, 899 (1999) (Johnson, J., concurring/dissenting).
ś 313 Yet the DOMA's legislative history reveals that what the proponents of the legislation intended was to impose religious and moral restrictions on the state regulated civil institution of marriage.[9] In addition, there is ample evidence in the legislative history that the DOMA's supporters were motivated by animus, an undisguised desire to discriminate against gays and lesbians. Each of these purposes has been rejected by the United States Supreme Court as illegitimate interests that cannot support legislation targeting a minority group.
ś 314 Included in the legislative history materials of Washington's DOMA is a transcript of Senator Byrd's testimony to the United States Senate in favor of the federal DOMA. In that argument, Senator Byrd spoke of Judeo Christian tradition, quoted several Bible verses, and predicted that acceptance of families with two mothers or two fathers would be catastrophic for society. Tr. of Senator Byrd's Remarks at 5-6, 10-11. The Washington director of Concerned Women for America called on our legislators to remember that marriage is a "God-ordained institution." Test. of Anne Ball at 1 (quoting biblical passages). She also claimed that legally sanctioning same-sex marriage "does not mean we will be `slouching toward Gomorrah.' Instead, we will be in an all-out sprint." Id. Offering another biblical reference, a different proponent of the DOMA argued that only heterosexual marriages are sanctified by God. Test. of Leilani Lutak at 2.
ś 315 During floor debate, Representative Mulliken opined that homosexuality is "against the Creator's design," and that homosexuality is "contrary to God's will." House Floor Debate (Feb. 4, 1998), audio recording by TVW, Washington State's Public Affairs Network, available at http:// www.tvw.org. Other representatives and senators explained that the DOMA's ban on same-sex marriage codified their view of God's intentions. Lynda V. Mapes, House Passes Ban on Gay Marriagesâ Backers Say Bill Defends "God's Choice," SEATTLE TIMES, Feb. 5, 1998. Several other representatives referred to the religious debate surrounding the bill. (Murray, Dickerson, Mulliken, Appelwick). Representatives Dickerson and Murray lamented the religious intolerance reflected in the legislation. House Floor Debate, supra.[10]
ś 316 However, religious restrictions on the institution of marriage have never governed civil marriage in this country, nor would it be constitutionally permissible for them to do so. For example, historically many religions have strictly forbidden marriage outside of the denomination, but these churches could not prevent interdenominational civil marriages because "marriage was [ultimately] a state matter, not subject to .. . religious restrictions." CHAUNCEY, supra, at 80-81 (citing The Roman Catholic Code of Canon Law (1918) and statements issued by protestant denominations forbidding marriage to Catholics). This court cannot endorse the use of state law to impose religious sensibilities or religiously-based moral codes on others' most intimate life decisions. Lawrence, 539 U.S. at 571, 123 S.Ct. 2472; see also CHAUNCEY, supra, at 85-86. The *1035 DOMA reflects a religious viewpoint; religious doctrine should not govern state regulation of civil marriage.
ś 317 Furthermore, even absent a religious objection to same-sex marriage, moral judgment is not a sufficiently valid interest to support upholding a law that singles out a minority group for disparate treatment. Lawrence, 539 U.S. at 577-78, 123 S.Ct. 2472 (adopting the rationale of Justice John Paul Stevens' dissenting opinion in Bowers, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140). As evidenced by its title and plain language, the primary purpose of the DOMA is to defend the traditional institution of marriage, and throughout the legislative history of the bill are references to "protecting" the institution. FINAL BILL REPORT, ESHB 1130, 55th Leg., Reg. Sess., at 3 (Wash.1998); HOUSE BILL REPORT, ENGROSSED SUBSTITUTE S.B. (ESSB) 5398, 55th Leg., Reg. Sess., at 3 (Wash.1997); SENATE BILL REPORT, ESHB 1130, 55th Leg., Reg. Sess., at 2 (Wash.1997). The plain language of the legislation reflects the legislature's intent to exclude an entire class of people from the institution of civil marriage.[11]
ś 318 The Final House Bill Report reflects that testimony in favor of the bill included the opinion that "[w]e shouldn't lower our moral standards or allow the concept of family to be distorted by a minority." FINAL BILL REPORT, ESHB 1130, supra, at 4. The Senate committee debate included testimony that "[d]eviating from moral foundations causes devastating impact on families and children in particular." HOUSE BILL REPORT, ESSB 5398, supra, at 1. In support of the DOMA, the Washington Director of Concerned Women for America complained same-sex marriage would lead to children being taught that same-sex marriage is the moral equivalent of opposite-sex marriage. Test. of Anne Ball at 1. She also characterized the gay civil rights movement as a campaign to call "wrong right and right wrong." Id.; see also Test. of Forrest Messenger at 2 (arguing that same-sex marriage would reduce "moral standards").
ś 319 Moral judgment of a minority class of citizens is inherent in the DOMA. Yet the United States Supreme Court recently emphasized that. "`the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice.'" Lawrence, 539 U.S. at 577-78, 123 S.Ct. 2472 (quoting Bowers, 478 U.S. at 216, 106 S.Ct. 2841 (Stevens, J., dissenting)); see also id. at 582, 123 S.Ct. 2472 (O'Connor, J., concurring) ("Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause."). While the Lawrence Court explicitly did not address the issue of same-sex marriage, rightly so since that issue was not before it, the Court's emphasis on this principle is central to the Lawrence opinion.[12]
*1036 ś 320 Finally, I agree with one commentator who has opined that the legislature's moral stance in framing the DOMA amounts to animosity with a nicer name. Note: Litigating the Defense of Marriage Act: The Next Battleground for Same-Sex Marriage, 117 HARV. L. REV. 2684, 2697 (2004). See also Lawrence, 539 U.S. at 601, 123 S.Ct. 2472 (Scalia, J., dissenting) (opining that "`preserving the traditional institution of marriage' is just a kinder way of describing the State's moral disapproval of same-sex couples" (quoting id. at 585, 123 S.Ct. 2472) (O'Connor, J., concurring)). Even ignoring religious underpinnings, "bare [legislative] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." Moreno, 413 U.S. at 534, 93 S.Ct. 2821. Discrimination and animosity are not legitimate state interests. Id.; see also Romer, 517 U.S. at 634, 116 S.Ct. 1620 (legislation "born of animosity" toward gays and lesbians is unconstitutional). It is our duty to ensure that legislative classifications are not drawn "for the purpose of disadvantaging the group burdened by the law." Romer, 517 U.S. at 633, 116 S.Ct. 1620.
ś 321 There exists manifold evidence of overt animosity in the legislative history of the DOMA. During floor debate, Representative Murray noted that the prime sponsor of the DOMA advocated that homosexuals be removed from American society and suggested that homosexuals can and should be "reprogrammed." House Floor Debate, supra. A written statement in support of the DOMA argued that marriage should not be "diluted" by extension to same-sex couples and suggested that homosexual marriages could not contribute to society in the same way that opposite-sex marriages do. Statement of Professor Lynn D. Wardle at 3-4. Another proponent of the DOMA characterized homosexual people as inherently more promiscuous than heterosexual people and "broken." Test. of Leilani Lutak at 1-2. Another explained that in her view, good parenting and homosexuality are mutually exclusive. Test. of Suzanne Cook at 2.
ś 322 Other members, during floor debate in both houses and testimony in committee, decried the discriminatory intent and intolerance motivating the legislation. Representative Appelwick and Senators Thibaudeau, Fine, Kohl, and McAuliffe condemned the hostility underlying the bill. House Floor Debate, supra; Senate Floor Debate (Feb. 6, 1998), audio recording by TVW, Washington State's Public Affairs Network, available at http://www.tvw.org; FINAL BILL REPORT, ESHB 1130, supra, at 4 ("The bill represents the use of people's hate and fear to try and destroy families that are loving, caring, nurturing, and ordinary in every other way."); SENATE BILL REPORT, ESSB 5398, supra, at 1. The League of Women Voters noted that the legislation singled out gay and lesbian couples, unfairly equating them with "criminal bigamists and those committing incest." Letter from League of Women Voters of Washington at 1 (Feb. 4, 1997).
ś 323 Like Justice Fairhurst, I also take issue with the notion that children thrive better in opposite-sex households than in same-sex households. It is important to note that some of the studies about the negative effects of fatherlessness or motherlessness contained in the record might more accurately measure the growth and development of children raised in single-parent homes, not in homes headed by two parents of the same sex.[13] Concurrence (J.M. Johnson, J.) at 1005 n.42 (citing Clerk's Papers (CP) at 372). Or, the results of some studies might be skewed by the specter of an acrimonious divorce between two heterosexual parents. Id.[14]
*1037 ś 324 Most importantly, even if numerous reputable scientific studies were to conclusively show that children raised in same-sex households are seriously disadvantaged (a development I very much doubt would occur), those problems are not solved by the DOMA, since homosexual couples may raise children whether they are married or not. And, since same-sex couples can and will (and should) raise children together, the economic and social benefits denied to those couples through the DOMA are also denied to their children. Rather than protecting children, the DOMA harms them.[15] The DOMA does nothing to fortify or preserve heterosexual marriage.
ś 325 Thus, while I agree with Justice Fairhurst that the complete lack of connection between the plurality's asserted state interests and the denial of marriage to homosexuals reveals that animus motivated the DOMA, it is necessary to confront the overt evidence of discriminatory intent behind this law. These disturbing aspects of the DOMA's legislative history are a piece of this debate that cannot be ignored. The DOMA is, at best, a "classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." Romer, 517 U.S. at 635, 116 S.Ct. 1620. At worst, the DOMA amounts to the use of state law to enforce religious and moral objections to gays and lesbians in general and to same-sex relationships in particular. It is a deplorable consequence that the plurality condones.

The Equal Rights Amendment
ś 326 The plurality and concurrence also conclude that the DOMA does not violate Washington's Equal Rights Amendment (ERA), Const. art. XXXI, § 1, which provides, "[e]quality of rights and responsibility under the law shall not be denied or abridged on account of sex." I disagree with the plurality's reading of the ERA and believe the plurality ignores the nearly absolute prohibition against discrimination based on sex that this court has interpreted the ERA to create in the decades since Singer v. Hara, 11 Wash.App. 247, 522 P.2d 1187 (1974). Moreover, Justice J.M. Johnson's concurrence fails to appreciate that the ERA ultimately protects the rights of the individual under the law. Thus, both the plurality and the concurrence are too quick to reject the Loving analogy. 388 U.S. at 12, 87 S.Ct. 1817.
ś 327 The DOMA violates the ERA because it discriminates on the basis of sex. A woman cannot marry the woman of her choice but a man can marry the woman of his choice. In other words, the only thing preventing plaintiff Heather Andersen from marrying her partner, Leslie Christian, is the fact that Andersen is a woman. Andersen should no more readily be prohibited from marrying her partner than she is from voting for president or practicing law. Plaintiffs David Serkin-Poole and Michael Serkin-Poole should no more readily be prohibited from marrying than they are prohibited from attending nursing school or raising children. Of course, it also goes without saying that, regardless of the historical discrimination against women that was the catalyst for the ERA, it protects both men and women from discrimination based on gender. Guard v. Jackson, 132 Wash.2d 660, 666, 940 P.2d 642 (1997) (holding wrongful death statute, as applied, discriminated against a man).
*1038 ś 328 In the decades since the Court of Appeals decided Singer in 1974, this court has imposed a strict reading of the ERA. Washington is one of only two states that applies an "absolute" standard of review to sex-based classifications that is even more narrow than strict scrutiny. Thomas C. Schroeder, Note & Comment: Does Sex Matter? Washington's Defense of Marriage Act Under the Equal Rights Amendment of the Washington State Constitution, 80 WASH. L. REV. 535, 543 (2005); Guard, 132 Wash.2d at 663-64, 940 P.2d 642; SW Wash. Chapter, Nat'l Elec. Contractors Ass'n v. Pierce Co., 100 Wash.2d 109, 127, 667 P.2d 1092 (1983) ("The ERA absolutely prohibits discrimination on the basis of sex and is not subject to even the narrow exceptions permitted under traditional `strict scrutiny.'"); Darrin v. Gould, 85 Wash.2d 859, 871, 540 P.2d 882 (1975) (The ERA "added something to the prior prevailing law by eliminating otherwise permissible sex discrimination if the rational relationship or strict scrutiny tests were met"). "The ERA mandates equality in the strongest of terms and absolutely prohibits the sacrifice of equality for any state interest, no matter how compelling." Elec. Contractors Ass'n, 100 Wash.2d at 127, 667 P.2d 1092.
ś 329 The ERA's absolute prohibition is subject to only two narrow exceptions. Guard, 132 Wash.2d at 664, 940 P.2d 642. The ERA is not violated when the classification is based on an actual physical difference between the sexes or when the classification is part of a program designed to alleviate effects of past discrimination and attain equality in fact. Id. (citing City of Seattle v. Buchanan, 90 Wash.2d 584, 584 P.2d 918 (1978); Elec. Contractors, 100 Wash.2d at 127, 667 P.2d 1092). Thus, absent application of these exceptions, no sex-based classification is allowed in Washington, regardless of the purported government interest. Surely, the DOMA does not survive this absolute prohibition.
ś 330 This absolute reading of the ERA has evolved since Singer, calling the reasoning of that case into question. The Singer court argued that Washington law denied same-sex couples the right to marry, not due to gender, but because of a definition of marriage that necessitates an opposite-sex couple. In other words, discrimination based on gender was permissible in that case because opposite-sex marriage is the "traditional" definition of marriage. As other courts have noted, the Singer court's logic amounts to "tortured and conclusory sophistry." Baehr, 852 P.2d at 63. This is especially so in the face of the high burden required to justify classifications based on sex. As the United States Supreme Court recently noted, constitutional law can mandate change with an evolving social order. Lawrence, 539 U.S. at 577-78, 123 S.Ct. 2472; see also Loving, 388 U.S. at 10-12, 87 S.Ct. 1817. Mere reliance on tradition was not enough to justify discriminatory legislation in the face of rational basis review; surely tradition cannot withstand the ERA's absolute prohibition.
ś 331 In rejecting the plaintiffs' ERA claim, the plurality and the concurrence rely on the equal application theory, asserting that because the DOMA restricts men and women equally as classes (because it prohibits both lesbians and gay men from marrying same-sex partners), there is no sex discrimination here. But this equal application theory, as applied to the institution of marriage, has already been rejected by the United States Supreme Court in Loving:
Thus, the State contends that, because its miscegenation statutes punish equally both the white and the Negro participants in an interracial marriage, these statutes, despite their reliance on racial classifications do not constitute an invidious discrimination based upon race.... [W]e reject the notion that the mere "equal application" of a statute containing racial classifications is enough to remove the classification from the Fourteenth Amendment's proscriptions of all invidious racial discriminations .... In the case at bar ... we deal with statutes containing racial classifications, and the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race.
*1039 Loving, 388 U.S. at 8-9, 87 S.Ct. 1817. The same logic holds true for classifications based on sex in Washington under the ERA. Mere equal application of the DOMA is not enough to remove it from the ERA's absolute prohibition against sex-based classification; equal application does not immunize the DOMA from the ERA's heavy burden.
ś 332 The plurality and concurrence respond by noting that the Loving Court also discussed the history of discrimination against African-Americans and the historical use of antimiscegenation laws to promote white supremacy. The plurality and concurrence argue that absent this history, the DOMA can survive the test that antimiscegenation laws failed.
ś 333 However, this argument, and indeed the equal application theory at its core, depends upon the assumption that the ERA was intended to prohibit only broad-based discrimination on the basis of sex without regard for individual impacts. For example, under the equal application theory adopted by the plurality and concurrence, a state law could require that upon dissolution of a marriage, all female children must reside with the mother and all male children must reside with the father. See Baker, 744 A.2d at 906 n. 10 (1999) (Johnson, J., concurring/dissenting). Similarly under the equal application theory, a facially "neutral" law could prohibit all people from holding jobs traditionally held by persons of the opposite sex. See Stephen Clark, Same-Sex But Equal: Reformulating the Miscegenation Analogy, 34 RUTGERS L.J. 107, 143-44 (2002). Because such laws would facially apply equally to both sexes, they would not violate the ERA under the equal application theory.
ś 334 It is simply disingenuous to turn a blind eye toward the individual application of the statute; simply put, there is little doubt that the DOMA was enacted because of, not merely in spite of, its adverse effects upon gays and lesbians. Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 470, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (overturning a Washington initiative, despite its facially neutral language, because of its obvious "substantial and unique" effect upon racial minorities). The Loving Court recognized the individual character of the freedom at stake: "[u]nder our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State." Loving, 388 U.S. at 12, 87 S.Ct. 1817 (emphasis added). Moreover, this court has analyzed the individual impact of government discrimination in prior ERA cases. Guard, 132 Wash.2d at 666, 940 P.2d 642 (analyzing whether the statute at issue in that case, as applied, was discriminatory); State v. Wood, 89 Wash.2d 97, 103, 569 P.2d 1148 (1977) (considering an as applied challenge); Darrin, 85 Wash.2d at 875, 540 P.2d 882 (though challenged regulation was based on justification that a majority of girls would be unable to compete with boys in contact football, there was no finding that what was true for a majority of girls was true for the particular plaintiffs). The equality of the sexes required by the ERA begins and ends with the rights of the individual under the law. Accord Deane v. Conaway, No. 24-C-04-005390, 2006 WL 148145, at *5-6 (Baltimore City Cir. Court Jan. 20, 2006). In every instance where a man is denied the ability to marry the man of his choice, but a woman is not, that man bears a burden that the woman does not. As applied, the DOMA discriminates against the female plaintiffs who wish to marry their female partners and the male plaintiffs who wish to marry their male partners.

Conclusion
ś 335 The DOMA denies fundamental basic human rights to Washington's gay and lesbian citizens, human rights that impact the very core of their everyday lives. The plaintiffs in this case represent the ever-growing diversity of the openly gay community in Washington. They are teachers, attorneys, ministers, and foster parents. In their everyday lives they are bosses, coworkers, neighbors, clients, parents, friends, and volunteers. It is in these seemingly mundane, everyday roles that the discrimination imposed by the DOMA is deeply felt, but it is nowhere more wounding than in their very homes. Unless the concept of equal rights has meaning there, it has little meaning anywhere.
*1040 ś 336 "Those who cannot remember the past are condemned to repeat it." GEORGE SANTAYANA, THE LIFE OF REASON OR THE PHASES OF HUMAN PROGRESS: REASON IN COMMON SENSE 82 (1953). Future generations of justices on this court and future generations of Washingtonians will undoubtedly look back on our holding today with regret and even shame, in the same way that our nation now looks with shame upon our past acts of discrimination. I will look forward to the time when state-sanctioned discrimination toward our gay and lesbian citizens is erased from our state's law books, if not its history. I dissent.
CHAMBERS, J. (concurring in dissent).
ś 337 I fully endorse the views of Justice Fairhurst in dissent. I write separately to express my disagreement with the lead opinion's analytical approach toward our state constitution's privileges and immunities clause, article I, section 12.
ś 338 The lead opinion concludes plaintiffs have not established "that they have a fundamental right to marriage that includes the right to marry a person of the same sex." Lead opinion at 969. Because the lead opinion concludes that no fundamental right is implicated, the rest of its discussion on article I, section 12 is unnecessary and dicta.
ś 339 Our state privileges and immunities clause provides:
No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.
CONST. art. I, § 12. This text envisions a two part analysis: (1) has a law been passed granting a citizen, class, or corporation a privilege or immunity, and if so, (2) does that privilege or immunity belong equally to all of us? Id. Accord James A. Bamberger, Confirming the Constitutional Right of Meaningful Access to the Courts in Non-Criminal Cases in Washington State, 4 SEATTLE J. SOC. JUST. 383, 413-15 (2005). The clause applies only if the law grants a privilege or immunity, though, of course, it may be susceptible to other constitutional challenges.
ś 340 The lead opinion states, without holding, that unless a statute grants a privilege or immunity to a minority group, we will apply the tripartite approach the federal courts have developed to interpret the federal equal protection clause. It implies that we will follow the lead of the federal courts in both analysis and result. But see Sofie v. Fibreboard Corp., 112 Wash.2d 636, 640, 771 P.2d 711 (1989);[1]State ex rel. Bacich v. Huse, 187 Wash. 75, 80, 59 P.2d 1101 (1936), overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos, 92 Wash.2d 939, 955, 603 P.2d 819 (1979). Although the lead opinion cites authority for its conclusion, I disagree with both its approach and its determination that the authorities cited lead naturally to its conclusion. The fact that we have taken this approach during the infancy of our interpretation of the clause does not turn it into the law of this state. Our constitution demands a deliberative process. We should not abdicate our responsibility to interpret Washington's constitution to the judicial branch of a different government, let alone defer to an interpretation of a different clause of a different constitution.
ś 341 Because, by its plain language, history, and structure, article I, section 12 applies to any privilege or immunity granted by the State on unequal terms and because I continue to believe, as we held in Grant County Fire Protection District No. 5 v. City of Moses Lake, 150 Wash.2d 791, 806, 83 P.3d 419 (2004) (Grant County II), that our constitution protects the privileges and immunities of "all citizens," I write separately.

WHAT ARE PRIVILEGES AND IMMUNITIES?
ś 342 Privileges and immunities can be traced back at least to the Middle Ages in canonical law. At that time, they were rights *1041 granted to specific individuals or groups. See R.H. Helmholz, Magna Carta and the lus Commune, 66 U. CHI. L. REV. 297, 330, 349 (1999).[2] However, these terms acquired new meanings under English secular law. David S. Bogen, The Privileges and Immunities Clause of Article IV, 37 CASE W. RES. L. REV. 794, 802 (1987). Privileges and immunities came to encompass the basic rights of English and American citizenship that were granted to all citizens, not merely to some privileged group. See Corfield v. Coryell, 6 F. Cas. 546, 551-52, 4 Wash. C.C. 371 (C.C.E.D.Pa.1823); cf. Paul v. Virginia, 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1868) (rejecting natural law approach); Bogen, supra, at 800.
ś 343 More than a century ago, a legal scholar catalogued many state court decisions construing their own privileges and immunities clauses in terms of what was and was not included. W.J. Meyers, The Privileges and Immunities of Citizens in the Several States, 1 MICH. L. REV. 286 (1902). Professor Meyers concluded, "[r]oughly, the `privileges and immunities' belonging to a citizen by virtue of citizenship are `personal' rights, that is, private rights, as distinguished from public rights." Id. at 290.
ś 344 This court has never definitively defined "privileges or immunities" under our own constitution. We did come close more than a century ago, noting that "privileges and immunities [are] those fundamental rights which belong to the citizens of the state by reason of such citizenship." State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902) (emphasis added) (citing THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 597 (6th ed. 1890)). In other words, in general terms, privileges and immunities are those personal, fundamental rights that belong to each of us by virtue of our citizenship.[3] The legislature may, perhaps, expand the privileges and immunities of citizenship, but where it does, it is bound by the constitution to do so on equal terms.
ś 345 I conclude that properly read, article I, section 12 of the Washington Constitution protects us against all governmental actions that create unmerited favoritism in granting fundamental personal rights. See State v. Smith, 117 Wash.2d 263, 283, 814 P.2d 652 (1991) (Utter, J., concurring). Again, nothing in the text of our constitution supports a conclusion that we should follow the federal interpretation of a different clause of the United States Constitution unless the law grants a privilege and immunity to a minority. Instead, we should conclude that our privileges and immunities clause protects against all laws that grant privileges or immunities, "which upon the same terms shall not equally belong to all." CONST. art. I, § 12. While the privileges and immunities clause may have been inspired in part by preventing the State from granting privileges to a few, cf. State v. Clark, 291 Or. 231, 236, 630 P.2d 810 (1981), the clause protects all of us from privileges granted on unequal terms.

EQUAL PROTECTION VS. PRIVILEGES AND IMMUNITIES
ś 346 If both equal protection and privileges and immunities involve the giving or withholding of rights, how do these concepts differ? There is certainly overlapâ both "seek to prevent the State from distributing benefits and burdens unequally." Smith, 117 Wash.2d at 283, 814 P.2d 652 (Utter, J., concurring). But there are important differences analytically.
*1042 ś 347 First, the denial of any right implicates the federal equal protection clause. U.S. CONST. amend. XIV, § 1. The fact that the right is fundamental merely elevates the level of scrutiny. See generally Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). But only the privileges and immunities of citizenship implicate article I, section 12. Vance, 29 Wash. at 458, 70 P. 34.
ś 348 Second, both equal protection and privileges and immunities involve classifications. A law that grants a privilege to some necessarily excludes others based upon a classification. Classifications may of course be proper; there is nothing unconstitutional about limiting criminal penalties to those who have been properly tried and convicted of crimes or limiting the right to practice law to those who have passed a bar examination. Once a legitimate class has been defined, the law must treat its members the same. Equal protection prevents discrimination against some class; privileges and immunities prevents favoritism. See Smith, 117 Wash.2d at 283, 814 P.2d 652; State v. Savage, 96 Or. 53, 59, 184 P. 567, 189 P. 427 (1919).[4]
ś 349 In Smith, Justice Utter wrote separately to analyze whether Washington's privileges and immunities clause should be interpreted independently and differently from the federal and state equal protection clauses. He largely embraced the analysis of our sister state, Oregon. Smith, 117 Wash.2d at 287-91, 814 P.2d 652 (citing State v. Clark, 291 Or. 231, 630 P.2d 810). One significant difference between equal protection and privileges and immunities is that an individual does not have to assert that she has been denied a right as an individual or as a member of a disfavored class. She need not show discrimination. She need only show that some person or class of which she is not a member has been singled out for a privilege she does not receive; unless, of course, the State can show a justification for the difference in treatment. Otherwise, the challenged legislation is beyond the power of the State to enact. CONST. art. I, § 12. The standard set by the privileges and immunities clause is perhaps the best test of justice and equality under the law for all.

DOES IT MATTER WHETHER A MAJORITY OR MINORITY RECEIVES THE PRIVILEGE OR IMMUNITY?
ś 350 This court has never held, after full due consideration, that the effect of article I, section 12 is limited to positive grants of favoritism to a minority class. The lead opinion unfortunately makes reference to "grant[s] of positive favoritism to minorities," as having some constitutional significance in our analysis, but relies upon Grant County II, 150 Wash.2d 791, 83 P.3d 419, and Smith, 117 Wash.2d at 282, 814 P.2d 652 (Utter, J., concurring). Lead opinion at 971. The opinion I signed in Grant County II did not hold that the protections of the privileges and immunities clause effectively extended only to outraged majorities, and saying that we did so hold then does not make it a holding of the court now.[5]
ś 351 In Grant County II, this court concluded that our state privileges and immunity clause was different from and may provide greater protections than its federal counterpart. Grant County II, 150 Wash.2d at 811, 83 P.3d 419. Because of our shared history and textual similarities between Washington's and Oregon's privileges and immunities clauses, we have relied heavily on Oregon Supreme Court opinions. The only difference between the Washington and Oregon clauses is Washington's added reference to corporations. We explained that the corporate reference was added because our framers were gravely concerned with the effect of large concentrations of wealth and the undue *1043 political influence of corporations. Grant County II, 150 Wash.2d at 808, 83 P.3d 419.
ś 352 After a review of history and case law, this court concluded simply, "[f]or a violation of article I, section 12 to occur, the law, or its application, must confer a privilege to a class of citizens." Grant County II, 150 Wash.2d at 812, 83 P.3d 419. Grant County II relied upon both Smith, 117 Wash.2d 263, 814 P.2d 652, and Clark, 291 Or. 231, 630 P.2d 810.[6] There is nothing in these cases or the authorities upon which they rely that should lead to the conclusion that the class receiving the benefit must be a minority class before we will independently examine our state constitution. Such a limitation upon our state's privileges and immunities clause would be, in my view, a far greater limitation than any other state has placed on its privileges and immunities clause in the modern era.

HAS THE PRIVILEGES AND IMMUNITIES QUESTION BEEN ANSWERED?
ś 353 Finally, the lead opinion begins its privileges and immunities analysis at the end of the analysis. The proper question is whether marriage is a fundamental right that belongs to each of us by reason of our citizenship. Our founders would have answered that question with a resounding yes! Having determined that marriage is a privilege of citizenship, the next step is to determine whether the privilege is available to all on equal terms. This step necessarily requires the court to determine whether the challenger is challenging a valid classification.
ś 354 Instead of engaging in an independent analysis of the State's privileges and immunities clause, the lead opinion relies upon the analytical framework developed to interpret the federal equal protection clause. Given the resolution of this case and my adherence to the dissent, I find it unnecessary to explore this issue further. However, it is important to stress that the lead opinion has neither addressed nor answered the important privileges and immunities arguments raised by the respondents. Resolution of these important questions will have to wait for another day.

CONCLUSION
ś 355 I take the time to discuss article I, section 12 of our state constitution because, in constitutional terms, it is still in its infancy. But it is clearly not the same as equal protection. While the privileges and immunities clause in the fourteenth amendment to the United States Constitution was arguably to prevent states from granting fundamental rights to some of its citizens and not others, to our founders it was also a major component of the guaranty of equality for all. Article I, section 12 should be permitted to be interpreted and applied as our founders intended. As the judicial body charged with its interpretation, we should do so with utmost care. We should interpret our constitution only when the issues are properly framed and argued by real parties at interest and essential to the outcome of the case, not when they have been rendered effectively irrelevant by the court's disposition of predicate issues. While I certainly understand the temptation to reach every issue, if only to show that we thought it through, I do not believe it is the best way to develop our jurisprudence.
ś 356 With these observations, I concur in dissent.
Concurrence in dissent; OWENS, J.
NOTES
[1] Faced with a similar dissent in Hernandez v. Robles, 2006 N.Y. slip op. 5239, 2006 N.Y. LEXIS 1836, ___ N.Y.3d ___, ___ N.Y.S.2d ___, ___ N.E.2d ___, 2006 WL 1835429, (Ct.App. July 6, 2006), the lead opinion stated: "The dissenters assert confidently that `future generations' will agree with their view of this case. [2006 N.Y. slip op. 5239 (dissent at *90), ___ N.Y.3d at ___, ___ N.Y.S.2d ___, ___ N.E.2d ___.] We do not predict what people will think generations from now, but we believe the present generation should have a chance to decide the issue through its elected representatives." Id. at *22, ___ N.Y. at ___, ___ N.E.2d ___. (The New York Court of Appeals determined that New York's restriction of marriage to same-sex couples does not violate the New York State Constitution.)
[2] Justice Fairhurst's dissent attempts to shift the focus from whether limiting marriage to opposite-sex couples furthers these interests to whether excluding same-sex couples furthers these interests. By doing so the dissent fails to give the legislature the deference required under the constitution.
[3] As will be explained, the court in Andersen erroneously relied on federal constitutional cases involving race and the right to privacy to conclude that the state constitution guarantees a right to same-sex marriage. In the Castle case, the court erred in finding that same-sex orientation forms the basis for a suspect class of persons. There is nothing in this state's constitution or case law to support this conclusion. It is this court's duty to review the opinions of the lower courts. The fact that some lower court decisions are reversed is not a negative reflection on the diligence, integrity, or scholarship of the judges involved. The trial judge in each of these cases is a well-respected jurist, and Justice J.M. Johnson's suggestion that the judges' decisions were result-oriented is unwarranted.
[4] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).
[5] The Thurston County Superior Court agreed but did so by applying an independent state constitutional analysis to determine that the class is inherently suspect. As we have explained, an independent state analysis is not appropriate in this case.
[6] We recognize that this question is being researched and debated across the country, and we offer no opinion as to whether such a showing may be made at some later time.
[7] E.g., Engrossed Substitute H.B. 2661, 59th Leg., Reg. Sess. (Wash.2006); RCW 9A.36.080; RCW 9A.36.078; RCW 10.95.120(6)(e)-(f); Bothell Mun.Code 8.60.020(G); Bremerton Mun. Code 22.01.260; Everett Mun.Code 2.104.260; Kenmore Mun.Code 9.40.010(H); Kirkland Mun. Code 3.80.020(b); King County Code (KCC) 6.27A.120; KCC 12.16.020; chapter 12.19 KCC; San Juan County Mun.Code 12.08.190; Seattle Municipal Code (SMC) 14.08.020(M), .045, .060, .070, .080; SMC 3.14.931; Yelm Mun.Code 9.08.080.
[8] It is noteworthy that, as amended, the Hawai`i constitution does not foreclose the legislature from amending state marriage laws to extend the right to marry to same-sex couples.
[9] In Lawrence, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508, involving the Texas sodomy statute, the Court addressed the validity of the statute by deciding whether the petitioners had a liberty interest under the due process clause of the Fourteenth Amendment. The Court looked to laws and traditions in the past half century showing an emerging awareness of protection to be afforded adults in decision making about their private lives and sex. Lawrence, 539 U.S. at 571-72, 123 S.Ct. 2472. The Court explained that "early American sodomy laws were not directed at homosexuals as such but instead sought to prohibit nonprocreative sexual activity more generally." Lawrence, 539 U.S. at 568, 123 S.Ct. 2472. Not until the 1970s did any state specifically prohibit same-sex relations for criminal prosecution, and only nine states did so. Lawrence, 539 U.S. at 570, 123 S.Ct. 2472. The Court observed that at the time of its decision only 13 states still prohibited sodomy, 4 of these only in the case of homosexual conduct, and noted a pattern of nonenforcement of most of these laws with respect to consenting adults acting in private. Lawrence, 539 U.S. at 573, 123 S.Ct. 2472. Although Lawrence addressed the place of history and tradition in deciding the nature and extent of the due process liberty interest it recognized, the case was decided under a rational basis scrutiny standard of review.
[10] Justice J.M. Johnson resorts to name-calling in an effort to refute this point. However, it is difficult to explain the United States Supreme Court's decisions in Loving and Lawrence other than that the Supreme Court has recognized that the concept of fundamental rights is not static, locked in at the time of the founders.
[11] In 1970, an amendment to RCW 26.04.010 eliminated the terms "male" and "female" and substituted "persons." Laws of 1970, 1st Ex. Sess., ch. 17, § 2. However, the amendment was not intended to alter marriage as between a man and a woman. Instead, the statute was amended to provide the age of consent for both parties to a marriage to be 18 years, rather than 21 years for a male and 18 years for a female as before. Because the same age now applied to both, there was no longer any need to use the terms "male" and "female." In 1972, the ERA was adopted, and gender designations were subsequently eliminated from chapter 26.04 RCW. Again, the change did not involve recognition of same-sex marriage, as we explain below in our discussion of whether DOMA violates the ERA. In 1976, the Court of Appeals held in Singer, 11 Wash.App. 247, 522 P.2d 1187, that state statutes defined opposite-sex marriage and were constitutional. Then, in 1998, DOMA was enacted expressly prohibiting same-sex marriage.
[12] Contrary to the view expressed in Justice Fairhurst's dissent, the right to marry is not grounded in the State's interest in promoting loving, committed relationships. While desirable, nowhere in any marriage statute of this state has the legislature expressed this goal.
[13] In a rare case where the rational basis standard was found not to have been satisfied, legislative materials affirmatively showed that the challenged legislation could not rationally be thought to have furthered the identified legislative interests. DeYoung, 136 Wash.2d at 148-50, 960 P.2d 919.
[14] See 2 House Journal, 55th Leg., Reg. Sess., at 343-44 (Wash.2006); Senate Journal, 55th Leg., Reg. Sess., at 229-30 (Wash.2006);

http://apps.leg.wa.gov/billinfo/summary.aspx?bill=2661 & year=2006 (search hyperlinks under "View roll calls" (last visited July 12, 2006)).
[15] Justice Fairhurst's dissent also fails to consider that traditional and generational attitudes toward marriage may have contributed to the vote by any individual legislator as well as the possibility that legislators who were favorably disposed toward same-sex marriage were nevertheless concerned with developments in other states, including the amendments to state constitutions.
[16] The Court explained that `[i]f special accommodations for the disabled are to be required, they have to come from positive law." Garrett, 531 U.S. at 368, 121 S.Ct. 955.
[17] Many employers have recognized the need to provide their gay and lesbian employees with equivalent benefits policies. See Howard Paster, The Federal Marriage Amendment is Bad for Business, Wall St. J., Oct. 5, 2004, at B2 ("American businesses have been changing their workplace policies, adding domestic partner benefits and rethinking their corporate cultures since the early 1980s." Forty percent of the Fortune 500 companies, including "oil giants Shell Oil and BP, the Big Three auto makers, Lockheed Martin, General Electric, and Coca Cola", provide equivalent benefits because "[b]ottom-line, business decision-making explains it: Respected employees perform better and stay longer.")
[18] The Andersen plaintiffs reason that no Gunwall analysis is necessary because there is no dispositive federal law. Whether a Gunwall analysis is required does not depend on whether there is dispositive federal law.
[19] While opponents of the measure said in their "Statement against" HJR 61 in the Voters Pamphlet at 53 that homosexual and lesbian marriage would be legalized, the Attorney General's statement of the "Effect of HJR No. 61 if approved into Law" includes no such information. And, in any event, a statement in opposition to a ballot measure does not carry weight in construing an enacted measure. Lynch v. Dep't of Labor & Indus., 19 Wash.2d 802, 811-13, 145 P.2d 265 (1944).
[1] As the recent case of In re Parentage of L.B., 121 Wash.App. 460, 464, 89 P.3d 271 (2004), aff'd in part, rev'd in part on other grounds, 155 Wash.2d 679, 122 P.3d 161 (2005), illustrates, this right is not restricted to (self-identified) heterosexual couples, both father and mother were identified as "gay."
[2] See App. A â other states' laws and/or constitutional provisions.
[3] See App. B â lists cases from other states' supreme courts understanding marriage as a union between one man and one woman.
[4] The remaining exception: the ruling of the Massachusetts Supreme Judicial Court. Goodridge v. Dep't of Pub. Health, 440 Mass. 309, 798 N.E.2d 941 (2003) (constitutional amendment pending). A similar decision of the Hawaii Supreme Court was quickly superseded by constitutional amendment. See Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44, 56 (1993) (discussed, infra, p. 1003).
[5] Pub.L. No. 104-199, 110 Stat. 2419 (1996) (codified at 1 U.S.C. § 7; 28 U.S.C. § 1738C).
[6] Laws of 1998, ch. 1 (codified at RCW 26.04.010, .020).
[7] These were probably invalidated by constitutional amendments, statutory changes, and court decisions in those states. See Apps. A, B.
[8] Such marriage is among the rights or privileges reserved under the United States and Washington Constitutions.
[9] The fourteenth amendment to the United States Constitution reiterates,

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
This also demonstrates the authors of that amendment recognized a difference between privileges and immunities and equal protection because the clauses are set forth independently. Moreover, "privileges and immunities" are available only to "citizens" whereas due process and equal protection apply to "any person." See also Richard A. Epstein, Of Citizens and Persons: Reconstructing the Privileges or Immunities Clause of the Fourteenth Amendment, 1 N.Y.U.J. L. & LIBERTY 334, 340-49 (2005).
[10] See also Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872) (Bradley, J., dissenting) (citing Corfield v. Coryell, 6 F. Cas. 546).
[11] "We cannot ignore the plain difference in the language and history that exists between the federal equal protection clause and the privileges and immunities language of our own constitution. To do so is to rewrite our constitution without benefit of a constitutional convention and to deprive the people of this state of additional rights, which they adopted in our constitutional convention, without their consent." State v. Smith, 117 Wash.2d 263, 282, 814 P.2d 652 (1991) (Utter, J., concurring).
[12] As have the people in most other states through statutes and constitutional amendments, defining marriage as between one man and one woman, discussed infra and App. A.
[13] See Jones v. Hallahan, 501 S.W.2d 588, 589 (1973) (noting that appellants seeking to marry someone of the same-sex "are prevented from marrying, not by the statutes of Kentucky . . . but rather by their own incapability of entering into a marriage as that term is defined."). See also Goodridge, 440 Mass. at 351, 798 N.E.2d 941 (Spina, J., dissenting) ("The marriage statutes do not disqualify individuals on the basis of sexual orientation from entering into marriage. All individuals, with certain exceptions not relevant here, are free to marry.").
[14] See, e.g., Thomasson, 80 F.3d at 928 (rejecting heightened scrutiny of "`don't ask don't tell" policy); Equality Found. v. City of Cincinnati, 128 F.3d 289, 292-93 (6th Cir.1997) (holding the city charter's amendment concerning sexual orientation was subject to "rational relationship" review); Richenberg v. Perry, 97 F.3d 256, 260 (8th Cir.1996), cert. denied, 522 U.S. 807, 118 S.Ct. 45, 139 L.Ed.2d 12 (1997) (holding that homosexuality is not a suspect or quasi-suspect class and that the military's "don't ask don't tell" policy is only subject to rational basis review).
[15] See also Smelt v. County of Orange, 374 F.Supp.2d 861, 875, aff'd in part, vacated in part on other grounds, 447 F.3d 673 (9th Cir.2006) ("The U.S. Supreme Court and the Ninth Circuit recognize homosexuals as a constitutionally protected classâ although not a suspect or quasi-suspect classâ for equal protection purposes." (citing Romer v. Evans, 517 U.S. 620, 631-32, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) and High Tech Gays, 895 F.2d at 573-74)); State v. Limon, 280 Kan. 275, 286, 122 P.3d 22 (2005) (discussing Lawrence and concluding that "the United States Supreme Court has not recognized homosexuals as a suspect classification);" Wilson v. Ake, 354 F.Supp.2d 1298, 1307 (M.D.Fla.2005) (citing Lofton as authority for rejecting the claim that homosexuality is a suspect class under the equal protection clause of the Fourteenth Amendment); In re Kandu, 315 B.R. 123, 144 (Bankr.W.D.Wash.2004) (noting that Lawrence "did not hold that same-sex couples constitute a suspect or semi-suspect class under an equal protection analysis").
[16] What is "fundamental" under the "privileges and immunities" clause is discussed, supra, pp. 1016-1017.
[17] Derived from that right are correlative liberty interests that include the right to marital privacy, the right of married persons to have children (or decide not to), and the right to direct the education and upbringing of children. See Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).
[18] See Morrison v. Sadler, 821 N.E.2d 15, 33 (Ind.Ct.App.2005) ("This language linking marriage and procreation, particularly when combined with the fact that marriage was undoubtedly viewed as an opposite-sex institution in 1942, indicates that the Court was obviously contemplating unions between men and women when it ruled that the right to marry was fundamental."' (quoting Baehr, 852 P.2d at 56)); Lewis v. Harris, 378 N.J.Super. 168, 191, 875 A.2d 259 (App.Div.2005) ("Subsequent Supreme Court decisions also indicate that the constitutionally protected right recognized by the Court is the right of members of the opposite-sex to marry.").
[19] Courts have specifically held that Baker is binding precedent in challenges to state marriage statutes, See, e.g., Sadler, 821 N.E.2d at 19 (describing Baker as "binding United States Supreme Court precedent indicating state bans on same-sex marriage do not violate the United States Constitution"). See also, e.g., Hernandez v. Robles, 2006 N.Y. slip op. 5239, at *15, 2006 N.Y. LEXIS 1836, at *36 n. 4, ___ N.Y.3d at ___, n. 4, ___ N.Y.S.2d ___, ___ N.E.2d ___, (Ct.App. July 6, 2006) (Graffeo, J., concurring).
[20] See Lofton, 358 F.3d at 815-16 (noting that "[t]he effect of [Lawrence] was to establish a greater respect than previously existed in the law for the right of consenting adults to engage in private sexual conduct. Nowhere, however, did the Court characterize this right as `fundamental.'" (citation omitted)).
[21] See, e.g., Lofton, 358 F.3d at 817 ("We conclude that it is a strained and ultimately incorrect reading of Lawrence to interpret it to announce a new fundamental right."); Sadler, 821 N.E.2d at 20 ("The five justices of the Lawrence majority, as well as Justice O'Connor in her concurring opinion, do not appear to be prepared to extend the logic of their reasoning to the recognition of same-sex marriage"); Kandu, 315 B.R. at 140 ("[N]either the majority nor concurring opinions in Lawrence conclude that the fundamental right to marry includes the right to marry someone of the same sex. This Court views the Supreme Court's decision in Lawrence as appropriately acknowledging that all people, no matter what their sexual preferences, are entitled to respect for their private lives."); Wilson, 354 F.Supp.2d at 1306 ("[T]he majority in Lawrence was explicitly clear that its holding did not extend to the issue of same-sex marriage. . . .").
[22] The cases are now so numerous, they are cited in App. B. Recent examples are Hernandez, 2006 N.Y. slip op. 5239, 2006 N.Y. LEXIS 1836, ___ N.Y.3d ___, ___ N.Y.S.2d ___, ___ N.E.2d ___ (holding same-sex "marriage" is not a fundamental right and that article I, sections 6 and 11 of the New York Constitution do not compel state recognition of marriages between persons of the same-sex); Standhardt v. Superior Court ex rel. Maricopa, 206 Ariz. 276, 290, 77 P.3d 451, (App.2003) ("we hold that the fundamental right to marry protected by our federal and state constitutions does not encompass the right to marry a same-sex partner"), review denied 2004 Ariz, LEXIS 62; Kandu, 315 B.R. at 140 ("Based on the specific directives provided by the Supreme Court for fundamental rights analysis, and in the absence of binding precedent holding same-sex marriages to be a fundamental right, this Court declines to hold that there is a fundamental right to marry someone of the same-sex"); Wilson, 354 F.Supp.2d at 1306 ("no federal court has recognized that this [fundamental] right includes the right to marry a person of the same sex."); Sadler, 821 N.E.2d at 32 ("most courts have not looked favorably upon finding a `fundamental right' to marry a person of the same-sex"); Smelt, 374 F.Supp.2d at 878 ("The history and tradition of the last fifty years have not shown the definition of marriage to include a union of two people regardless of their sex."); Lewis, 378 N.J.Super. at 183, 875 A.2d 259 ("Marriage between members of the same-sex is clearly not a `fundamental right[ ] . . . deeply rooted in our legal tradition.'" (quoting Glucksberg, 521 U.S. at 722, 117 S.Ct. 2258)).
[23] Similarly, the trial court in Andersen concluded that "no case stands for the proposition that that narrowly defined right [to marry someone of the same-sex], standing by itself, constitutes a fundamental right." Andersen v. King County, No. 04-2-049-64-4, 2004 WL 1738447, at *5 (King County Super. Ct. Aug. 12, 2004).
[24] See Loving, 388 U.S. at 11, 87 S.Ct. 1817 ("[t]here is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification.").
[25] See note 22, supra.
[26] 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting) ("Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved.").
[27] "Heterosexual couples are the only couples who can produce biological offspring of the couple." Madsen, J., op. at 982-983. See Lewis, 378 N.J.Super. at 199, 875 A.2d 259 (Parrillo, J.A.D., concurring) ("a core feature of marriage is its binary, opposite-sex nature.... [T]he binary idea of marriage arose precisely because there are two sexes."); Goodridge, 440 Mass. at 357 n. 1, 798 N.E.2d 941 (Sosman, J., dissenting) ("the reasons justifying the civil marriage laws are inextricably linked to the fact that human sexual intercourse between a man and a woman frequently results in pregnancy and childbirth ... that fact lies at the core of why society fashioned the institution of marriage in the first place."); Hernandez, 2006 N.Y. slip op. 5239, at *5, 2006 N.Y. LEXIS 1836, at *6, ___ N.Y.3d at ___, ___ N.Y.S.2d ___, ___ N.E.2d ___ (Observing that "the vast majority of children are born as a result of a sexual relationship between man and a woman" and noting "the undisputed assumption that marriage is important to the welfare of children.").
[28] See Lewis, 378 N.J.Super. at 197, 875 A.2d 259 (Parrillo, J.A.D., concurring) ("Marriage's vital purpose is not to mandate procreation but to control or ameliorate its consequencesâ the so-called `private welfare' purpose. To maintain otherwise is to ignore procreation's centrality to marriage.").
[29] Sociological studies undermine the suggestion these relationships are "permanent" as contrasted with traditional marriage. See infra, note 44.
[30] See, e.g., Murphy v. Ramsey, 114 U.S. 15, 45, 5 S.Ct. 747, 29 L.Ed. 47 (1885) ("no legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth... than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from the union for life of one man and one woman"); Beason, 133 U.S. at 341, 10 S.Ct. 299 ("[Bigamy and polygamy] tend to destroy the purity of the marriage relation, to disturb the peace of families, to degrade woman and to debase man.").
[31] 1 U.S.C. § 7; 28 U.S.C. § 1738C (1997).
[32] Baehr, 74 Haw. at 570, 852 P.2d 44.
[33] See, e.g., Clerk's Papers (CP) at 465 (Floor Remarks of Rep. Sheehan on Engrossed Substitute House Bill (ESHB) 1130, Feb. 4, 1998):

this bill is about who decides if there's going to be a change in that institution. Should the decision be made by an unelected judge in another state, for example Hawaii or Vermont? Or should the decision be made by those of us here in this state?
See also CP at 477 (Floor Remarks of Rep. Pennington on ESHB 1130, Feb. 4, 1998):
we feel, many of us in the state of Washington and here in this chamber, that we need to assert our right as a state to make this decision, that we don't want it to be done by a judge in either Vermont or Hawaii, that we are the elected body and we should make that decision as much as possible.
[34] The legislative history clearly indicates that legislators supporting and opposing DOMA all understood that preexisting Washington statutes were premised upon marriage as the union of one man and one woman. See, e.g., CP at 444 (Floor Remarks of Rep. Constantine on SHB 1130, Mar. 18, 1997): "the law of the state of Washington, our own revised code of Washington, makes it clear that marriage is between a man and a woman. And our courts have interpreted our statutes that way."
[35] See, e.g., CP at 442 (Floor Remarks of Rep. Sheehan on SHB 1130, Mar. 18, 1997):

And if a court case were to come to the supreme court, they would look to our law, they would look to our statutes to say, how has the legislature spoken on this issue? They can override an appellate court decision. So it is important that it's in our code. It's important that it's in our statute to give that guidance to the court if a case comes before us.
[36] See CP at 460 (Floor Remarks of Rep. Thompson on ESHB 1130, Feb. 4, 1998):

The current law is not a supreme court law and in affect actually does not cover the whole state as law. It is an appellate court decision in the first division....
[37] See CP at 442, Floor Remarks of Rep. Sheehan, quoted supra, note 35.
[38] See, e.g., CP at 443 (Floor Remarks of Rep. Thompson on SHB 1130, Mar. 18, 1997):

We already have one exception, on one type of marriage that we don't allow, on common-law marriages. We don't give common-law marriages in Washington state. But we do accept them from other states. We already have one precedence [sic]. It would be very difficult, unless we have a specific law against it, for us to say, well we're going to accept this one but we're not going to accept that one. And that's where we run into the situation with full faith and credits. But our legal opinions tell us very clearly that if we show a strong position of the people in statute, either from the legislature, an initiative, a referendum, then we have ourselves covered. We have a very strong position. It doesn't mean it can never be overturned. But it does show the best possible condition that we can, under the situation.
[39] See, e.g., CP at 461 (Floor Remarks of Rep. Thompson on ESHB 1130, Feb. 4, 1998):

We already have a precedence [sic] in this case where we have common-law marriage. You can't get a common-law marriage in Washington state, but we accept it from other states. We currently accept all marriages from all other states. This is something that now we have to clarify. This bill gives us that clear statutory policy. It does basically two things: it says, number one, we define marriage as a contract between one man and one woman. That is basically it. But then, two, it says we will not honor any marriages from other states even though they might be legal in other states if they don't meet this requirement of one man and one woman.
[40] Even the Supreme Judicial Court of Massachusetts upheld its state law prohibiting issuance of Massachusetts marriage licenses to nonresident same-sex couples. Cote-Whitacre v. Dep't of Pub. Health, 446 Mass. 350, 844 N.E.2d 623 (Mass.2006). See especially id. at 352-382, 844 N.E.2d 623 (Spina, J., concurring) (citing principles of comity and rejecting plaintiffs' contrary claims based on the Massachusetts Declaration of Rights' guarantees of equal protection and due process and the federal constitution's article IV, section 2 privileges and immunities clause.)
[41] See App. A
[42] Testimony to the legislature underscored the importance of marriage to civil society, citing several studies in support of the principle that children benefit from being raised in families consisting of married mothers and fathers. See CP at 372 (Hearing on HB 1130 Before the House Law and Justice Comm., Feb. 4, 1998 Agenda at 36-37). Documentation provided to the committee, which also is in the legislative record, summarized studies establishing that children do not fare as well in households where there is an adult male who is not the married, biological father of the children. CP at 358.
[43] The assessment summarized:

With respect to fatherlessness, quantifiable deficits occur in literally every area of developmentâ social, psychological, intellectual, educational, emotional, relational, medical, even with respect to longevity, as well as with respect to sexuality, likelihood of cigarette use, drug and alcohol abuse, age of onset of sexual activity and likelihood of teen or earlier pregnancy.
CP at 540 (Decl. of Satinover).
[44] As Dr. Satinover observed:

only recently has it occurred to anyone to question whether children actually need mothers, so that the research confirming they indeed do, convincing as it is, is smaller than that for fathers, whose necessity was first questioned some forty years ago.
CP at 539-40 (Decl. of Satinover).
[45] Studies cited find that the average same-sex female union lasted an average of only 4.9 years, same-sex male couples 6.9 years, and the average heterosexual couple 20 years. See CP at 535 (Decl. of Satinover).
[46] See, e.g., Reno v. Flores, 507 U.S. 292, 310, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (describing a state's express preference for custody of children to reside with their biological parents "whom our society and this court's jurisprudence have always presumed to be the preferred and primary custodians of their minor children."); Bowen v. Gilliard, 483 U.S. 587, 614, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987) (Brennan, J., dissenting) ("`[t]he optimal situation for the child is to have both an involved mother and an involved father.'" (quoting Henry B. Biller, Paternal Deprivation 10 (1974))).
[47] Goodridge, 440 Mass. at 386 n. 23, 798 N.E.2d 941 (Cordy, J., dissenting) cites:

[H. Elaine] Rodney [ & Robert Mupier], Behavioral Differences between African American Male Adolescents with Biological Fathers and Those Without Biological Fathers in the Home, 30 J. Black Stud. 45, 53 (1999) (African-American juveniles who lived with their biological fathers displayed fewer behavioral problems); [Roland J.] Chilton [ & Gerald E. Markle], Family Disruption, Delinquent Conduct and the Effect of Subclassification, 37 Am. Soc. Rev. 93, 95 (1972) (higher proportion of youth charged with juvenile offenses when not living in husband-wife family); [John P.] Hoffmann [& Robert A. Johnson], A National Portrait of Family Structure and Adolescent Drug Use, 60 J. Marriage & Fam. 633 (1998) (children from households with both mother and father reported relatively low use of drugs).
[48] See also Lofton, 358 F.3d at 825:

we must ask not whether the latest in social science research and professional opinion support the decision of the Florida legislature, but whether that evidence is so well established and so far beyond dispute that it would be irrational for the Florida legislature to believe that the interests of its children are best served by not permitting homosexual adoption.
[49] See, e.g., CP at 465 (Floor Remarks of Rep. Sheehan on ESHB 1130, Feb. 4, 1998): "This bill is not about an assault on a group of people or of a lifestyle, this group, this bill is about upholding that institution of marriage." See also, e.g., CP at 477 (Floor Remarks of Rep. Pennington on ESHB 1130, Feb. 4, 1998).
[50] We have before us only the Washington legislative record, but comity and precedent requires we extend the same presumption of legitimacy to the United States Congress and President Clinton in adopting the federal DOMA.
[51] Laws of 1998, ch. 1, § 2.
[52] Goodridge, 440 Mass. at 385, 798 N.E.2d 941 (Cordy, J., dissenting) ("It is difficult to imagine a State purpose more important and legitimate than ensuring, promoting, and supporting an optimal social structure within which to bear and raise children. At the very least, the marriage statute continues to serve this important State purpose.").
[53] See especially, Reynolds, 98 U.S. at 165-66, quoted supra, p. 1003; Murphy, 114 U.S. at 45, 5 S.Ct. 747, quoted supra, p. 1003 note 30; Maynard, 125 U.S. at 213, 8 S.Ct. 723, quoted supra, p. 1008.
[54] Justice Sanders and I dissented from this court's decision in In re Election Contest filed by Coday, 156 Wash.2d 485, 130 P.3d 809 (2006) that later challenges to the problematic 2004 gubernatorial election were controlled by one trial court decision that was not appealed. The underlying issue preclusion theory applies to these cases since all claims have now been considered and disposed of by this court.
[1] Although the title of the Castle court's memorandum opinion refers to RCW 26.02.010 and RCW 26.02.020, no such statutes exist. See CP at 93. The opinion later correctly refers to RCW 26.04.010 and RCW 26.04.020, which are the statutes at issue in the case. See CP at 95.
[2] Despite the plurality's attempts to distance itself from the concurrence, the plurality itself acknowledges that the concurrence "merely repeats the result and much of the reasoning of the [plurality's] decision on most issues." Plurality at 990. In truth, the concurrence fills the noticeable, and presumably intentional, omissions in the plurality's reasoning. The plurality notably avoids any real discussion of the State's interest in excluding same-sex couples from civil marriage and focuses exclusively on the State's interest in marriage for opposite-sex couples. See, e.g., plurality at 983 ("[R]earing children in a home headed by their opposite-sex parents is a legitimate state interest furthered by limiting marriage to opposite-sex couples because children tend to thrive in families consisting of a father, mother, and their biological children."). The concurrence, on the other hand, more directly addresses the necessarily discriminatory correlative of that argument. See, e.g., concurrence at 1006 ("Direct comparisons between opposite-sex homes and same-sex homes further support the former as a better environment for children."). As Justice Antonin Scalia noted in his dissent in Lawrence v. Texas, 539 U.S. 558, 601, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), "`preserving the traditional institution of marriage' is just a kinder way of describing the State's moral disapproval of same-sex couples." (Scalia, J., dissenting) (quoting id. at 585, 123 S.Ct. 2472 (O'Connor, J., concurring)). As much as the plurality would like to deny the discriminatory impact of its decision to uphold an unconstitutional law, that is the plurality's result.
[3] The plurality and concurrence also incorrectly assert that by analyzing whether the fundamental right to marry extends to a class of individuals to whom it historically has been denied that I am somehow creating a new fundamental right. See plurality at 979; concurrence at 999. United States Supreme Court precedent has taught us again and again that framing the inquiry into a constitutional right in such a narrow way misunderstands and undermines the value of the right at stake. See, e.g., Lawrence, 539 U.S. at 567, 123 S.Ct. 2472 (overruling a previous Supreme Court decision that framed the liberty interest in sexual privacy as whether there was a fundamental right to homosexual sodomy, which disclosed that Court's "failure to appreciate the extent of the liberty at stake.").
[4] What is at issue here is solely civil marriage defined by RCW 26.04.010(1) as a "civil contract." Granting same-sex couples the right to marry has no effect upon religious recognition of marriage or who is entitled to that recognition.
[5] The trial court opinion in Andersen lists "but a few" examples of such rights and responsibilities afforded to married persons and the statutes in which they reside: rights to property and income under the community property laws (chapter 26.16 RCW); the right to inherit property (chapters 11.04 and 11.28 RCW); court oversight into dissolution of the relationship and equitable distribution of assets, as well as protection of the best interests of the children involved (chapter 26.09 RCW); benefits in the employment arena, such as renewing a deceased spouse's commercial fishing license (chapter 77.65 RCW), health care services (chapter 48.44 RCW), retirement benefits (chapter 41.40 RCW), and state taxes (chapter 82.45 RCW); the right to bring wrongful death actions on behalf of one's spouse (chapter 4.20 RCW); and the right to assert the spousal testimonial privilege (chapter 5.60.060 RCW). See CP (Andersen) at 881.
[6] H.R.Rep. No. 104-664, at *2, *4-6 (1996), reprinted in 1996 U.S.C.C.A.N. 2905, 2906, 2908-10.
[7] The federal DOMA, codified at 28 U.S.C. § 1738C, provides that:

No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.
And at 1 U.S.C. § 7, defines "`marriage'" as "a legal union between one man and one woman as husband and wife" and "spouse" as "a person of the opposite sex who is a husband or a wife."
[8] Among other justifications for denying same-sex couples the right to marry was moral disapproval: "Civil laws that permit only heterosexual marriage reflect and honor a collective moral judgment about human sexuality. This judgment entails both moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality." H.R. Rep. No. 104-664, at *15-16, reprinted in 1996 U.S.C.C.A.N. 2919-20 (footnote omitted).
[9] DOMA was codified in and amended RCW 26.04.010 and .020.
[10] "It is clear that there is no question of legislative intent.... The legislature's intent is to prohibit same-sex marriage as contrary to our civil law." CP (Castle) at 96.
[11] The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? ... It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.

....
[A]n act of the legislature, repugnant to the constitution, is void.
Marbury v. Madison, 5 U.S. 137 (1 Cranch), 176-77, 2 L.Ed. 60 (1803); see also Wash. State Labor Council v. Reed, 149 Wash.2d 48, 62, 65 P.3d 1203 (2003) (Alexander, C.J.) ("The ultimate power to interpret, construe, and enforce the constitution of this state belongs to the judiciary.... This is so even when that interpretation serves as a check on the activities of another branch or is contrary to the view of the constitution taken by another branch.") (citations omitted).
[12] For the purposes of the analysis here, I assume, like the plurality, that article I, section 12 of the Washington Constitution does not give greater protection than the federal equal protection clause in this situation. See Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wash.2d 791, 806-10, 83 P.3d 419 (2004) (Grant County II). Although I would not foreclose the possibility that article I, section 12 provides greater protection, I do not reach the issue because I would hold that DOMA fails even rational basis review.
[13] Respondents also argue that denial of the right to marry arbitrarily violates their substantive due process right to liberty. The same rational basis analysis applies to the same-sex couples' due process claims. Because DOMA fails rational basis review under the privileges and immunities clause, it also fails rational basis review under the due process clause.
[14] "The guaranty of `equal protection of the laws is a pledge of the protection of equal laws.'" Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (quoting Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)).
[15] The requirement that a classification have a rational basis dictates that the issue in this case be framed as whether the exclusion of same-sex couples from civil marriage is rationally related to a legitimate interest. The privileges and immunities clause of the Washington Constitution and the equal protection clause of the federal Constitution require that this court make this inquiry, otherwise this court would not be able to determine if the classification was drawn for the purpose of disadvantaging Washington's gay and lesbian citizens. This court must determine whether allowing opposite-sex couples and not same-sex couples to marry furthers a legitimate interest, not merely whether allowing opposite-sex couples to marry furthers a legitimate interest.
[16] The plurality focuses too greatly on the deference afforded by rational basis review and in doing so, conducts no real analysis at all. "Read the constitution, and read it once again, I find no textual support for the proposition that a usurping legislature may impose an unconstitutional, yet `doubtful,' legislative act beyond the remedy of judicial review." Island County v. Washington, 135 Wash.2d 141, 156, 955 P.2d 377 (1998) (Sanders, J., concurring).
[17] See e.g., Willoughby v. Dep't of Labor & Indus., 147 Wash.2d 725, 741-42, 57 P.3d 611 (2002) (blanketly rejecting every proposed rational basis for a statutory bar to disbursing industrial insurance permanent partial disability benefits to prisoners without statutory beneficiaries who were unlikely to be released from prison); In re Det. of Brooks, 145 Wash.2d 275, 292, 36 P.3d 1034 (2001) (holding that preventing the subject of a commitment petition from presenting evidence of less restrictive alternatives to confinement until after commitment trial bears no rational relationship to the state's interest in public safety), over-ruled in part by In re Det. of Thorell, 149 Wash.2d 724, 72 P.3d 708 (2003); DeYoung, 136 Wash.2d at 147-50, 960 P.2d 919 (concluding that an eight-year statute of repose for medical malpractice claims was not rationally related to the State's interest in protecting insurance companies because the statute would only reduce insurance claims by 0.2 percent, a relationship that was "too attenuated"); Hunter v. N. Mason High Sch., 85 Wash.2d 810, 818-19, 539 P.2d 845 (1975) (holding that nonclaim statutes requiring victims of governmental torts to give notice of their claims within a short period after they arise bear no rational relationship to the legislature's goals of ensuring that large governmental institutions are notified of claims or facilitating governmental institution's budget planning); see also State v. Marintorres, 93 Wash.App. 442, 452, 969 P.2d 501 (1999); Simpson v. State, 26 Wash.App. 687, 695, 615 P.2d 1297 (1980).
[18] It is far from clear that those goals are legitimate state interests to begin with, but because I find that DOMA is not rationally related to any proffered state interest, I do not dissect them.
[19] The only rational basis the plurality proposes to support denying same-sex couples the right to marry is "the need to resolve the sometimes conflicting rights and obligations of the same-sex couple and the necessary third party in relation to a child." Plurality at 982. Although the meaning of that statement is unclear, the plurality appears willing to deny same-sex couples the right to marry because there are often third parties involved in conceiving children, which creates conflicting and confusing rights and relationships. But infertile opposite-sex couples also involve third parties in conceiving or adopting children, and yet they are still allowed (and apparently encouraged) to marry. Additionally, this court's recent decision in In re Parentage of L.B., concluding that a lesbian mother who was biologically unrelated to her child could establish de facto parent status undercuts this reasoning. 155 Wash.2d 679, 711-12, 122 P.3d 161 (2005).

Furthermore, denying same-sex couples the right to marry does not make resolving individuals' conflicting parental rights and obligations easier. If anything, denying same-sex parents the right to marry would seem to make resolving parental rights and obligations more difficult. This reason certainly is not a rational basis for denying same-sex couples the right to marry.
[20] The trial court in Andersen poignantly defined the issue here as "whether barring committed same-sex couples from the benefits of the civil marriage laws somehow serves the interest of encouraging procreation." CP (Andersen) at 894.
[21] This reasoning accords with that of other state courts that have found no rational relationship between denial of the right to marry to same-sex couples and any legitimate state interest. See, e.g., Goodridge, 440 Mass. at 341, 798 N.E.2d 941 ("The absence of any reasonable relationship between, on the one hand, an absolute disqualification of same-sex couples who wish to enter into civil marriage and, on the other, protection of public health, safety, or general welfare, suggests that the marriage restriction is rooted in persistent prejudices against persons who are (or who are believed to be) homosexual."); Baker, 744 A.2d at 886 ("[W]e conclude that none of the interests asserted by the State provides a reasonable and just basis for the continued exclusion of same-sex couples from the benefits incident to a civil marriage license under Vermont law."); In re Coordination Proceeding, Special Title [Rule 1550(c)], Marriage Cases, No. 4365, 2005 WL 583129, at *2 (Cal.Super.Ct. Mar. 14, 2005) (unpublished order) (concluding that state statutes defining marriage to be between a man and a woman violated equal protection under either a rational basis or strict scrutiny analysis); People v. Greenleaf, 5 Misc.3d 337, 780 N.Y.S.2d 899, 901 (2004) ("I find that `tradition' is not a legitimate state interest, and that prohibiting same-sex couples from marrying is not rationally related to furthering the state's legitimate interest in providing a favorable environment for procreation and child-rearing."); People v. West, 4 Misc.3d 605, 780 N.Y.S.2d 723, 725 (2004).
[22] "[T]he concept is a living one, that it guarantees basic rights, not because they have become petrified as of any one time, but because due process follows the advancing standards of a free society as to what is deemed reasonable and right." Poe v. Ullman, 367 U.S. 497, 518 n. 9, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Douglas, J., dissenting).
[23] The concurrence takes this argument one step further and argues that the "United States Supreme Court has directly rejected the argument that a fundamental right to marry extends to same-sex unions" by citing Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185 (1971), appeal dismissed, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). Concurrence at 999. It goes without saying that the Supreme Court's dismissal "for want of substantial federal question" does not settle the substantive issues of a case and does not stand for the proposition that the concurrence asserts. Baker, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65.

Additionally, the concurrence implies that the Court also settled the issue in Lawrence. Concurrence at 999-1000. However, the Lawrence majority only acknowledged that that case did not present the issue of "whether the government must give formal recognition to any relationship that homosexual persons seek to enter." 539 U.S. at 578, 123 S.Ct. 2472. Similarly, Justice Sandra Day O'Connor's statement in her concurrence that "other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group" was mere dicta and did not address whether those interests were rationally related to any law. Id. at 585, 123 S.Ct. 2472 (O'Connor, J., concurring). Thus, neither of the cases cited by the concurrence guides this court's determination.
[24] An Alaska superior court declaring that the fundamental right to marry extends to same-sex couples discussed the error of too narrowly defining the right at stake:

When the Supreme Court of Hawaii in Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44 (Hawaii 1993), addressed same-sex marriage, it noted that:
"[W]e do not believe that a right to same sex marriage is so rooted in the traditions and collective conscience of our people that failure to recognize it would violate the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions... 852 P.2d at 57." The Hawaii court could reach such a conclusion because of the question it chose to ask. It is self-evident that same-sex marriage is not "accepted" or "rooted in the traditions and collective conscience" of the people. Were this not the case, Brause and Dugan and the plaintiffs in Baehr would not have had to file complaints seeking precisely this right.
Brause v. Bureau of Vital Statistics, No. 3AN-95-6562 CI, 1998 WL 88743, at *4 (unpublished order) (Alaska Super.Ct. Feb. 27, 1998).
[25] The dissenting opinions in Bowers foreshadowed that conclusion. See, e.g., Bowers, 478 U.S. at 199, 106 S.Ct. 2841 (Blackmun, J., dissenting) ("This case is no more about `a fundamental right to engage in homosexual sodomy,' as the Court purports to declare, ... than Stanley v. Georgia, 394 U.S. 557[, 89 S.Ct. 1243, 22 L.Ed.2d 542] (1969), was about a fundamental right to watch obscene movies, or Katz v. United States, 389 U.S. 347[, 88 S.Ct. 507, 19 L.Ed.2d 576] (1967), was about a fundamental right to place interstate bets from a telephone booth. Rather, this case is about `the most comprehensive of rights and the right most valued by civilized men,' namely, `the right to be let alone.'") (quoting Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)).
[26] Despite the plurality's and concurrence's suggestions to the contrary, neither this court nor the United States Supreme Court has ever described this right as the right to choose to marry a person of the opposite sex. Plurality at 979 ("Federal decisions have found the fundamental right to marry at issue only where opposite-sex marriage was involved."); concurrence at 999 ("Every United States Supreme Court decision concerning the right to marry has assumed marriage as the union of one man and one woman.").
[27] Even if the right to marry is somehow linked to fundamental rights of procreation, childbirth, and child rearing, as the plurality espouses, that link cannot be a basis to deny the right to marry to same-sex couples because we allow them to adopt and rear children. The same liberty and privacy interests historically recognized in decision making pertaining to the family is at stake here.
[28] Although I do not believe that this court's determination of whether DOMA is unconstitutional is dependent on whether there is a "societal commitment" to same-sex marriage (plurality at 979), there is evidence that attitudes toward same-sex marriage are shifting. Recent polls indicate that only a slim majority of Americans (51 percent) now oppose legalizing same-sex marriage, down from 63 percent in February 2004. Survey Report, Less Opposition to Gay Marriage, Adoption and Military Service, THE PEW RESEARCH CENTER FOR THE PEOPLE AND THE PRESS, Mar. 22, 2006, at 1, available at http://www.people-press.org.
[29] As this opinion clearly states, I reach this conclusion based on my reading of the United States Supreme Court's recognition of marriage as a fundamental right and the Washington Constitution's protection of that right through the privilege and immunities and due process clauses. Suggestions by the plurality and the concurrence that I reach this determination by "judicial fiat" or based on "personal views" are unsuccessful attempts to deflect attention from the discriminatory impact of unconstitutional statutes. Concurrence at 1001; plurality at 968.

In so concluding, I join the other state courts that have held that the fundamental right to marry includes the right to choose a marriage partner of the same sex. See, e.g., Goodridge, 440 Mass. at 327-28, 798 N.E.2d 941; Brause, 1998 WL 88743, at *4-5 (asking whether freedom to choose one's life partner is so rooted in our history and traditions that it is a fundamental right, and concluding that "choice of a life partner is personal, intimate, and subject to the protection of the right to privacy" such that government intrusion into that right is subject to strict scrutiny). The plurality points to other courts that have come to the opposite conclusion. See plurality at 978. The plurality is correct that some jurisdictions have refused to extend the fundamental right to marry to same-sex couples, but they incorrectly imply that all courts recently considering the issue have done soâ courts across the country and even within the same states are coming to different conclusions on these related issues. See, e.g., Deane v. Conaway, 2006 WL 148145 (Md.Cir.Ct.2006) (holding that Maryland's marriage statute unconstitutionally discriminated on the basis of sex and was void) (unpublished opinion).
[30] Because I would find DOMA unconstitutional on those two, independent bases, I do not address the applicability of article I, section 7 or the ERA, nor do I consider whether strict scrutiny is appropriate under article I, section 12 because respondents constitute a suspect class.
[1] While exact figures are not available, particularly where lesbians are concerned, homosexuals likely comprise anywhere from 1 to 10 percent of the population. See The Shrinking Ten Percent, TIME MAGAZINE, Apr. 26, 1993, at 27. Thus, no matter what figure within that range one espouses, it is indisputable that gays and lesbians are a marked minority.
[2] For example, unless a municipality provides otherwise, under Washington's new law gays and lesbians have no access to a partner's "medical, life, and disability insurance, hospital visitation and other medical decision making privileges, spousal support, intestate succession, homestead protections, and many other statutory protections." Baker v. State, 170 Vt. 194, 744 A.2d 864, 870, 883-84 (1999). See CHAUNCEY, supra, at 111-16 (detailing the myriad legal vulnerabilities still suffered by gays and lesbians even where they are afforded protections in employment, housing, and lending).
[3] Badgett suggests that the stereotype about the wealth of homosexuals is based on data gathered from marketing research specifically targeted at wealthier homosexuals, rather than on empirical data gathered in economic studies. BADGETT, supra, at 24-26.
[4] I note that while evidence of political powerlessness has consistently been linked to the areas explored above, there are other areas not discussed by the parties that might have evinced a lack of political power. For example, this discussion might have benefited from a study of the financial resources of various gay and lesbian organizations as compared to other agenda-based organizations, particularly in the area of lobbying.
[5] In addition to concluding that gays and lesbians as a class are politically powerful, the plurality and concurrence also conclude homosexuality is not an immutable characteristic. Neither science nor religious tenets can conclusively prove or disprove this proposition. Indeed, the resolution of this question has proved to be something of a struggle for courts. Compare High Tech Gays, 895 F.2d at 573-74 (concluding that homosexuality is not immutable for the purpose of an equal protection analysis because it is behavioral and one could refrain from the conduct) with Herandez-Montiel v. I.N.S., 225 F.3d 1084, 1093 (9th Cir.2000) (holding that sexual orientation and sexual identity are immutable). But the law can resolve this question. Rather than being merely an unchanging characteristic, "`immutability' may describe those traits that are so central to a person's identity that it would be abhorrent for government to penalize a person for refusing to change them, regardless of how easy that change might be physically." Watkins v. United States Army, 875 F.2d 699, 726 (9th Cir.1989) (Norris, J., concurring); see Hernandez-Montiel, 225 F.3d at 1093. Courts and legislators therefore should not conclude that homosexuality is mutable because reasonable minds disagree about the causes of homosexuality or because some religious tenets forbid gays and lesbians from `acting on' homosexual behavior. Instead, courts should ask whether the characteristic at issue is one governments have any business requiring a person to change. Viewed in that light, homosexuality should properly be considered as a static characteristic. While one may debate the "causes" of homosexuality, there can be little argument that the expression of consensual sexual, affectionate, or romantic attraction is an integral part of an individual's personal and social identity. Amicus Curiae Br. of Am. Psychological Ass'n at 8-10 (arguing that "[O]ne's sexual orientation defines the universe of persons with whom one is likely to find the satisfying and fulfilling relationships that, for many individuals, comprise an essential component of personal identity.").
[6] I do not mean to imply that all religious organizations object to same-sex marriage. Some have been quite outspoken in support of the gay and lesbian members of their congregations who wish to marry. Indeed, a coalition of 18 Washington churches, temples, and synagogues filed an amicus brief in support of the plaintiffs in this case. As discussed below, I agree with Judge Downing that it is not for secular government to choose between religions or take moral or religious sides in this debate. Andersen v. King County, No. 04-2-04964-4, 2004 WL 1738447, at *8 (King County Super. Court Aug. 4, 2004).
[7] In some religions, the church's involvement in marriage has evolved over time. For example, one historian notes that the sacramental character of marriage was not formally adopted by the Roman Catholic Church until the mid-fifteenth century. CHAUNCEY, supra, at 79. It was not until the sixteenth century that the Catholic Church required a ceremony in the presence of a priest. Id.
[8] While considering the history of civil marriage in this nation in general, and in Washington in particular, we should also remember some "traditional" aspects of the marriage institution that have (quite correctly) fallen by the wayside. In addition to the anti-miscegenation laws discussed at length in Justice Fairhurst's opinion, the legal doctrine of coverture (suspending the very legal existence of a woman during marriage), restrictions on divorce, restrictions on remarriage after divorce, and the marital exemption to the crime of rape were all once widely accepted aspects of the institution of marriage. See, e.g., Bradwell v. Illinois, 83 U.S. (16 Wall.) 130, 141, 21 L.Ed. 442 (1872) (Bradley, J., concurring); Hernandez v. Robles, 26 A.D.3d 98, 805 N.Y.S.2d 354, 381-82 (2005) (Saxe, J., dissenting). If nothing else, history demonstrates that marriage is not a stagnant institution, and any scholar of the history of women's rights in this country is aware of the evolving nature of the institution in our society.
[9] Unless otherwise noted, the legislative history materials discussed in this opinion are on file with the Washington State Archives.
[10] For additional examples of blatantly discriminatory language in the legislative history of the federal DOMA, on which Washington's DOMA was based, see Note: Litigating the Defense of Marriage Act: The Next Battleground for Same-Sex Marriage, 117 HARV. L. REV. 2684, 2701-04 (2004).
[11] Justice J.M. Johnson's concurrence argues that the DOMA does not discriminate against gays and lesbians because it does not allow anyone to marry a person of the same sex, even heterosexual people, and also does not prohibit gays and lesbians from marrying members of the opposite sex. Concurrence (J.M. Johnson, J.) at 996. I am reminded of the adage cautioning that to say too much says nothing at all. A marriage is frequently distinguished from other social relationships by the presence of romantic love and sexual attraction. Heterosexual people by definition are not interested in pursuing a sexual or romantic relationship with individuals of the same sex and thus are likely not interested in marrying them. Therefore, the DOMA is not at all applicable to heterosexual people. Its irrelevance to heterosexuals does not translate into a lack of discrimination against homosexuals. Likewise, as discussed in more detail below, it is equally imprudent to conclude that the DOMA is not discriminatory because it affords homosexuals the ability to marry a person for whom they have no romantic or sexual attraction.
[12] In his concurrence, Justice J.M. Johnson draws a comparison between same-sex marriage and polygamy. Concurrence (J.M. Johnson, J.) at 1003. Comparing same-sex marriage to polygamy is like comparing chalk to cheese. Of course, each of the plaintiffs in this case seeks to marry a person whom they love; none seeks to enter into a plural marriage. Indeed, in Lawrence, Justice Antonin Scalia was unable to convince a majority of the United States Supreme Court that the specter of polygamy should overcome the Lawrence Court's legal reasoning. The same tactics should also fail here. See Amicus Curiae Br. of the Libertarian Party of Washington State et al. at 2 n.1 ("The `slippery slope' issues raised by Appellants ... should not provide sensationalistic distractions.").
[13] In fact, a recent review of 15 different studies addressing the effects on children of growing up in a same-sex household reveals that those children "are no more likely to have problems with self-esteem, psychological adjustment, or gender identity than kids [raised] with heterosexual parents." Kids With Gay Parents Do Just Fine, PARENTS MAGAZINE, Feb. 2006, at 46.
[14] I also note that Justice J.M. Johnson's concurrence argues a child "thrive[s] best" in families headed by his or her biological father and mother. Concurrence (J.M. Johnson, J.) at 1005. This argument not only invalidates the many healthy and happy family constellations consisting of adoptive parents, foster parents, or stepparents, but it is also premised in part on the astonishing and scientifically faulty notion that homosexuals are often pedophiles. Concurrence (J.M. Johnson, J.) at 1005 n.42 (citing CP at 358 (testimony from Family Council relaying abstracts of studies purporting to find high percentage of gay men are pedophiles)). In fact, this corrosive stereotype has been debunked by noted experts in the field of psychology and in courts alike. See, e.g., Marc E. Elovitz, Adoption by Lesbian and Gay People: The Use and Mis-Use of Social Science Research, 2 DUKE J. GENDER L. & POL'Y 207, 216-17 & n.55 (1995) (citing Gregory M. Herek, Myths About Sexual Orientation: A Lawyer's Guide to Social Science Research, 1 LAW & SEXUALLY 133, 156 (1991)); Dale v. Boy Scouts of Am., 160 N.J. 562, 734 A.2d 1196, 1243 (1999), rev'd on other grounds, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) ("The myth that a homosexual male is more likely than a heterosexual male to molest children has been demolished.").
[15] In contrast to the lack of legitimate reasons for justifying the DOMA, there is voluminous argument presented by amici and parties attesting to the psychological, social, financial and political harm prohibitions like the DOMA visit upon the partners in a same-sex relationship, and upon any children raised within that union.
[1] In Sofie, Justice Utter cogently noted that this court had "generally followed the federal tiered scrutiny model of equal protection analysis .... because a separate analysis focusing on the language and history of our state constitution has not been urged." Sofie, 112 Wash.2d at 640, 771 P.2d 711 (citation omitted).
[2] See also Barbara Mahoney, The Privileges or Immunities Clause in the Washington State Constitution: A Source of Substantive Rights? 4-6 (Feb. 12, 2002) (unpublished manuscript available in the University of Washington Gallagher Law Library); Barbara J. Rhoads-Weaver, Has the Legislature Crossed the Boundaries Imposed by Article I, § 12 of the Washington Constitution by Using Class Legislation to Grant Marriage Licenses Exclusively to Opposite-Sex Couples? (Spring 2002) (unpublished manuscript on file in the Washington State Supreme Court).
[3] I agree with my colleagues Justices Jim Johnson and Richard Sanders to this extent; the appropriate analytical approach to article I, section 12 is to determine (1) whether the law grants a privilege or immunity and (2) whether it is available to all on equal terms. See concurrence (J.M. Johnson, J.) at 993.
[4] As the Oregon Supreme Court held: "The provisions of the state Constitution are the antithesis of the fourteenth amendment in that they prevent the enlargement of the rights of some in discrimination against the rights of others, while the fourteenth amendment prevents the curtailment of rights." Savage, 96 Or. at 59, 184 P. 567; see also Tanner v. Or. Health Scis. Univ., 157 Or.App. 502 522-25, 971 P.2d 435 (1998) (construing Oregon's privileges and immunities clause to protect gays and lesbians).
[5] I stress that the lead opinion does not explicitly hold that the privileges and immunities clause applies only when a statute grants a privilege or immunity to a minority.
[6] It is important to remember that in Smith, the issue discussed by Justice Utter was whether disparate treatment between juvenile defendants and adult defendants either discriminated against juveniles in violation of equal protection or was a privilege for adults. In the criminal justice system, adults are not a minority. Similarly, in Clark the issue was whether a preliminary hearing available to most criminal defendants but not to those indicted by grand jury was a privilege to the majority.